```
           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
```

```
UNITED STATES OF AMERICA      *    Case No. 18-CR-654(KAM)
                              *
                              *    Brooklyn, New York
                              *    November 27, 2018
      v.                      *
                              *
DARRELL WOODFORD,             *
                              *
            Defendant.        *
                              *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

```
        TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
             BEFORE THE HONORABLE STEVEN M. GOLD
                 UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

For the Government:          PENELOPE BRADY, ESQ.
                             Asst. United States Attorney
                             United States Attorney's Office
                             271 Cadman Plaza East
                             Brooklyn, NY 11201


For the Defendant:           ALLEGRA W. GLASHAUSSER, ESQ.
                             Federal Defenders of New York,
                              Inc.
                             One Pierrepont Plaza, 16th
                             floor
                             Brooklyn, NY  11201




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 11:35 a.m.)

2               THE CLERK: Criminal cause for a bail application,

3     docket no. 18-1138M, USA vs. Darrell Woodford.  Counsel,

4     please state your name for the record.

5               MS. BRADY:  Penelope Brady for the government.

6     Good morning, again, Your Honor.

7               THE COURT:  Good morning.

8               MS. GLASHAUSSER:  Good morning, Your Honor.

9     Allegra Glashausser, representing Mr. Woodford.

10              THE COURT:  Mr. Woodford, do you speak and

11    understand English?

12              THE DEFENDANT:  Yes.

13              THE COURT:  What's the application?

14              MS. GLASHAUSSER:   Yes, Your Honor.

15         So I have three sureties to pose for Your Honor.

16         Unfortunately, I believe one of them is on -- Mr.

17    Woodford's father is on his -- I think his bike.  He is

18    almost here.  He is a bike messenger. So I expect him to walk

19    in while we're speaking here.

20         Mr. Woodford's grandmother is available by phone.

21    She is in Pennsylvania right now.

22              THE COURT:  She or he?  I thought you said

23    grandfather.

24              MS. GLASHAUSSER:   So the three people are his

25    father, his grandmother and his aunt.

3

1          THE COURT:  Grandmother. I'm sorry. I misheard you.

2          MS. GLASHAUSSER:  So his father I expect to walk

3     in, hopefully, any moment.

4          His grandmother is available by phone.  She just

5     took a brief vacation to Pennsylvania, and then his Aunt

6     Deanna was due to be here.  I fear that she may not make it

7     today, but is willing to sign at a future date.

8          Just to give you a little information about his

9     suretors, his father and his grandmother both live in the

10    same home where Mr. Woodford was living and where -- Mr.

11    Woodford has grown up in New York City. He's lived here his

12    entire life.

13         So the proposal would be to live with them in that

14    home.  His father is a bike messenger and his grandmother is

15    a medical technologist.  And she makes a good salary. She

16    makes $100,000 a year.  His father makes significantly less,

17    about $400 a week.

18         And then his aunt, who he also grew up with, has a

19    job as a -- at the FCO Family Services.  It's a counseling

20    job and she makes $17 an hour and about $33,000 a year.

21         So the proposal would be those three suretors.  And

22    his grandmother does make a significant amount of money.

23         To give you same background to Mr. Woodford, he's

24    only 18 years old and he was living in his family home.  He

25    recently took his GED.  He's awaiting the result.

4

1              And I'm sure Your Honor has seen from the report

2        that he has a significant prior felony conviction.

3              THE COURT:  Not only felony, but violent felony.

4        That's the problem here.  It's not risk of flight.  It's

5        violence.

6              MS. GLASHAUSSER:   I understand, Your Honor.  It is

7        a significant --

8              THE COURT:  And it's multiple episodes of violence.

9        I don't know what to do about that.  And I don't know how

10       this bail package addresses it.

11             MS. GLASHAUSSER:   Well, Your Honor, there are a

12       couple of things that I'd like to point out to Your Honor.

13             The first thing is while that prior conviction is

14       undeniably serious, I understand that he was released by the

15       parole board at the first available opportunity, which I

16       think at least signals that the New York State Parole Board -

17       -

18             THE COURT:  When was he released on parole?

19             MS. BRADY:   May 29th.

20             THE COURT:  Of?

21             MS. BRADY:   This year.

22             THE COURT:  And on August 30th he's on video

23       shooting somebody, according to the government's allegations.

24       Am I right?

25             MS. BRADY:   Correct.

5

1          MS. GLASHAUSSER:   And so this is what's a little

2     difficult for me about this situation is I have not seen the

3     video. I have not seen any pictures from the video.  And from

4     the complaint it's not clear to me how Mr. Woodford is

5     identified in the video or how strong that identification is.

6          THE COURT:  I'm sure we can arrange for discovery

7     of the video.

8          MS. BRADY:   Your Honor, there are several reasons

9     --

10          THE COURT:  I'll watch it.

11          MS. BRADY:   -- I would not want to disclose the

12     video at this point.

13          I can represent as an officer of the court that I

14     have seen the video.  There are actually several videos that

15     track him through a time period that includes the shooting.

16          And the video of the shooting, you can actually see

17     the victim on the ground and that defendant shooting him.

18     You see the flash from the gun.

19          THE COURT:  I don't understand why they wouldn't be

20     discoverable if they're being relied upon in a detention

21     application?

22          MS. BRADY:   Your Honor, I would turn them over in

23     the normal course of discovery, after indictment, but there

24     is a reason I would not want to address on the public record

25     for why I would not want to disclose them early.

6

1          THE COURT:  Okay.  If we went to a dangerousness

2     hearing, how would you prove it?

3          MS. BRADY:   Well, Your Honor, I have -- if you'd

4     like -- I didn't know if you wanted to let Ms. Glashausser

5     finish, but I'm happy to address my arguments at this time,

6     if you'd like.

7          THE COURT:  No.  We'll let Ms. Glashausser finish.

8          MS. GLASHAUSSER:   So I think as Your Honor's

9     questions illustrate, there are a few -- there are some

10    problems with the weight of the evidence, at last as Your

11    Honor and I can see them.

12         I understand from the representation of the

13    prosecutor they can see a shooting, but the issue would be

14    his identification.    He's not arrived with any weapons of

15    any sort and is arrested many weeks later.

16         And he also was charged with a parole violation on

17    the same conduct in state parole and that was dismissed.  And

18    the State apparently never filed charges either.  And I'm

19    just not -- it's actually impossible for me to assess the

20    weight of the evidence.  It does not seem strong to me, from

21    my position here today.

22         And I do think that's something that Your Honor

23    strongly needs to take into account here and I also do not

24    know the reason why we cannot see the video at this stage to

25    assess how serious this case is, and whether he is a serious

7

1    risk of danger.

2            Because from the evidence that the government has

3    presented, there's a past conviction in 2015 that was

4    serious, when Mr. Woodford was only 15 years old.

5            And children, of course, change dramatically as

6    they're growing up, and Mr. Woodford was released at his

7    earliest opportunity and was living with family, recently

8    took his GED.  You know, making some strides forward.

9            And, you know, he's so young it's hard to assess

10   over time how Mr. Woodford is doing, but he has this strong

11   family support to help his succeed, if he were released.

12       Both his father and his grandmother live in the same

13   home where Mr. Woodford would live, and his aunt and other

14   family members were all there for him to (inaudible, audio

15   malfunction) bet on the right path.

16           So I think (inaudible, audio malfunction) that

17   watching the video would be appropriate, because that seems

18   to be the (inaudible, audio malfunction) component here that

19   would change that calculus.

20           THE COURT:  Thank you. I understand.

21           MS. BRADY:   Your Honor, it's the government's

22   position, as is Pretrial's position from the report, that a

23   permanent order of detention should be issued against this

24   defendant.

25           I would disagree that there is a flight risk. I

8

1    actually do think that there is a flight risk in this case.

2              The defendant in Manhattan was charged with four

3    separate violent robberies.  They were consolidated in one

4    case in the indictment.

5              Three of those robberies he displayed what appeared

6    to be a firearm, and one of those robberies the complainant

7    was physically injured.

8              During the pendency of that case, the judge in

9    state court allowed Mr. Woodford to try to earn a juvenile

10   offender treatment by attending a program.

11             He did very poorly in that program and did not

12   return to court on that case.  A bench warrant was issued.

13   The warrant squad went to apprehend him on the bench warrant

14   that was issued and when they --

15             THE COURT:  And they got him the next day, right?

16             MS. BRADY:  I'm sorry?

17             THE COURT:  The bench warrant -- they got him

18   within two weeks.

19             MS. BRADY:  Correct.  Because they knew his

20   address.  When they went to apprehend him --

21             THE COURT:  So he didn't show up to court, but he

22   didn't flee.

23             MS. BRADY:  He did not come to court as directed.

24             THE COURT:  Yeah.  He failed to appear.

25             MS. BRADY:  Correct.

9

1          When the warrant squad attempted to apprehend him,

2     he was hiding in a bathroom with ammunition and an imitation

3     firearm.

4          In addition to hiding into that bathroom, as his

5     judge in state court noted, not only did he put his whole

6     family in danger by doing that, but the judge in that case

7     was particularly disturbed that the defendants asked his

8     younger sister to stay in the bathroom and hide with him,

9     putting her in danger, obviously, and putting everyone in the

10    situation in danger.

11         I've gotten this information from the assigned

12    assistant in New York County who was assigned to Mr.

13    Woodford's robbery cases.

14         He allocuted -- he had to plead to the entire

15    indictment and, obviously, he was sentenced on that case to a

16    state prison term, I believe to three and a half to seven

17    years.

18         As far as dangerousness, Your Honor, the factors

19    outlined in 3142(g), the nature and circumstances of this

20    case, again, he shot someone using a firearm.  The shell

21    casings were recovered.  So obviously a firearm was involved.

22         As to the weight of evidence, obviously, I

23    represented to you that that shooting is on video. In

24    addition to the video tracing him through the area that you

25    can see the gun go off.

1          As to his history and characteristics, we've

2     already addressed his criminal history and his robberies.  He

3     was paroled, as Your Honor asked, on May 29th and this

4     incident occurred while the defendant was still on parole.

5          In addition he is a self reported gang member. He

6     reported that to the New York City Department of Corrections

7     when he was in the process of intake.  They obviously do a

8     safety assessment.  They don't want rival gang members near

9     each other and so that's the purpose of that interview.

10         But in that interview he self reported that he was

11    a member of the Eight Tray Cowboy Crips.  In addition, he is

12    noted in the New York City Department of Corrections

13    paperwork that he was involved in a gang related fight while

14    he was in New York City Department of Corrections custody.

15         And for all of those reasons, Your Honor, the

16    government's position is that there is no combination of

17    conditions that would ensure the defendant would return to

18    court, or the safety of the community and a permanent order

19    of detention should be issued.

20         THE COURT:  In light of his age, and the family

21    support, the court's primary concern is with dangerousness.

22         He's not even charged with the shooting at this

23    point.  He's charged with possession of casings.  So I don't

24    know what's going on.

25         The government's responsibility, when it wants to

1    detain somebody as a danger to the community, is to prove

2    that danger by clear and convincing evidence.  The facts

3    you've recited persuade me, but the evidence to support them

4    is not articulated.

5            I can understand that there are reasons why the

6    government legitimately doesn't want to display its evidence,

7    but it can't ask a court to rely upon evidence that it

8    doesn't present.

9            He's been in custody for a week almost, right?  He

10   was arrested on the 21st.

11           MS. BRADY:  Correct, but I did not know that there

12   was going to be a bail application --

13           THE COURT:  So will give you time.  If you need a

14   couple of days to get this case indicted, or to make sure

15   somebody is safe, I'm not going to make you disclose it this

16   minute.

17           But I think we have to put it on for a hearing on

18   dangerousness if you want him detained at 18 years old for

19   possession of shell casings, which is all you've charged him

20   with.

21           When do you want to go to the hearing?

22           MS. BRADY:  Whenever's convenient for you, Your

23   Honor?

24           THE COURT:  What's convenient for you, Ms.

25   Glashausser?  Well, how much time do you need to ensure that

1    whatever -- let me rephrase that.

2            Your concerns may be investigative.  They may

3    concern security.  If they're investigative, that's your

4    problem, frankly.  You decided to make the arrest.  You made

5    it affirmatively, not reactively, and you set in motion this

6    chain of events.

7            If it's security, I certainly want to give you

8    adequate time to make sure that any safety concerns can be

9    addressed. I'm not hearing from you so I assume tomorrow or

10   the day after would be adequate.

11           MS. BRADY:   That's fine.

12           THE COURT:  What's good for you?

13           MS. GLASHAUSSER:   I can do tomorrow or the day

14   after.

15           THE COURT:  All right.  So let's do it tomorrow at

16   11:00. I'm not on duty but I will bring the duty magistrate

17   judge up to speed.  Okay?

18           MS. GLASHAUSSER:   Thank you, Your Honor.

19       (Case concluded at 11:47 and recalled at 2:26 p.m.)

20           THE CLERK:  This is second call USA vs. Darrell

21   Woodford, case no. 18-1138M.

22           Counsel, your name for the record.

23           MS. BRADY:   Penelope Brady for the government.

24   Good afternoon, Your Honor.

25           MS. GLASHAUSSER:   Good afternoon, Your Honor.

1    Allegra Glasshausser, representing Mr. Woodford.

2          THE COURT:  Good afternoon.

3          So I've been advised of a couple of facts that I'd

4    like to confirm are so.

5          Number, one although I put this matter over until

6    tomorrow in light of the government's concerns about

7    revealing the video to afford them time to address those

8    concerns, we got word from the United States Attorney's

9    Office and Ms. Brady that they were actually ready to proceed

10    this afternoon with the video. Correct?

11          I've also been advised by the magistrate judge

12    clerical staff that the video has been made available for

13    viewing by counsel for the defendant.  Is that correct?

14          MS. GLASHAUSSER:   That's correct. I viewed it.

15          THE COURT:  And before I look at it I guess I'll

16    ask you, Ms. Glashausser, is there going to be a dispute

17    about what it reveals, or do we agree on what it shows?

18          Because if there's no dispute about what it shows,

19    then I don't actually have to see it, although I'm happy to

20    look at it if you think that there's an argument to made from

21    it and you wish the challenge the government's

22    characterization that it made earlier.

23          MS. GLASHAUSSER:   Well, the video does -- it shows

24    -- it appears to show a shooting, as the government explained

25    earlier.

1        But it -- I don't see it showing my client.

2        THE COURT:  Okay.

3        MS. GLASHAUSSER:   You can't really see the face.

4        THE COURT:  I understand.

5        MS. GLASHAUSSER:   So that's the --

6        THE COURT:  Is it the government's position that I

7    should watch the video because I'll recognize the defendant,

8    or is it the government's position that it's going to proffer

9    something that's going to tie the defendant to the person

10   that's seen in the video?

11       MS. GLASHAUSSER:   Your Honor, I can proffer

12   something that I think will tie to the defendant to the

13   person in the video.

14       How he was identified through the video, the

15   various video clips -- and again, I think I said this this

16   morning, but there are various clips of him in different

17   locations, from earlier in a bodega to at a point where

18   there's a fight prior to the shooting, to the shooting, to

19   him running away from the shooting.

20       Of those videos the best shot of his face is one

21   where he is running away from the shooting and one where he's

22   in the bodega.

23       He's wearing the same clothes, obviously, in all of

24   the videos.  He was identified by a law enforcement officer

25   who has had contact with him.

1          Basically, once the defendant was released and put

2     out on parole, this field intelligence officer who was

3     assigned to the particular precinct, began to see the

4     defendant with the gang members he knows from that

5     neighborhood about once every two weeks.

6          Starting in about August -- and this shooting was

7     August 30th, maybe late July, he started to see him about

8     once a week in the same location with the same people.

9          In fact, that same officer conducted a car stop in

10    July and actually the defendant was in the car.  He ran off

11    everyone in the car's information and there's actually a

12    record of him -- of the officer's print out of -- that he got

13    Mr. Woodford's name, his date of birth and information.

14          He also was aware of Mr. Woodford's social media

15    presence and he is the identifying officer from the video.

16          THE COURT:  So he saw the video or he was at the

17    scene --

18          MS. BRADY:  He is in all the videos.

19          THE COURT:  And he recognizes the defendant.

20          MS. BRADY:  Correct.  From his many interactions

21    with the defendant.

22          THE COURT:  I mean, I'll look at them, if you want

23    me, Ms. Glashausser.  If there's an argument you want to make

24    in response, I'll be happy to watch the video, if you think

25    it would be -- if there's something in the videos that's

16

1     worth my seeing.

2              MS. GLASHAUSSER:   Well, perhaps the government can

3     show Your Honor the clip that they believe shows him most

4     clearly.

5              I couldn't identify anybody in the video. I mean,

6     it's just --

7              THE COURT:  But even if I can't, why wouldn't I

8     rely on the fact that there's somebody who knows the

9     defendant and says they've seen the videos and recognize him

10    in it?

11             You don't think that there are any videos of his

12    face that would allow even a person who knew him to recognize

13    him?  Is that your argument?

14             MS. GLASHAUSSER:   From what I saw, yeah, the video

15    did not show the person's face.

16             THE COURT: All right.  So show me -- come on

17    around, and Ms. Glashausser, Your Honor can come around too.

18    Do you want your client to see?  Because if you do, I'll come

19    around.

20             MS. GLASHAUSSER:   Do you want to see it?

21             MS. BRADY:   I should put one thing on the record.

22    The video from the bodega that is before -- hours before the

23    shooting, that video I don't actually have.

24             I have seen it.  That's the only one I don't have

25    in my possession.  I did have the agent send me a still from

1      that video.

2              It's -- again, when I print it out on my computer,

3      it's not quite as clear, but I do have that.  Ms.

4      Glashaussuer's seen it, but it's in black and white.  It's

5      not -- so that's the first one.

6              THE COURT:  So let's see whatever Ms. Glashausser

7      wants me to see.

8              The record will reflect I've come down off the

9      bench.  We're all gathered around Ms. Glashassuer's laptop

10     and it's your contention that the man in the white shirt and

11     the hat, or do-rag, is the defendant.

12             MS. BRADY:  Yeah.  He has black shorts on and

13     then there's white underneath the shorts, which you can see

14     better in some of the videos. I want to get to the point

15     where he's actually here.

16             In this video you won't see his face. You'll see

17     his clothing.  So this is the defendant.

18             THE COURT:  So he's not wearing anything on his

19     head in that --

20             MS. BRADY:  Correct.  Yes, I'm sorry.  The do-rag

21     is present it the bodega video. It's not in any of the other

22     videos.  But there's no face shot of him in this video.

23             This is a video I have in a different spot, so

24     I'll show you the clearer --

25             (Pause.)

18

1        This is the victim and that's the defendant.

2        (Pause.)

3        Again, you're not going to be able to see a face

4   shot in that one or the next one.  Again, that's the victim

5   and here's the defendant.  These are just bystanders.

6        THE COURT:  So this is before what we just saw, I

7   take it.

8        MS. BRADY:  No, it's kind of at the same time.

9   Yeah, before, but yes.  Sorry.  Yes, from that angle.  I'm

10  sorry, did you need to see that again?

11       THE COURT:  No.

12     (Pause.)

13       MS. BRADY:  And then --

14       THE COURT:  And when is this one --

15       MS. BRADY:  This one is him running away from the

16  shooting.  Again, when I enlarge it, you lose the clarity,

17  but you -- it's really -- it's hard to see when it's that

18  size.

19       THE COURT:  I can see it.

20       MS. BRADY:  It's kind of hard for me to see the

21  timestamp.

22       THE COURT:  Yeah.

23       MS. BRADY:  It's right about 8:40 that you'll see

24  him come into the frame.

25       THE COURT:  Yup.  If you want to freeze it there?

19

1              MS. BRADY:   Yeah.  Sorry. I missed it by a

2      second, but --

3              THE COURT:  Okay.

4              MS. BRADY:  And again, if it's smaller --

5              THE COURT:  So make it smaller now.

6              MS. BRADY:  You can see it a little bit better,

7      although, again, when you freeze it, it doesn't work so

8      well.

9              THE COURT:  I got it.

10             And your representation to the court is that -- a

11     probation officer, did you say?

12             MS. BRADY:  No, it's a police officer from the

13     precinct.

14             THE COURT:  A police officer has viewed this video

15     tape.

16             MS. BRADY:  All of them, yes.

17             THE COURT:  Has met the defendant in person on

18     multiple occasions.

19             MS. BRADY:  Correct.

20             THE COURT:  Knows the defendant from the

21     community.

22             MS. BRADY:  Correct.

23             THE COURT:  And has identified this man, Darrell

24     Woodford, as the person in that series of videos that you've

25     shown me.

20

1          MS. BRADY:  Correct.  And he was interviewed by

2     the FBI and made that identification.

3          THE COURT:  Thank you.

4          Is there anything else the government wants to say

5     before I give the floor back to Ms. Glashausser?

6          MS. BRADY:  Yes, there was one -- I just failed

7     to mention it on one of the prior robberies, as far as it

8     goes to dangerousness and the defendant did allocute when he

9     pled guilty to those robberies in Manhattan that he held a

10    gun against a woman's head and threatened to kill her if she

11    didn't give up all of her property.

12         THE COURT:  And that's on the record of the state

13    court proceeding?

14         MS. BRADY:  It was part of the allocution,

15    according to the assistant district attorney who was

16    assigned to that case. I have not seen the minutes.

17         THE COURT:  Do you want to argue further?

18         MS. GLASHAUSSER:  Just to say that as I hope Your

19    Honor saw in that video, that could be any black man running

20    around the streets of New York.  It doe t not -- you're not

21    able to see the facial characteristics that would allow

22    somebody to make an identification of one particular person.

23         THE COURT:  Okay.

24         MS. GLASHAUSSER:  I'd ask Your Honor to take that

25    into account.

21

1          THE COURT:  I understand the argument, but I don't

2     agree with it.

3          Is there a permanent order of detention in place

4     now?

5          MS. BRADY:  Correct.

6          MS. GLASHAUSSER:  There is.

7          THE COURT:  It will remain in place.  I find the

8     government has shown by clear and convincing evidence that

9     Mr. Woodford is a danger to the community.  The proposed

10    conditions of bail don't address that concern.

11         I've rarely seen a man this young with a record

12    this serious and I've rarely seen somebody this young get

13    out of custody and within three months commit a shooting

14    that appears to be murder, in cold blood, on the street in

15    front of other -- what appears to be in front of other

16    people.

17         There's no inhibiting this man. I don't know what

18    else to do.  Thank you.

19         MS. GLASHAUSSER:  Thank you, Judge.

20    (Proceedings concluded at 2:34 p.m.)

21

22

23

24

22

1

2      I, CHRISTINE FIORE, court-approved transcriber and

3  certified electronic reporter and transcriber, certify that

4  the foregoing is a correct transcript from the official

5  electronic sound recording of the proceedings in the above-

6  entitled matter.

7

8

9  _____        February 18, 2019

10  Christine Fiore, CERT

11        Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24