UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------- X
                                       :
UNITED STATES OF AMERICA               :
                                       :
                                       :
        v.                             :    **MEMORANDUM & ORDER**
                                       :
                                       :    18-CR-654(KAM)
DARRELL WOODFORD,                      :
                                       :
            *Defendant.*               :
                                       :
-------------------------------------- X

**MATSUMOTO, United States District Judge:**

          Defendant Darrell Woodford, ("Woodford" or

"defendant"), is charged with the possession of ammunition

subsequent to a felony conviction.  (ECF No. 7, Indictment.)

Specifically, defendant is charged with violating 18 U.S.C. §

922(g)(1).  (*Id.*)  On May 21, 2019, Woodford, moved to suppress

the identification testimony of two New York City Police

Department ("NYPD") officers implicating him in an August 30,

2018 shooting in Brooklyn.  (ECF No. 27, Def.'s Mot. to Suppress

("Mot.").)  The parties filed motion papers in advance of the

hearing, (ECF No. 28, Gov't's Opp'n Mem. ("Opp."); ECF No. 32,

Def.'s Reply ("Reply")), and post-hearing briefing, (ECF No. 54,

Def.'s Supp. Mem. ("Supp. Mem."); ECF No. 55, Gov't's Supp. Opp.

("Supp. Opp."); ECF No. 56, Def.'s Supp. Reply ("Supp. Reply")),

which the court now considers.[1]

**BACKGROUND**

## I.   Factual Background

On August 30, 2018, an unnamed victim was shot

multiple times in the Flatbush area of Brooklyn.  (Opp. 2.)  In

the courtyard of the Flatbush Gardens housing development,

located at 3104 Newkirk Avenue, a black male chased a male

victim and began firing a handgun, striking the victim at least

three times.  (*Id.* at 3.)  The shooter fled with the handgun,

leaving the victim on the ground.  (*Id.*)  A New York City Police

Department ("NYPD") officer recovered three .380 auto-caliber

cartridge casings from the scene approximately one hour after

the shooting.  (*Id.*)  Defendant Darrell Woodford was arrested on

September 14, 2018, for crimes committed in connection with the

shooting.[2] (ECF No. 27, Mot. 1.)

### A.   *Video Footage*

Portions of the shooting, and the events leading up to

and shortly after it, were captured by video surveillance.

---

[1]   The parties additionally filed several letters regarding defendant's request that the court issue a subpoena for NYPD social media accounts.  (*See generally* ECF Nos. 52, 53.)  The court ruled on the subpoena request in a separate Docket Order, denying defendant's request as largely inconsistent with the Stored Communications Act, and because the information obtainable under the Stored Communications Act would not be material or relevant to the court's determination of the instant motion to suppress.

[2]   Defendant asserts he was not charged with any state crimes in connection with the shooting.  (Mot. 1.)

First, video captured a crowded sidewalk near 1844 Nostrand Avenue moments before the shooting. (Opp. 4, ("1844 Nostrand Ave. Video"); *see also* Mot., Ex. E, DW000018 Video; Ex. 8.) At approximately 8:51 p.m. on August 30, 2018, four young males walk nearly single file in front of a deli; one of these four males is identifiable as the shooter in a subsequent video at the scene of the shooting, and is wearing a white t-shirt, black and white basketball shorts, and red and white sneakers. (*Id.* at 4.) A heavy-set black male with a cast on his right arm leads the line of four toward a group of three males walking in the opposite direction and, without warning, the heavy set male punches one of the three in the face. The other two males in the group of three, one of whom would become the shooting victim, immediately run out of the camera's view; the shooter and several other males give chase. (*Id.* at 5.)

Second, video captured the shooter, a male with an afro, and a shirtless male, followed by the heavy-set male with the cast running near 3102 Newkirk Avenue shortly before the shooting. (*Id.* (citing "3102 Newkirk Avenue Video").) Third, a camera along 1356 New York Avenue recorded the shooter chasing the victim along a walkway leading to 3104 Newkirk Avenue where the shooting eventually occurred. (*Id.* at 6 (citing "1356 New York Avenue video").)

Fourth, a camera captured the shooter chasing the victim along a walkway into the courtyard of 3104 Newkirk Avenue while three other individuals walk from the opposite direction. (*Id.* (citing "3104 Newkirk Avenue Video"); *see also* Ex. 9.) As the victim passes these three individuals, the shooter slows down, raises his right hand, and fires a handgun with at least one visible muzzle flash. The three individuals who were walking in the opposite direction stop or slow down, crouch and flinch, and move aside as the shooter continues to run past them and off-camera. (Ex. E, DW000019 Video.) This footage also captures the victim falling to the ground and getting up, the shooter closing the distance between the victim and himself with his right arm extended, and the victim falling down again.[3] The shooter then walks closer to the victim, apparently shooting once from close range, backing up and firing twice more, walking closer and firing at least once more at the victim before running back towards New York Avenue. (Opp. 6.)

Fifth, and shortly after the shooting, the 3102 Newkirk Avenue video captured the shooter running from 3104 Newkirk Avenue towards Avenue D. (*Id.* at 6-7.) Sixth, two cameras along Avenue D and Nostrand Avenue captured the shooter, a shirtless male, and a male with a black t-shirt, walking

---

[3]    Defendant's submitted footage does not include this later portion of the shooting.

towards Avenue D.  (*Id.* at 7 (citing "Avenue D Video").)  The
shooter turns back to the male in the black shirt to hand-off an
object and briefly looks towards the recording camera.  (Ex. E,
DW000021.)

Finally, a video dated and time-stamped one night
before the shooting, August 29, 2018, and located inside a deli
at 1990 Bedford Avenue, captured an individual wearing clothing
that appears identical to that worn by the shooter: a white
short-sleeve t-shirt, black and white basketball shorts bearing
a black Nike logo, a white scarf or do-rag, and a closely
cropped beard.[4]  (Opp. 3.)  The government asserts this
individual is the shooter (and, allegedly, defendant Woodford)
wearing the same clothing he would the following day, August 30,
2018, when the shooting took place.  (*Id.*)  Together with the
shooter are several other males, including: (1) a heavy-set
black male wearing a black or navy short-sleeve shirt with a
white box over the left breast pocket, black shorts with a white
trim at the bottom, gray and white sneakers, a black do-rag, and
a white cast on his right arm; and (2) a tall black male with an
afro, wearing a black short-sleeve t-shirt with a white Puma
logo over the left breast, black shorts with a white design on

---

[4]     The government's memorandum states that the male with white shirt,
black and white shorts, and white do-rag was also wearing red and white Nike
sneakers.  (Opp. 3.)  However, the government's Exs. 10A and 10B, ostensibly
the 1990 Bedford Avenue Video, do not offer a clear picture of the shoes this
individual is wearing.

the left pant leg, and red underwear that is clearly visible under the black shorts. (Opp. 4.)

## B. *Identifications*

Sergeant Christopher Donohue and Assistant Field Intelligence Officer Vasilios Vasilopoulos worked in the NYPD's 70th Precinct in August 2018.[5] As field intelligence officers, they were responsible for monitoring recidivists and gang members within the precinct, including cultivating confidential informants. (Tr. 8-9.) Sometime over the summer 2018, the two officers "became familiar with the defendant, who frequently spent time in the 70th precinct with members of a gang known as the Eight Trey Cowboy Crips." (Opp. 7; Tr. 10:3-15.) And, when shown footage of the shooting, and the events leading up to and shortly after the shooting, the two identified defendant Woodford as the shooter based on their prior familiarity with defendant as field intelligence officers. As proof of the officers' familiarity with defendant, the government offers two primary bases: a July 17, 2018, traffic stop in which Officer Vasilopoulos and Sergeant Donohue, along with a third officer, interreacted and spoke with defendant while they attempted to ascertain his identity, (Opp. 8; Tr. 45-46); and the officers'

---

[5] Sergeant Donohue is currently assigned to the NYPD's Force Investigation Division. (Opp. 7.)

extensive social media monitoring of defendant and his associates. (Opp. 8; *see also, e.g.*, Tr. 21, 23, 35-36).

During the course of the July 2017 traffic stop, the officers spoke face-to-face with Woodford for several minutes while he stood outside the vehicle. (Opp. 8; Tr. 46-47.) Officer Vasilopoulos testified during the July 8, 2019, suppression hearing, that he immediately recognized Woodford in the passenger seat, and addressed defendant as "Fresh," his nickname. (Tr. 46-47.) Initially, Woodford gave his name as "Darrell Smith," but then admitted that his name was Darrell Woodford. (*Id.*; Opp. 8.) Vasilopoulos recalled asking Woodford how to spell his first name, not recalling if it was spelled with one or two letter Rs. (Tr. 48:4-5.) Then, when asked to spell his last name, Woodford responded, "Smith." (Tr. 48:6-7.) Vasilopoulos testified that he warned Woodford it was a crime to lie about his name, and then demonstrated to Woodford that a data search for Darrell Smith provided no results. (Tr. 48:9-14; *see also* Ex. 6.)

The government also represents, and Officer Vasilopoulos testified, that the officers routinely reviewed social media posts, including photographs and videos, and comments, posted by Woodford and others on publicly available social media pages, and a four-minute YouTube music video featuring Woodford. (Opp. 8; *see also, e.g.*, Tr. 21, 23, 35-

36.)  At the hearing, the government offered into evidence
through Officer Vasilopoulos several videos posted to social
media featuring defendant.  Officer Vasilopoulos testified to
viewing these videos, and others, contemporaneously with their
publication by defendant out of necessity.  Some of these videos
known as "stories," are not accessible after 24 hours of initial
posting, others known as "Facebook Live" or "Instagram Live" are
broadcast live, in real-time, and are likewise not accessible
afterwards unless the viewer records them by some other means.

        Sometime on the evening of August 30, 2018, following
the shooting, the two officers each viewed the 1844 Nostrand
Avenue, the 1356 New York Avenue, and the 3104 Newkirk Avenue
videos.  (Opp. 8.)  Officer Vasilopoulos was on his way home
when he received a phone call from Sergeant Donohue.  (Tr.
60:10-18.)  Vasilopoulos testified that Sergeant Donohue had
told him to pull over to watch a video of a shooting that had
taken place in the 67th precinct; Sergeant Donohue also told
Vasilopoulos the name of the victim who was known to both of
them.  (Tr. 60-61.)  Sergeant Donohue did not, however, inform
Vasilopoulos of the suspected shooter's name.  (Tr. 61:5-8.)
Sergeant Donohue then sent to Vasilopoulos the 1844 Nostrand
Avenue Video, shown at the hearing as Exhibit 8.  (Tr. 61-62.)
Officer Vasilopoulos testified that, upon first watching the
1844 Nostrand Avenue Video on August 30, 2018, he recognized

Michael Williams (also known as Sheff G), Tegan Chambers (also known as Sleepy Hallow), and defendant (also known as Fresh), among other individuals. (Tr. 66:18-67:8.) The Officer's identification was based, in part, on recognizing Woodford's body, receding hairline, and mannerisms, and his height and build, which were consistent with Vasilopoulos's previous interaction with, and observations of, Woodford. (Tr. 67-68.) Officer Vasilopoulos also testified that he was "very confident" in his identification of Woodford in the 1844 Nostrand Avenue Video. (Tr. 67:15.)

Vasilopoulos was alone when he watched the video, but called Sergeant Donohue immediately afterwards. (Tr. 62:1-7.) Sergeant Donohue, however, testified that he and Vasilopoulos were still on the phone while Vasilopoulos watched the video. (Tr. 219-20.) Vasilopoulos told Sergeant Donohue that he feared retaliation against defendant and his associates, by the victim's associates, after the shooting because it involved two rival gangs, the Eight Trey Cowboy Crips and Folk. (Tr. 70:1-10.) After sharing this concern with Sergeant Donohue, Vasilopoulos then identified the individuals he recognized in the 1844 Nostrand Avenue Video. (Tr. 70:17.) Vasilopoulos testified that Sergeant Donohue agreed with this identification, and that his agreeing did not influence Officer Vasilopoulos's identification of Woodford. (Tr. 70:18-22.) Sometime after the

two identified Woodford in the 1844 Nostrand Avenue video,
Sergeant Donohue informed officers in the 67th precinct about
Woodford's alleged role in the shooting so that they could open
an investigation. (Tr. 73:2-12.)

Before the two officers reviewed the videos, they
heard from other officers of the 67th precinct, responsible for
the area where the August 30, 2018 shooting took place, the name
of a suspect whom the 67th precinct officers believed to be the
heavy-set male with the cast who was visible in the footage.[6]
(*Id.*) Sergeant Donohue and Officer Vasilopoulos both disagreed
with the 67th precinct's suggested identification, (*id.*), and
Officer Vasilopoulos testified that he believed the heavy-set
male was an individual named Michael Williams, (Tr. 12:15; 71:6-
12).[7] Sergeant Donohue and Officer Vasilopoulos received no
other names from the 67th precinct officers of potential
suspects or other individuals in the video. (Opp. 9; Tr. 69:19-
21.) The 67th precinct officers did not name the potential
identities of any other individuals in the videos shown to
Officer Vasilopoulos on August 30, 2018.

---

[6] At the hearing, Officer Vasilopoulos testified that the officers of the
67th precinct suggested the individual with the cast was Barrington Solange,
also known as "Pudge Boom." (Tr. 71:6-15.)
[7] During the July 8, 2019 hearing, Officer Vasilopoulos testified that he
had monitored Michael Williams' various social media accounts for
approximately two-and-a-half years, (Tr. 68:22-25), and previously arrested
and debriefed him, (Tr. 65:9-12).

Later, on the evening of August 30, 2018, by the time
Officer Vasilopoulos arrived home, he testified that Sergeant
Donohue sent him another video that depicts the shooting at 3104
Newkirk Avenue. (Tr. 74; Ex. 9A.)[8] Before watching the video,
Sergeant Donohue did not identify anyone in the video to Officer
Vasilopoulos. (Tr. 74.) After watching the video, Officer
Vasilopoulos recognized defendant as the shooter, and
immediately contacted Sergeant Donohue. (Tr. 74-75.) Sergeant
Donohue and Officer Vasilopoulos were not in contact while
Vasilopoulos watched the video. (*Id.*) Vasilopoulos testified
that he recognized Woodford in the shooting video at 3104
Newkirk Avenue because the shooter was wearing the same clothes
and had the same body type as the individual he had identified
as Woodford in the 1844 Nostrand Avenue video. (Tr. 76:1-5.)
Vasilopoulos told Sergeant Donohue that he believed Woodford was
the shooter in that video, and Sergeant Donohue agreed. (Tr.
76:6-10.) Vasilopoulos testified that Sergeant Donohue's
concurrence did not influence Vasilopoulos's identification.
(Tr. 76:11-13.)

The two officers were together again on September 14,
2018 when they reviewed the Avenue D Videos which showed the

---

[8]     Exhibit 9A, admitted at the July 8, 2019 suppression hearing, appears
to be a cellphone video capturing the surveillance video of the shooting.
Exhibit 9, also admitted at the hearing, is the original surveillance video.
Officer Vasilopoulos testified to reviewing both videos. (Tr. 77:17-78:1.)

shooter rounding a corner store while turning back, facing the
camera, and handing an unknown object to another individual.
(Opp. 9; Tr. 118:10-16.)  The two officers identified the
individual wearing the white t-shirt and black and white Nike
shorts as defendant.  (Opp. 9.)  Defendant was then arrested
later that day for violating his state parole, (Opp. 9), and
eventually arraigned before Magistrate Judge Kuo on November 23,
2018, (Minute Entry dated 11/23/2018).  A grand jury returned
the instant indictment on December 6, 2018. (Opp. 10.)

Sometime after defendant's arrest, Sergeant Donohue
and Officer Vasilopoulos together viewed the 1990 Bedford Avenue
video, which showed a scene inside a deli dated and time-stamped
the day prior to the shooting, including the heavy-set male with
a cast, the tall male with an afro and black t-shirt, and an
individual wearing the same clothes as the shooter and a white
do-rag.  (*Id.*; Tr. 121.)  Both officers identified defendant as
the individual wearing a white t-shirt, black and white
basketball shorts, and white do-rag.  (Opp. 9-10; Tr. 121:14
(Vasilopoulos testimony); Tr. 245:19 (Donohue testimony).)
Vasilopoulos testified that he identified Austin Williams, Tony
Darden, and Tegan Chambers as the individuals with defendant
Woodford in the 1990 Bedford Avenue video.  (Tr. 121:14-15.)

After his arrest, Woodford first appeared before the
court on December 13, 2018 and was arraigned on Count 1 of the

sealed indictment.  (Minute Entry dated 12/14/2018.)  The

parties continued plea negotiations and exchanged discovery

until April 30, 2019, when defendant indicated his intent to

move to suppress the identifications by Sergeant Donohue and

Officer Vasilopoulos.  (Minute Entry dated 4/30/2019; *see

generally* ECF Nos. 27-29, 32.)  The court heard testimony from

Officer Vasilopoulos and Sergeant Donohue on July 8, 2019, and

July 23, 2019.

## DISCUSSION

## I.  Due Process Challenge

Defendant argues in his motion, and largely reiterates

in his supplemental briefing, that the officers' identification

was both unduly suggestive and not independently reliable in

violation of the due process clause.  (Supp. Mem. 15-24.)

Due process requires that the court examine whether

the identification was unnecessarily suggestive and conducive to

irreparable mistaken identification.  If so, the court must

exclude identification testimony that is not otherwise

independently reliable.  *Manson v. Brathwaite*, 432 U.S. 98, 114

(1988); *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) (noting

that district court must determine, from totality of

circumstances, whether identification "was so unnecessarily

suggestive and conducive to irreparable mistaken identification

that [defendant] was denied due process of law").  "The ultimate

questions are whether the pretrial proceedings have been conducted in a manner that was unnecessarily suggestive and whether, in all the circumstances, there is a very substantial likelihood of irreparable misidentification." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).

Circumstances may require law enforcement, from time-to-time, to employ suggestive identification techniques to address exigencies. *United States v. Concepcion*, 983 F.3d 369, 377 (2d Cir. 1992) (noting that a "showup"—the presentation of a single suspect to a victim or witness—may be permissible where there is an "overriding necessity"); *see also Stovall*, 388 U.S. at 302 (upholding hospital showup where victim, the only witness to the crime, was believed to be dying).

A prior identification is admissible under Federal Rule of Evidence 801(d)(1)(C), regardless of whether the witness confirms the identification in-court. *United States v. Salameh*, 152 F.3d 88, 125 (2d Cir. 1998) (citing *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir. 1991) and *United States v. Lewis*, 565 F.2d 1248, 1251–52 (2d Cir. 1977)). A prior identification will be excluded only if the procedure that yielded the identification is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Simmons*, 923 F.2d at

950 (internal quotation marks and citation omitted; alteration in original).

Typically, identifications are challenged when law enforcement officers attempt to elicit a positive identification from a witness to the crime that highlights the defendant as the suspect in some way.  That is, when the circumstances surrounding the identification procedure prompt the witness to conclude that the individual whom the witness is viewing is the same one who committed the crime.  *Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir. 1986).  Unlike in most cases, the witnesses in this case are law enforcement officers engaged in investigating the activities of a gang of which defendant purportedly is a member, and typical lineup or photo array procedures were not used to identify defendant.  What is relevant here is case law that concerns impermissibly suggestive identifications due to "subsequent actions or remarks by government agents."  *United States v. Thai*, 29 F.3d 785, 810 (2d Cir. 1994).

In *Thai*, after the witness had selected the defendant from a photo array, officers showed the witness a mug shot of the defendant.  *Id.* at 810-11.  Officers then complimented another witness for a job well-done after identifying the defendant.  *Id*. at 811.  These confirmatory tactics risked inflating a witness's in-court certainty.  *United States v. Leonardi*, 623 F.3d 746, 755 (2d Cir. 1980).  Still, when the

risk is present, "if the original identification was strong and unequivocal, such misguided post-identification remarks or actions will not render it invalid or preclude a subsequent in-court identification." *Thai*, 29 F.3d at 810.

Joint identification by witnesses should also call in to question an identification's reliability for suggestiveness. *United States v. Gilbert*, 388 U.S. 218 (1967), is a sister-case in the trio of cases decided with *United States v. Wade*, 388 U.S. 218 (1967), the seminal case on identification procedures. Though the Supreme Court vacated the defendant's conviction in *Gilbert* based primarily on the *absence* of counsel at a post-indictment lineup, the court discussed at length the risks and infirmities of the identification procedures employed there. *Gilbert*, 388 U.S. at 272. In its concurrently issued *Wade* opinion, the Court referred to the *Gilbert* identification, where "some 100 witnesses . . . made wholesale identifications of [the defendant] . . . in each other's presence," and concluded such procedures were "fraught with dangers of suggestion." *Wade*, 388 U.S. at 234.

Accordingly, in *Escalera v. Coombe*, 652 F. Supp. 1316 (E.D.N.Y. 1987), in dismissing a habeas petition, Judge Glasser opined that "[i]f 'suggestive confrontations are disapproved because they increase the likelihood of misidentification,' one would be hard pressed to conceive a procedure more suggestive

than a showup where two witnesses view a single suspect through a one-way mirror." *Escalera*, 652 F. Supp. at 1326.[9]  There, witnesses were unsupervised during a portion of the identification, may have viewed photographs of the suspects while together in a room, and viewed the defendant through a one-way mirror together. *Id.* at 1327.

Suggestive identification procedures, however, may be permissible in the face of exigent circumstances.  Some obvious examples of exigent circumstances include, as discussed above, when a victim is believed to be dying in the hospital shortly after a crime, *Stovall*, 388 U.S. at 302, or when multiple suspects are in custody and police must determine which suspects to release or arrest, *Simmons*, 390 U.S. at 384.  *See also United States v. Bautista*, 23 F.3d 726, 730 (2d Cir. 1994).

## A.    Unduly Suggestive

Defendant first argues that the government used unduly suggestive procedures to identify him in the video footage. (Mot. 5; Supp. Mem. 16-19.)  Defendant cites to the joint identification by Vasilopoulos and Donohue.  Second, defendant

---

[9]    *Escalera* was reversed and remanded by the Second Circuit, 826 F.2d 185 (2d Cir. 1987), and then vacated and remanded by the Supreme Court, *Coombe v. Escalera*, 108 S. Ct. 1004 (1988).  Whether the identification procedures used were unduly suggestive was not the discrete issue on appeal, however, and in reversing Judge Glasser's dismissal, the Second Circuit noted that "[a]n uncontrolled, joint selection, if it occurred, would render the initial photographic identification suspect." 826 F.2d at 192 (citing *Styers v. Smith*, 659 F.2d 293, 297-98 (2d Cir. 1981)).

raises the officers' knowledge of other background facts related to the shooting, including the victim's name and gang affiliation. And third, defendant challenges the identification as improperly based on "guilt by association." (*Id.* at 19.) In opposition, the government argues first that the identification procedures did not single out defendant, and thus were not unduly suggestive. (Opp. 14; Supp. Opp. 6.) Secondly, the government argues that the officers' identifications of Woodford as the shooter were independently reliable.[10] (Opp. 14; Supp. Opp. 8-9.)

Defendant argues that the joint identification employed here allowed Sergeant Donohue and Officer Vasilopoulos to confirm their views that Woodford was the shooter with each other, and that each potentially bolstered the other's confidence in the identification. (Supp. Mem. 16.) Defendant cites to the risk of "peer pressure" and the "obvious dangers" that a joint identification is "the product of mutual reinforcement of opinion." (*Id.* at 16-17.) The government responds that the manner in which Sergeant Donohue and Officer

---

[10] Though the parties initially argued over the existence of an exigency—which may excuse or justify suggestive identification procedures—they did not renew these arguments in their post-hearing briefing. Given the case law in this Circuit, the court disagrees with the government's pre-hearing contention that the situation presented exigencies that warranted suggestive procedures. Exigencies may permit showup identifications that risk highlighting the suspect and suggesting to the witness that the suspect is somehow guilty due, in part, to his presence in police custody, or, due to the absence of other suspects. Those circumstances were not present in this case.

Vasilopoulos reviewed the video did not suggest to the other officer that Woodford was the shooter.  (Opp. 13; Supp. Opp. 6.) Further, the government argues, the officers were not susceptible to suggestion, demonstrated by the fact that the officers independently disagreed with the suggestion from the officers of the 67th precinct that another suspect was in the video.  (Opp. 13.)  According to the government, no one confirmed either Sergeant Donohue's or Vasilopoulos's identifications.  (Supp. opp. 6.)  If they had, the government argues, the officers' confidence in their initial identification would not be rendered invalid or precluded based on post-identification comments.  (*Id.* (citing *Thai*, 29 F.3d at 810).) The government cites to *Umjoa v. Griffin*, No. 11-CV-0735, 2014 WL 2453620, at *18 (E.D.N.Y. May 29, 2014), a habeas corpus case in this District in which the court approved joint viewing of a photo array in which there was no evidence the witnesses were influenced by each other in making their identifications. (Supp. Opp. 7.)

Officer Vasilopoulos testified that he watched the video alone, and was not in contact with Sergeant Donohue until after he had independently identified Woodford in the 1844 Nostrand Avenue video and, shortly after, in the video depicting

the shooting.[11] (Tr. 69-70.)  Moreover, Sergeant Donohue did not

suggest to Officer Vasilopoulos who the shooter might be prior

to watching Officer Vasilopoulos watching the video, though he

did agree with Officer Vasilopoulos's identification.   (Tr.

69:19-22, 70:15-19.)  The two were apparently together for the

September 14, 2018, identification based on the 1990 Bedford

Avenue video depicting the inside of a deli the night prior to

the shooting.  This later identification only served to confirm

the initial two identifications by the officers.

     Officer Vasilopoulos also testified that he was

certain of his identification of Mr. Woodford on the first two

videos he viewed on the night of August 30, 2018.  The manner in

which he identified defendant was not suggestive, as

Vasilopoulos was not told whom the shooter might be or whom

Sergeant Donohue believed the shooter was.  Defendant's argument

that the officers' knowledge of the victim's identity somehow

suggested defendant's identification is not persuasive.  Though

neither the 1844 Nostrand Avenue nor the 3104 Newkirk Avenue

video is crystal clear, Officer Vasilopoulos testified that he

immediately recognized Michael Williams and Tegan Chambers,

among others, who plainly stand out among the other pedestrians

---

[11]    Sergeant Donohue, however, testified that he remained on the phone with
Vasilopoulos, (Tr. 220:2.), though Sergeant Donohue consistently and credibly
testified that he did not identify any of the individuals in the video to
Vasilopoulos.

on Nostrand Avenue.  Officer Vasilopoulos explained that his
basis for recognizing these individuals was his personal
interactions with them and monitoring their social media
presence in his role as Assistant Field Intelligence Officer.
Officer Vasilopoulos also recognized Woodford's receding
hairline, his relative height and build, and his other
mannerisms.  Upon watching the 3104 Newkirk Avenue video,
Officer Vasilopoulos identified the shooter as defendant based,
again, on his height and build, and that he was wearing the same
clothing as in the 1844 Nostrand Avenue video.  (Tr. 76:1-2.)
Though Sergeant Donohue's identification of Mr. Woodford was
consistent with Officer Vasilopoulos's identification, Officer
Vasilopoulos is at much lower risk than lay witnesses of being
influenced by confirmatory tactics and eager officers as in
other cases involving civilian witnesses.  Moreover, both
officers, and especially Officer Vasilopoulos, testified to
being confident in their initial identification.  Post-
identification comments will not render a "strong and
unequivocal" identification invalid or preclude subsequent in-
court identification."  *United States v. Thai*, 29 F.3d 785, 810
(2d Cir. 1994).  Thus, the joint identification by the two
officers in this case was not unduly suggestive and did not
influence or bolster the officer's confidence in their
respective identifications.

Defendant next argues that the identification procedures were unduly suggestive because Officer Vasilopoulos and Sergeant Donohue "knew a great deal of information from other officers before watching" the videos in this case. (Supp. Mem. 18.) Specifically, defendant points to the officers' knowledge that the victim was a member of the Folk Nation gang, a rival to the Eight Trey Cowboy Crips. (*Id.*) Defendant speculates that this knowledge "contributed to their identification, either subconsciously or consciously," and that the officers "likely shared more information than they remember now." (*Id.*) Defendant also argues that the fact the officers typically shared investigative information among their small four-person team precluded the officers from making an "unbiased" identification. (*Id.* at 19.) The government responds that defendant has not cited to relevant authority nor explained how knowing a victim's identity would impermissibly influence a witness's identification. (Supp. Opp. 8.) The government further responds that defendant's argument is based on speculation that the officers shared "more information than they remember now." (*Id.*)

That the officers had background knowledge of defendant and the other individuals identified in the videos, including the victim, does not render their identification suggestive. Identifications need not happen in a vacuum devoid

of context.  The officers' knowledge of the victim, the

defendant, and their associates, was not improperly transmitted

prior to their identification of defendant such that it may have

influenced a civilian witness.  Instead, the officers possessed

knowledge of the victim, the defendant, and their associates

before the shooting, and officers in the 67th precinct sought

their knowledge and assistance.  Their prior knowledge does not

render the identification procedure suggestive, as it certainly

would not if the video were shown to the victim or another

individual familiar with defendant and his associates.

Finally, defendant argues that the procedures leading

to the officers' identification of Woodford as the shooter were

improper because they are based, in part, on group association.

(Supp. Mem. 19.)  Defendant notes that the officers "surely

relied on their identification" of Teagan Chambers and Michael

Williams, associates of defendant, "to bolster their

identification."  This, defendant argues, is akin to guilt by

association, "one of the most odious institutions of history."

(Supp. Mem. 21 (citing *Joint Anti-Fascist Refugee Comm. v.

McGrath*, 341 U.S. 123, 178-79 (1951)).)  Defendant, however,

cites no case authority that an *identification* based, in part,

on association is impermissible.  The government responds that

defendant has not supported his argument with citation to any

case authority, and that both officers were confident in their

identification of defendant as an individual.  (Supp. Opp. 8.)
Both officers testified to their ability to pick out defendant
specifically from the video footage.  (Tr. 66:24-67:1
(Vasilopoulos testimony); Tr. 228:8-11 (Donohue testimony).)

The court finds that Officer Vasilopoulos's out-of-
court identification of Mr. Woodford was not based upon undue
suggestion and that there is no risk of irreparable
misidentification.  This is not the kind of case where the
identification procedures highlighted defendant amongst a group
of line-up suspects or presented defendant in a manner
suggestive of culpability as in many showup cases.  The only
risk the court can countenance in the procedures employed is
that the officers bolstered each other's confidence in their
respective identification, however, no one suggested defendant's
identity to Officer Vasilopoulos or Sergeant Donohue prior to
their identifications of defendant.  As the court already found,
the procedures did not impact Officer Vasilopoulos's
identification or improperly bolster his confidence.

Were the video devoid of defendant's easily-
identifiable associates, the court would be more skeptical of
the officer's identification of Woodford from any other
individual in the footage, as would a jury, given the
shortcomings of the footage.  The court finds unavailing
defendant's argument that basing the identification on the

presence of Mr. Woodford's associates in the footage is
suggestive and amounts to guilt by association.  That
defendant's associates are in the footage does not suggest that
defendant is the depicted shooter.  At most, the presence in the
videos of defendant's easily-identifiable associates permissibly
provided the officers context within which to identify
defendant.  Given this context, the officers were able to
identify defendant as the shooter given the similarities in his
height, build, complexion, hairline, and hairstyle.  On this
basis alone, the court may deny Woodford's suppression motion as
to Officer Vasilopoulos's identification testimony.  However,
even if the procedures were unduly suggestive, Officer
Vasilopoulos's identification was independently reliable, as
discussed below.

**B.    Independent Reliability**

Defendant additionally argues that the unduly
suggestive procedures were not cured by an independently
reliable basis for the officers' identification because the
officers were not "intimately familiar" with defendant because
the video footage of the shooter is blurry.  (Supp. Mem. 22.)
The government responds that intimate familiarity is not
necessary for a valid identification, and that the officers'
prior observations of and interactions with defendant provide

more than a sufficient basis for the identification. (Supp. Opp. 10.)

Determining whether an identification is independently reliable is the second step of the due process inquiry. Even in the face of suggestive or confirmatory procedures, an unnecessarily suggestive identification will not on its own violate the defendant's due process rights. That is, an identification that is reliable based on other, independent evidence is still admissible. *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) ("The linchpin for admissibility of identification testimony is reliability."). Unless, "'under all the circumstances of th[e] case, there is a very substantial likelihood of irreparable misidentification,' the presence of some element" undercutting reliability goes to the identification's weight, not its admissibility. *Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998) (quoting *Manson*, 432 U.S. at 116).

To determine independent reliability, courts apply the factors enumerated in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). These factors are non-exclusive, and courts consider: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness at the

confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199-200. Courts should consider these factors in light of the totality of the circumstances, *see id.* at 199, and weigh them against the "corrupting effect" of the allegedly suggestive identification procedures, *Manson*, 432 U.S. at 114. Not every factor must weigh in favor of admissibility. *Salameh*, 152 F.3d at 126-27. As a result, independent reliability claims often overcome any unduly suggestive identifications in a variety of circumstances. *See, e.g.*, *id.* (witness observed and spoke with defendants while pumping gas for them, accurately described defendants to agents, and identification occurred shortly after crime); *United States v. Wong*, 40 F.3d 1347, 1360 (2d Cir. 1994) (finding ten-month interval between crime and identification was outweighed by witness's opportunity to observe gunman for a few seconds before ducking under table from fear); *United States v. Tortora*, 30 F.3d 334-39 (2d Cir. 1994) (finding five-year interval between crime and identification, and inaccurate description, outweighed by other "particularly strong indicia of reliability"); *Concepcion*, 983 F.2d at 378 (finding struggle and shooting gained and held witness's attention); *Maldonado-Rivera*, 922 F.2d at 976 (finding one-year interval between crime and identification "outweighed by [witness's] extended opportunity to become familiar with [defendant]'s appearance" and accuracy

of past descriptions).  Thus, courts have found witnesses sufficiently familiar with a suspect to render an independently reliable identification after a single minutes-long interaction, notable interactions, or conversations, and even after a year-long interval or longer.  *See also Alvarez v. Fischer*, 170 F. Supp. 2d 379, 386-87 (S.D.N.Y. 2001); *United States v. Wolfish*, 525 F.2d 457, 462 (2d Cir. 1975).  For example, in *United States v. Wolfish*, the Second Circuit found an identification independently reliable where the witness had three prior ten-minute meetings with defendant, during which defendant made unusual requests.  *Id.*

Defendant argues that the officers had insufficient contact with defendant to render their identification reliable.  (Supp. Mem. 23.)  Defendant points out that the government's collected authorities on independent reliability "involved more contact that the officers had here."  (*Id.* at 23.) Specifically, defendant takes issue with Officer Vasilopoulos's inability to testify about the specific circumstances with which he observed Woodford before the shooting.  As discussed above, those cases finding an identification independently reliable generally involve more contact, and defendant cites to several that involved three ten-minute meetings and unusual requests, frequent overnight visits, and weekly drug purchases over the course of months.  (*Id.* at 24.)  Additionally, defendant notes

that Officer Vasilopoulos monitored more than 40 individuals in the Eight Trey Cowboy Crips, and that he could not have been focused on defendant and thus was not intimately familiar with defendant. (Supp. Mem. 24.)

The government responds *first*, that the officers are trained to notice detail in contrast to civilian witnesses. *Second*, the government argues that the officers had repeatedly observed Woodford both in-person and through social media prior to the shooting. (Supp. Opp. 8.) In support of its first argument, the government cites authority that acknowledges that law enforcement officers are not "casual observers" of crime, (Opp. 16 (citing *Manson*, 432 U.S. at 115)), and thus officer witnesses can be expected to pay "scrupulous attention to detail" that would lend reliability to their identifications. (*Id.* (citing *United States v. Williams*, 999 F. Supp. 412, 415 (W.D.N.Y. 1998)).) *See also United States v. Sanchez*, 603 F.2d 381, 385 (2d Cir. 1979) (finding identification by narcotics officer reliable given "the degree of attention of an undercover police officer engaged in the purchase of narcotics for the explicit purpose of gathering evidence for a later prosecution of the seller will obviously be quite high"). The government also relies on *Manson*, where the Supreme Court found an undercover police officer's identification reliable after he interacted with the defendant for two-to-three minutes during a

drug sale in a well-lit area.  *Manson*, 432 U.S. at 114.  In

reaching its conclusions the Court noted that the officer was

"trained" and "on duty" and expected to pay attention to details

for a later identification.  (Opp. 17 (citing *Manson*, 432 U.S.

at 115-17).)

Neither officer is a "casual observer" of crime, and

both are trained in monitoring and investigating suspected gang

members; this does not render their identifications *inherently*

reliable.  The court will consider their respective training and

attention in addressing the *Biggers* factors.  That is, a witness

to a crime will likely be distracted or terrified, and their

later recollection is likely to be impaired or distorted.

Officers, on the other hand, observe a crime or a suspect with

the understanding that they may later make a case against this

individual, supporting the inference that the officer will be

paying close attention to the suspect with an eye towards

recollection.  The court finds that both officers, as field

intelligence officers tasked with investigating gang activity

within their precinct, paid particular attention to suspected

gang members including defendant and his associates.  This was

evident during the hearing when Officer Vasilopoulos identified

several other individuals active within the precinct by name and

nickname who were not involved with the shooting.  (*See, e.g.*,

Tr. 65:2-6; 71:6-9; 101:4.)

The government also argues that the officers had substantial prior, memorable interactions with Woodford that render their identifications independently reliable. (Opp. 17; Supp. Opp. 9.) In support, the government describes the prior contact the officers had with Woodford, including observations of Woodford within the 70th precinct over the summer of 2018; the July 17, 2018, traffic stop, six-weeks prior to the shooting; and their review of Woodford's and others' social media posts including a YouTube music video featuring Woodford. (Opp. 18; Supp. Opp. 10.) Defendant disputes these "repeated observations" of Woodford made by the officers, and calls into question how the officers' past contact with Woodford were sufficient to support their identification as independently reliable. (Reply 9.)

As previously discussed, the court considers the *Biggers* factors to determine if the identifications here are independently reliable. The *Biggers* factors are not exclusive, and courts can consider other factors that bear on reliability.

Chief among the factors is the officers' opportunity to observe Woodford prior to the identification. The cases the government cites to for independent reliability based on prior contacts generally involve contacts more substantial, sustained, or frequent than a single traffic stop. These prior-interactions cases include: three ten-minute meetings featuring

unusual requests by the defendant, *Wolfish*, 525 F.2d at 462;

frequent overnight stays by defendant with the witness over the

course of two months, *Robinson v. Artus*, 664 F. Supp. 2d 247,

259-60 (W.D.N.Y. 2009); opportunity to observe defendant over a

two-day period, *United States v. Perez*, 248 F. Supp. 2d 111,

114-16 (D. Conn. 2003); and frequent and weekly drug purchases

from defendants by the witnesses over several months, *United*

*States v. Alexander*, 923 F. Supp. 617, 622, 625 (D. Vt. 1996).[12]

Despite defendant's contentions, the officers' in-

person interaction with Woodford, the traffic stop, was more

remarkable than an everyday broken headlight or speeding

infraction.  First, Woodford apparently gave the officers an

incorrect name as his last name, and the officers spent some

time speaking with him outside of the vehicle.  This would be

remarkable on its own, despite testimony that someone giving a

fake name was not unusual, (Mot. 6 (citing Tr. 93)), because the

officers immediately recognized Woodford when the stop was in

progress.  Officer Vasilopoulos greeted defendant by his

nickname, "Fresh," and consequently unsettled Woodford as he

approached the passenger seat.  This too would make the July 17,

---

[12]     The government also cites to *United States v. Williams*, 396 F. App'x
516, 519 (10th Cir. 2010), where the Tenth Circuit found a National Forest
Service officer's identification of a defendant from surveillance video
sufficiently reliable when the officer previously interacted with defendant
on six occasions over the course of three years, during which defendant had
occasionally acted angrily. (Opp. 18.)

2018, traffic stop memorable to the officers despite the otherwise routine nature of the traffic infraction that led to the car stop. Furthermore, Officer Vasilopoulos testified that the officers arrested the driver, defendant's associate, further making the stop more memorable than a routine interaction. (Tr. 95:20-21.)

Aside from this traffic stop, Vasilopoulos testified that he observed Woodford one to two times each week within the 70th precinct. Though defendant argues he was not a resident of the 70th precinct during the summer of 2018 and that he instead lived with his family in Harlem, (Mot. 2-3), this asserted fact does not negate the officer's credible testimony regarding his observations; both could be true. That the officers could not remark on a single instance they observed Woodford aside from the vehicle stop does not undercut their familiarity with him. It would be unusual for officers responsible for investigating gang activity to note every mundane observation of suspected gang members within the precinct. Their testimony was not significantly challenged in this regard on cross-examination.

Defendant's argument that the officers had less familiarity with defendant than is typically found to be independently reliable ignores the officers' extensive investigation of defendant's social media presence. Officer Vasilopoulos testified to substantial, almost daily monitoring

of defendant's and his associates' social media presence.
Officer Vasilopoulos appeared intimately familiar with the
defendant and his associates, their various personas and
nicknames, and was even aware when defendant was being released
from state custody, and that defendant was filming a music video
on the night of his arrest. As to this factor, the court finds
that Officer Vasilopoulos's testimony credibly established his
significant familiarity with Mr. Woodford prior to the
identification.

Another factor courts consider is the witness's degree
of attention. As noted above, this factor is often implicated—
and undercut—when a bystander observes a typically traumatic
crime like a shooting or robbery. Though the circumstances of
the identification at issue here are not like a fast-moving bank
robbery, this factor is still relevant when considering how much
attention the officers paid to Woodford in their prior
interactions, such that they would reliably recall specific
details. The government's persuasive argument that the
officers' training regarding attention to detail addresses this
factor. Defendant's counter argument that the officers did not
witness the crime in-person or from a "position of stress" and
that neither was "undercover, remembering details for the
future," misses the point. (Supp. Reply 6.) The officers'
degree of attention is pertinent as of the time they observed

defendant *before* the shooting.  Thus, their respective
interactions with and observations of Woodford leading up to the
shooting are relevant.

Many of the prior-identification cases the government
cites to involve undercover officers who were expected to later
identify the suspect during a prosecution.  Here, the officers'
interaction with Woodford was perhaps not with an imminent
prosecution in mind, and most traffic stops do not require a
later identification at trial.  But, as discussed above, the
officers were tasked with monitoring the activity of suspected
gang members within their precinct.  Officer Vasilopoulos
readily recalled his several formal interactions with Mr.
Woodford's associates through arrests or debriefings.  Indeed,
he was able to address Mr. Woodford by his nickname, "Fresh,"
when initiating the traffic stop.  This indicates that Officer
Vasilopoulos had a reliable recall of those individuals he
believed were affiliated with a gang within the 70th precinct.
It is reasonable that Officer Vasilopoulos likely approached
interactions with, and observations of, these individuals with
the possibility that he would need to recall them later.  This
factor also weighs in favor of finding independent reliability.

The next relevant factor is the length of time between
the prior observation and the identification.  Courts often
liberally apply this factor, and even a period of years will not

weigh against reliability if other factors bolster the
identification.  Here, setting aside any of the officers' social
media observations of the defendant, a period of six weeks
between the July 17, 2018 traffic stop and the August 30, 2018
shooting and identification is not unreasonably long.  This also
weighs in favor of reliability.

A fourth relevant factor is the certainty which the
officers expressed in their initial identification.  Officer
Vasilopoulos credibly testified that he was certain in both
identifications; he did not waiver on cross-examination nor was
he apparently influenced by Sergeant Donohue's assent.

Having considered the pertinent *Biggers* factors, the
court finds that most if not all weigh in favor of a finding of
independent reliability.  Thus, even if the procedures here were
unduly suggestive, and the court finds they were not, Officer
Vasilopoulos's identifications of defendant Woodford in the 1844
Nostrand Avenue Video, and as the shooter in the 3104 Newkirk
Avenue video were independently reliable, and thus are
admissible without violating defendant's due process rights.[13]
The government notes that, once the court determines an

---

[13]    Officer Vasilopoulos also credibly testified to identifying defendant
in the footage from the deli, dated the night prior to the shooting, along
with defendant's associates.  The video clearly shows defendant's features,
in addition to his associates' features.  Except for the do-rag, defendant in
the deli video is wearing what appears to be the same clothing as the shooter
wears in the August 30, 2018, footage, and his associates appear to be
wearing the same clothing as well.

identification is not unduly suggestive, the reliability of the
identification is a "question for the jury."  (Supp. Opp. 8.)
The court agrees and defendant is free to cross-examine Officer
Vasilopoulos, in court, on his ability to identify Mr. Woodford
in the video despite the occasionally blurry features of the
shooter.

### C. Sergeant Donohue

Though defendant challenges the identification by both
officers, the government initially only offered Officer
Vasilopoulos's testimony at the suppression hearing.  The
government's post-hearing briefing, however, appears to argue
for admission of both officers' identifications.  There are good
reasons to question Sergeant Donohue's identification.  The
hearing testimony indicates Officer Vasilopoulos first
identified defendant and his associates in the videos, and his
identifications could have suggested the identifications to
Sergeant Donohue.  The court finds that although Sergeant
Donohue's identification did not influence Officer
Vasilopoulos's earlier identification, it cannot say to what
extent Officer Vasilopoulos's initial identification influenced
Sergeant Donohue's subsequent identification.  Sergeant Donohue,
however, testified to agreeing with Officer Vasilopoulos rather
than merely accepting his identifications.  Moreover, Sergeant

Donohue testified that he had identified the individuals in the video independently. (Tr. 228:8-11.)

Nevertheless, the court finds Sergeant Donohue was sufficiently familiar with defendant and that his identification was independently reliable to cure any suggestive procedures. Sergeant Donohue is apparently less familiar than Officer Vasilopoulos with defendant and his associates, at least insofar as the latter testified at length to his contacts with defendant and gang activity within the precinct. The government did not initially offer Sergeant Donohue's testimony during the suppression hearing, and appeared satisfied with Officer Vasilopoulos's identification. The defense requested the testimony of Sergeant Donohue, (Tr. 149:22-23), who credibly testified that he recognized Woodford during the traffic stop. Based on these contacts, the court concludes that Sergeant Donohue was sufficiently familiar with defendant, and that his August 30, 2018, identification of Woodford as the shooter is independently reliable.

## II. Evidentiary Challenge

In addition to defendant's challenge under due process grounds, he argues the officers' in-court identification of the defendant from the video would violate the Federal Rules of Evidence. (Mot. 1.) First, defendant argues under Rule 701 that the officers' testimony would constitute improper lay

opinion testimony in that it would not be based on the officer's respective personal perceptions, and further that it would not be helpful to the jury.  Defendant argues that because the jury will see defendant during the trial, they will be perfectly capable of comparing his appearance to that of the shooter in the video.  (Supp. Mem. 25.)  Second, defendant argues that the identification testimony's probative value would be substantially outweighed by the risk of unfair prejudice to defendant under Rule 403.  (*Id.* at 33.)

Rule 701 of the Federal Rules of Evidence allows lay opinion testimony "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  *United States v. Arroyo*, 600 F. App'x 11, 15 (2d Cir. 2015)(quoting Fed. R. Evid. 701).  Such testimony should not be admitted, however, "where the jury is 'in as good a position as the witness to draw the inference' . . . as the opinion is not helpful and should not be admitted."  *Id*. (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992)).

Defendant argues that the officers' testimony would not satisfy Rule 701(a)'s requirement of personal perception, citing to *United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005),

in support.  (Supp. Mem. 26.)  The Second Circuit found a law enforcement witness's opinion concerning the defendant's role in a conspiracy was not based on "personal endeavors" where it was the product of "the collective knowledge" of various other agents.  *Garcia*, 413 F.3d at 213.  The government argues that *Garcia* is inapposite given the officers' personal observations of defendant in person and through social media.  (Supp. Opp. 11-12.)

The court agrees with the government.  Though it is plain to see that the officers collaborate and consult with each other as a team tasked with investigating and preventing gang-related crime, there is ample testimony from both officers supporting their personal knowledge and observations of defendant.  The fact that their investigation is a joint endeavor does not preclude each from gaining or testifying to their personal knowledge.  Thus, Rule 701(a) is satisfied.

Defendant next argues the officers' testimony would not be helpful to the jury because the officers were not sufficiently familiar with Woodford.  (Supp. Mem. 30-31.)  In support, defendant largely recounts the same arguments he made in support of his due process challenge, that the officers prior contacts with defendant were not substantial.  Specifically, defendant argues that the officers did not testify to any specific awareness of a characteristic of defendant that the

jury would not observe during trial.  (*Id.* at 31-32.)  Defendant

concludes that, because the officers are not familiar with

Woodford, their identification testimony would simply be drawing

inferences that are the jury's function to draw.  (*Id.* at 33.)

The government responds that the officers' testimony

would be helpful because it is based on factors not otherwise

possessed by the jury, namely the officers' experience and

observations of defendant.  (Supp. Opp. 12.)  In support, the

government cites to *Arroyo*, in which a building superintendent

who did not observe a shooting, identified a defendant from a

surveillance video of a shooting based on the superintendent's

observation of the defendant in the building several times prior

to the shooting.  (*Id.* (citing *United States v. Arroyo*, 600 F.

App'x 11, 15 (2d Cir. 2015).)  The Second Circuit upheld the

identification testimony because it "was based on factors that

the jury did not possess, namely [the superintendent's]

familiarity with [the defendant's] manner of dress, gait, and

demeanor."  *Arroyo*, 600 F. App'x at 15.

It is true the jury will observe Mr. Woodford

throughout the trial, though defendant acknowledges the jury

will not likely observe defendant walking or moving in the

manner which the shooter does on the video footage.  The jury's

observation of Mr. Woodford, however, pales in comparison to the

officers' familiarity with him leading up to the shooting.  For

the reasons discussed at length above, and based on at least

Officer Vasilopoulos's credible testimony during the hearing,

the jury will not have the same familiarity with Mr. Woodford as

Officer Vasilopoulos had at the time of the August 30, 2018,

shooting and his subsequent identification.  The officers

clearly possess greater familiarity with defendant than did the

superintendent in *Arroyo*, as their task as officers was to

investigate gang activity, including identifying and tracking

suspected gang members.

Finally, defendant argues that the officers'

identification testimony will be prejudicial because of their

status as law enforcement officers in general, and specifically

as gang intelligence officers.  (Supp. Mem. 33-34.)  Such

testimony, defendant argues, "highlight[s] the defendant's prior

contact with the criminal justice system."  (*Id.* at 33.)  The

resulting prejudice, according to defendant, would outweigh the

limited probative value of the officer's identification

testimony.  The government does not directly respond to this

argument.  Nevertheless, the court finds that the probative

value of the officer's testimony is substantial, and is not

outweighed or substantially outweighed by the risk of unfair

prejudice of which defendant complains.  Moreover, the court

will entertain giving an instruction reminding the jury that it

is the jury's task to weigh the credibility of all witnesses and decided what and whom a video depicts.

## CONCLUSION

Based on the foregoing, the court finds defendant Woodford's due process rights will not be violated by the admission of Officer Vasilopoulos's and Sergeant Donohue's identification testimony.  Moreover, defendant has not demonstrated that the officers' identification testimony would not comport with the Federal Rules of Evidence.  Defendant's motion to suppress Officer Vasilopoulos's testimony and Sergeant Donohue's testimony is DENIED.

**SO ORDERED**

Dated:    October 23, 2019
          Brooklyn, New York

                              _____/s/_____
                              **Hon. Kiyo A. Matsumoto**
                              United States District Court