182

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - -X
3    UNITED STATES OF AMERICA,      : 18-CR-654 (KAM)
                                    :
4              Plaintiff,           :
                                    : United States Courthouse
5         -against-                 : Brooklyn, New York
                                    :
6    DARELL WOODFORD,               :
                                    : Monday, July 23, 2019
7              Defendant.           : 12:30 p.m.
- - - - - - - - - - - - - - - -X
8

9

10                TRANSCRIPT OF CRIMINAL CAUSE FOR
                  EVIDENTIARY HEARING (CONTINUED)
               BEFORE THE HONORABLE KIYO A. MATSUMOTO
11                UNITED STATES DISTRICT JUDGE

12
                      A P P E A R A N C E S:
13

     For the Government:       RICHARD P. DONOGHUE, ESQ.
14                             United States Attorney
                               Eastern District of New York
15                             271 Cadman Plaza East
                               Brooklyn, New York 11201
16                             BY:  ERIN REID, ESQ.
                                    TEMIDAYO AGANGA-WILLIAMS, ESQ.
17                             Assistant United States Attorney

18   For the Defendant:        FEDERAL DEFENDERS OF NY, INC.
                               One Pierrepont Plaza
19                             16th Floor
                               Brooklyn, New York 11201
20                             BY:  ALLEGRA GLASHAUSSER, ESQ.
                                    MICHAEL WEIL, ESQ.
21

22   Court Reporter:          DAVID R. ROY, RPR
                              225 Cadman Plaza East
23                            Brooklyn, New York 11201
                              drroyofcr@gmail.com
24
     Proceedings recorded by Stenographic machine shorthand,
25   transcript produced by Computer-Assisted Transcription.

Proceedings                    183

1              (In open court.  Continuation from July 8, 2019.)

2              THE COURTROOM DEPUTY:  This is the continuation of

3     the evidentiary hearing 18-CR-654, USA versus Darell

4     Woodford.

5              Would the Government's attorney state your

6     appearances?

7              MS. REID:  Yes.  Good afternoon, Your Honor.  Erin

8     Reid for the Government, along with Temidayo

9     Aganga-Williams; and with the Court's permission, Bailey

10    Springer, who is an intern with our office.

11             THE COURT:  Thank you.  All right.  Good

12    afternoon.

13             THE COURTROOM DEPUTY:  And on behalf of

14    Mr. Woodford?

15             MS. GLASHAUSSER:  Good afternoon, Your Honor.

16    Allegra Glashausser representing Mr. Woodford.  Also with me

17    is Michael Weil, another lawyer with the Federal Defenders.

18    We are also joined by Rachel Bass, paralegal at

19    Federal Defenders, and Katherine Matejcak, an intern with

20    Federal Defenders.

21             And I will let her spell her name for you.

22             MS. MATEJCAK:  M-A-T-E-J-C-A-K.

23             THE COURT:  All right.  Thank you.  Good

24    afternoon.

25             All right.  Are we ready to continue with the

Proceedings                   184

1    testimony of the sergeant, Ms. Reid?

2         MS. REID:  Well, Your Honor --

3         THE COURT:  Oh, right.  This was Ms. Glashausser's

4    witness.  You are correct.

5         MS. REID:  I just wanted to raise one issue before

6    we started.  Ms. Glashausser asked me to ask the officer to

7    bring his memo book from August 30th of 2018, which he did,

8    Your Honor, and I provided a redacted version to the

9    defense.

10        I wanted to just hand up a copy of the redacted

11   version, as well as the unredacted version, in case the

12   Court could review the redactions.  There was a question

13   about them this morning from the defense.

14        THE COURT:  All right.  Thank you.

15        And could you just describe on the record what it

16   is that you redacted so we have an idea?

17        MS. REID:  Yes, Your Honor.  I redacted irrelevant

18   and confidential materials within the memo book.

19        THE COURT:  All right.  Thank you.

20        All right.  Ms. Glashausser, do you have any

21   issues?

22        MS. GLASHAUSSER:  No, Your Honor.  I just inquired

23   about the redactions, and if Your Honor agrees with them,

24   then I have no...

25        THE COURT:  The Government had represented that

Proceedings                    185

1   the redactions were for confidential or irrelevant material.

2   Are the redactions that you have given to me due to the

3   confidential nature of it or the irrelevant nature of it or

4   both?

5           MS. REID:  Both, Your Honor.

6           THE COURT:  All right.

7           MS. REID:  But in particular the confidential

8   nature.

9           THE COURT:  All right.  I understand it is

10  confidential, but are you also saying that the redactions

11  have nothing whatsoever to do with this case?

12          MS. REID:  That's right, Your Honor.

13          THE COURT:  All right.  I'm satisfied, then, with

14  that representation.

15          MS. GLASHAUSSER:  Thank you, Your Honor.

16          And I apologize, Your Honor, but we seem to be

17  having some sort of audio difficulty in the other room.  The

18  audio is --

19          MR. WEIL:  I think if we speak into the

20  microphone.  I think as long as the people speak into the

21  microphone.  My understanding is that the defendant could

22  not hear Ms. Glashausser when standing.  So I think that if

23  the parties speak into the microphones, it will -- it will

24  do better.

25          THE COURT:  All right.  Your voice just has to

Proceedings                                    186

1    carry across the disk on the desk if you want your client to

2    hear you.

3                All right, Ms. Glashausser?

4                MS. GLASHAUSSER:  Thank you, Your Honor.

5                THE COURT:  All right.  And are you ready to

6    proceed?

7                MR. WEIL:  Your Honor, there was the brief --

8    before we continue with the witness, there was briefing

9    around the discovery issue.  I don't know if the Court wants

10   to take that up at the close of today's hearing, or if you

11   would --

12               THE COURT:  I think at the close would be fine so

13   the sergeant does not have to sit here through that.  I am

14   imagining that the parties are far apart on this issue.  I

15   am not sure that they are as far apart as they might think

16   they are.  But I think we can go ahead with the sergeant's

17   testimony so as not to delay him from his duties this

18   afternoon.

19               MR. WEIL:  Thank you.

20               THE COURT:  All right.  So if he is outside, maybe

21   we can get him up here on the stand.

22               MS. REID:  Yes, he is in the witness room,

23   Your Honor.

24               THE COURT:  All right.  Thank you.

25               (Pause in proceedings.)

Proceedings                187

1          (The witness enters the courtroom.)

2          THE COURT:  Good afternoon.

3          THE WITNESS:  Good afternoon, Your Honor.

4          THE COURT:  Sir, you are still under oath, all

5    right?

6          THE WITNESS:  Yes.

7          THE COURT:  So you are still under oath.  I do not

8    think there is any need, unless any of the parties request

9    to re-swear the witness.  He understands that he is still

10   under oath.

11         Speak toward the microphone.  You do not need to

12   get too close to it.  Just maintain about five inches, all

13   right?

14         THE WITNESS:  Okay.

15         THE COURT:  Thank you.

16         MS. GLASHAUSSER:  I apologize, Your Honor.  It

17   seems that the audio-visual have cut out in the other room.

18   I'll let Mr. Weil elaborate.

19         MR. WEIL:  Yes.

20         MS. GLASHAUSSER:  He's the one getting the text

21   messages.

22         MR. WEIL:  Yes.  Your Honor, now I'm speaking into

23   the microphone.  I've been told that the technical aides are

24   changing out a cable right now, and they've lost all

25   audio-visual.  If you give me a moment I think they're

Proceedings                           188

1    getting it fixed right now.
2             THE COURT:  Is there someone from IT in the
3    courtroom with --
4             MR. WEIL:  There is.
5             THE COURT:  -- Mr. Woodford?
6             MR. WEIL:  There is, Your Honor.
7             THE COURT:  All right.
8             MR. WEIL:  And I think I'll get a text as soon as
9    they're back up.
10            THE COURT:  All right.
11            Do you have one of your colleagues in the room, is
12   that how you --
13            MR. WEIL:  We do.
14            THE COURT:  All right.
15            MR. WEIL:  So I'm getting texts when there are
16   issues.
17            THE COURT:  All right.  I'm sorry there are
18   issues.
19            (Pause in proceedings.)
20            MR. WEIL:  It seems that -- I've gotten a text
21   that the audio has been fixed.
22            THE COURT:  What about the visual?
23            MR. WEIL:  Not yet.
24            (Pause in proceedings.)
25            THE COURT:  I apologize.  I think we can get

Donohue - Direct - Glashausser          189

1    started.

2              MS. GLASHAUSSER:  Thank you, Your Honor.

3              (The witness resumes the witness stand.)

4    C H R I S T O P H E R   D O N O H U E,

5         called as a witness, having been previously duly

6         sworn, was examined and testified as follows:

7    DIRECT EXAMINATION (CONTINUED)

8    BY MS. GLASHAUSSER:

9    Q    Good afternoon, Sergeant Donohue.

10   A    Good afternoon.

11   Q    So you testified that your job is to be the field

12   intelligence officer, right?

13   A    That's correct.

14   Q    And as the name suggests, part of that job is

15   collecting intelligence, right?

16   A    Yes.

17   Q    And that means collecting information about the people

18   in your precinct, right?

19   A    Certain individuals, yes.

20   Q    And as part of that collection you go out on patrol,

21   right?

22   A    Occasionally.

23   Q    Do you patrol by car when you go out on patrol?

24   A    Yes.

25   Q    And how often are you out on patrol -- or were you when

1    you were the field intelligence officer?

2    A    I tried to get out for a short time daily.

3    Q    Daily?

4    A    I tried to.

5    Q    Okay.

6    A    Yes.

7    Q    In your car?

8    A    Yes.

9    Q    And how would you collect the intelligence?

10   A    Well, I -- what do you mean by the question?  I'm

11   sorry.

12   Q    Well, when you would learn something new when you were

13   on patrol, what would you do to collect it; how would you

14   record it?

15   A    Well, you know, I wouldn't record it anywhere.  It

16   would just be information we would, know unless it wasn't a

17   major event.

18   Q    Well, you said that you go out on patrol for a short

19   time daily, but the other officers in your unit go out more

20   often, right?

21   A    Sometimes, yes.

22   Q    Without you sometimes?

23   A    Yes.

24   Q    So how would you learn the information that those

25   officers would see on patrol?

Donohue - Direct - Glashausser                191

1    A    Just through general speaking with one another.

2    Q    Well, if your job is to collect intelligence, where

3    would you store the information that you collect?

4    A    There is no one place to store it.

5    Q    Well, there are numerous places?

6    A    No.  There -- there's -- I would record things on DD-5

7    sometimes.  We have RTRD, which is a recidivist tracking

8    database, I believe, that stores like a recidivists and our

9    crews.

10   Q    By crews do you mean people that you believe are

11   involved in gangs?

12   A    Correct.

13   Q    So there's a database that tracks the people that you

14   believe are involved in gangs?

15   A    Yes.  That also DAS Lite as well.

16   Q    So the recidivist tracking database tracks the crews

17   that you're monitoring?

18   A    Yes.

19   Q    Okay.  And is that available on the DAS Lite system as

20   well?

21   A    No, they're two different systems.

22   Q    They're two different systems?

23   A    Yes.

24   Q    Can you get the recidivist tracking database on your

25   telephone?

Donohue - Direct - Glashausser                192

1   A    I -- I don't know.  I never have personally.

2   Q    Well, how do you access it?

3   A    From the hardtop computer.

4   Q    And do you input information when you learn new

5   information?

6   A    We input people, yes.

7   Q    And do other precincts have access to the database as

8   well?

9   A    Yes.

10  Q    So you in the 70th Precinct can see what somebody in

11  the 67th Precinct enters about an individual?

12  A    Correct.

13  Q    So if you look up an individual's name in the database,

14  do you see the whole history of any interactions an officer

15  has had with that person?

16       MS. REID:  I would object on the grounds of

17  relevance.

18       THE COURT:  Well, what is the relevance,

19  Ms. Glashausser?

20       MS. GLASHAUSSER:  Well, Your Honor, the sergeant

21  and the End Officer Vasilopoulos are testifying about how

22  they know Mr. Woodford and the other people that they

23  believe to be in a crew or gang, and I understand him to be

24  testifying about the way that they track those individuals,

25  which is --

Proceedings                                193

1        THE COURT:  He did not say that that is how he did

2   it.

3        You asked him how he records information and what

4   databases exist.

5        MS. GLASHAUSSER:  Correct, Your Honor.

6        THE COURT:  He was not testifying specifically in

7   regard to Mr. Woodford.  And I am not going to allow you to

8   take a whole deep dive into the intelligence databases of

9   NYPD, all right?  If you have specific questions about

10  Mr. Woodford and whether this individual was aware of him

11  prior to the identification, you may do that.  But you do

12  not get to explore everything about the database and then

13  ask me for subsequent permission to get access to the

14  database, because that is not going to happen.

15       It is not relevant and you are not entitled to

16  that.

17       MS. GLASHAUSSER:  Okay, Your Honor.

18       THE COURT:  So if you have specific questions

19  about how he knew Mr. Woodford or how he was familiar with

20  him or whether or not he was able to identity him based on

21  his investigations, patrols, and viewings of specific

22  videos, you may do that.

23       MS. GLASHAUSSER:  Well, Your Honor, may I ask if

24  he tracked the 8 Trey Cowboy Crips in this database?

25       THE COURT:  No.

Proceedings                    194

1          I mean, why is that relevant?

2          MS. GLASHAUSSER:  Well, I understand from the

3    Government's submissions and the previous officer's

4    testimony that the tracking of that group is how they are

5    saying they came to know or be aware of Mr. Woodford.

6          THE COURT:  Well, I think the prior --

7          MS. GLASHAUSSER:  So, Your Honor, you know, that

8    seems to me to be directly relevant to whether or not he had

9    an adequate knowledge about Mr. Woodford before viewing the

10   video.

11         THE COURT:  I think the prior officer testified

12   about how he personally became familiar with Mr. Woodford

13   and his associates and the 8 Trey Cowboy Crips, and he did

14   not testify about tracking or recording or extracting

15   information from any database, as I recall.

16         MS. GLASHAUSSER:  Well, Your Honor, he testified

17   that he documented it.  And then when I asked him how he

18   documented the information, he said that he didn't do any

19   reports, didn't write anything down.  And this is the first

20   I learned of this database, which sounds like where

21   Officer Vasilopoulos may have been -- what

22   Officer Vasilopoulos may have been referring to when he

23   said, I documented it.

24         THE COURT:  He did not say that he used -- this

25   witness did not say that he accessed information from this

Proceedings                    195

1   database.  He said it was accessible to police officers in

2   the precinct.

3          But what is at issue is his identification of

4   Mr. Woodford.

5          MS. GLASHAUSSER:  Understood, Your Honor.  And

6   how -- I have plenty of questions about that specifically.

7   But I do believe how he was tracking information as the

8   field intelligence officer and how he was monitoring the

9   specific crew, the 8 Trey Cowboy Crips and the specific

10  people in it, are directly relevant to how well he knew the

11  individuals we're talking about.

12         THE COURT:  There is one individual we are talking

13  about right now and that is Mr. Woodford, his identification

14  of Mr. Woodford.

15         MS. GLASHAUSSER:  Correct, Your Honor.

16         THE COURT:  And I understand that some of the

17  identification may have had something to do with the

18  associations that Mr. Woodford had with some of the other

19  members of the -- or associates of the 8 Trey Cowboy Crips.

20         MS. GLASHAUSSER:  Yes, Your Honor.

21         THE COURT:  But this witness has not testified

22  that he put data into the database or that he accessed the

23  database.

24         If you want to ask him that with regard to

25  Mr. Woodford, you may do so.

Donohue - Direct - Glashausser                196

1          MS. GLASHAUSSER:  Okay.  Thank you, Your Honor.  I

2     will do that.  Thank you.

3     BY MS. GLASHAUSSER:

4     Q    Sergeant Donohue, did you access this database to

5     search for information about Mr. Woodford?

6     A    I recall seeing him in there.  I don't know if I

7     specifically searched it.  But I know he is entered into the

8     system.

9     Q    Well, how did you learn that he is entered into the

10    system?

11    A    I don't know.  I just recall -- I know that he is in

12    the system.  I don't remember how I came about that

13    information, if I ran it myself or it was presented to me by

14    one of my officers.

15    Q    All right.  And how would something like that be

16    presented to you?

17    A    I don't know.  It -- a piece of paper given to me,

18    maybe.

19    Q    Sergeant, what type of piece of paper; would it be a

20    report?

21          MS. REID:  Objection.

22          THE COURT:  I will let him answer this question,

23    then we are going to move on.  Okay?

24    A    It's a printout.  When the NYSID is run, it prints out

25    the information of the individual.

Donohue - Direct - Glashausser                 197

1   BY MS. GLASHAUSSER:

2   Q    And do you have that piece of paper with regards to

3   Mr. Woodford?

4   A    Not with me, no.

5   Q    But would you have it in your records?

6   A    I -- I don't think so.

7   Q    I would like to turn your attention to July 17th.  You

8   did a car stop that day, right?

9   A    I believe so.

10          If I could refer to my memo book?

11  Q    Okay.  Would you like me to -- do you have it with you,

12  Sergeant?

13  A    Yes, I do.

14  Q    Okay.

15  A    Yes, I conducted a car stop that day.

16  Q    And you were with Officer Vasilopoulos?

17  A    Yes, I was.

18  Q    And Officer Lopez?

19  A    Yes, I was.

20          MS. GLASHAUSSER:  Your Honor, I apologize.

21  Mr. Weil has just told me that the audio has cut out again

22  in the other room.

23          THE COURT:  Abe, they do not have audio in there.

24          COURTROOM TECHNICAL OFFICER:  I know, they just

25  told me that right now.  Let me call them.

```
                        Proceedings                      198
```

1       (Pause in proceedings.)

2           MR. WEIL:  Your Honor?

3           THE COURT:  Yes.

4           MR. WEIL:  We've been told the audio is back.  I

5   just wanted to advise the Court from the defense perspective

6   if the Court wants to try putting Mr. Woodford in the back

7   room there.

8           THE COURT:  We are trying that.  We were just

9   checking with the marshals --

10          MR. WEIL:  Okay.

11          THE COURT:  -- to make sure.

12          That was my original plan.  Since he is not seeing

13  the witness anyway, but can sit in the back with that door

14  open.  I just do not know if it is a security issue.

15          MR. WEIL:  Right.

16          THE COURT:  I do not want to present any security

17  issues, but I do not see the problem.  If the marshals have

18  a problem, I will not do it.

19          MR. WEIL:  Or a speakerphone would work.  I just

20  wanted to say the defense is open to any solution at all to

21  move it along.

22          THE COURT:  A speakerphone where we would --

23          MR. WEIL:  I question whether a speakerphone by

24  the Court would suffice.  We sometimes have people appearing

25  for arraignment remotely like that.  It's difficult --

Proceedings                                        199

1          THE COURT:  Do you mean a speakerphone to

2    Judge Mauskopf's courtroom?

3          MR. WEIL:  That would be another option, right,

4    Your Honor.

5          (Pause in proceedings.)

6          THE COURT:  All right.  Okay.  Yes, let's do that.

7          We are just going to have him sit where he can

8    hear what is going on in the courtroom.  So everybody needs

9    to remember to please use the microphones and speak up.  All

10   right?

11         (Pause in proceedings.)

12         THE COURT:  Why don't you keep going until --

13   Mr. Weil, tell your colleague when he is ready to be moved,

14   we will stop and let him be moved.  But why don't we just

15   keep going right now.  We are already running an hour and a

16   half behind thanks to this glitch.  I'm sorry.

17         MR. WEIL:  Your Honor, when you say "when he's

18   ready," I just don't --

19         THE COURT:  When he's ready to be moved.  When the

20   marshals are ready to move him here --

21         MR. WEIL:  Okay.

22         THE COURT:  -- into the pen.

23         (Pause in proceedings.)

24         MR. WEIL:  All right.  They've moving him now,

25   Judge --

Donohue - Direct - Glashausser                    200

1           THE COURT:  All right.

2           MR. WEIL:  -- so...

3           (Pause in proceedings.)

4           MR. WEIL:  I believe he may still be downstairs,

5    Your Honor.  They're coming up now.

6           (Pause in proceedings.)

7           THE COURT:  All right.  I think we are ready to

8    proceed.

9           MS. GLASHAUSSER:  Thank you, Your Honor.

10   BY MS. GLASHAUSSER:

11   Q    So Sergeant Donohue, I was asking you about a July 17th

12   car stop, and I believe you just said you were with

13   Officer Vasilopoulos that day?

14   A    Correct.

15   Q    And Officer Lopez?

16   A    Correct.

17   Q    And do you remember why the car was stopped on

18   July 17th?

19   A    I don't.

20   Q    Do you remember the name of the driver of the car?

21   A    Not off the top of my head, no.

22   Q    Well, the driver of the car was arrested; is that

23   right?

24   A    Yes.

25   Q    And when the three of you searched the car,

Donohue - Direct - Glashausser                201

1   Officer Vasilopoulos went up to the passenger's side of the
2   car, right?
3   A    I believe so.
4   Q    Well, do you remember, Sergeant, what
5   Officer Vasilopoulos did?
6   A    I believe he went to the passenger's side of the car.
7   Q    And Officer Lopez arrested the driver?
8   A    Yes.
9   Q    And what was your role?
10  A    I was -- I'm the supervisor.  I'm there to make sure
11  that my officers are supervised.
12  Q    And so what does that mean; do you --
13  A    To verify the arrest, basically.
14  Q    Okay.  So once they decide to arrest, somebody you
15  verify it?
16  A    Correct.  And verify that their legal premise to be
17  arresting a person.
18  Q    So in this case you verified the arrest of the driver
19  of the car?
20  A    That's correct.
21  Q    Did you get out of the car during the car stop, or do
22  you do that from inside the car?
23  A    No, I'm outside the car.
24  Q    You wrote down in your memo book that the car was
25  stopped, right?

Donohue - Direct - Glashausser          202

1   A    Yes, I did.

2   Q    And you wrote down information about the person that

3   was arrested, right?

4   A    (No audible response.)

5   Q    That the person was arrested?

6   A    That the person was arrested, yes.

7   Q    You just wrote that, 92PO Lopez for open warrant,

8   correct?

9   A    Correct.

10        THE COURT:  And, Ms. Glashausser, would you just

11  mind referring to an exhibit number so that our record is

12  clear?

13        MS. GLASHAUSSER:  Sure, Your Honor, of course.

14  This is marked as 3500 CD2 --

15        THE COURT:  Is that D, as in "David" or --

16        MS. GLASHAUSSER:  D, as in "David" as in

17  Mr. Donohue.

18        THE COURT:  Thank you.

19        MS. GLASHAUSSER:  Let me just make sure that's --

20        MS. REID:  Your Honor, its's not been offered as

21  an exhibit.

22        THE COURT:  All right.  She was reading from

23  something.  I just wanted the record to reflect what it was.

24        MS. REID:  Yes.  And I would object to her reading

25  it.  It's not in evidence.

Donohue - Direct - Glashausser                    203

1          THE COURT:  Well, she is just using it to examine

2    him about what he wrote.

3          You are not reading it in verbatim, correct?  You

4    are just asking him specific questions about his entries?

5          MS. GLASHAUSSER:  Right.  I'm asking him about

6    what he wrote in his memo book.  And I apologize, it's

7    marked as 3500 CD3.  I misspoke earlier.

8          THE COURT:  All right.  Thank you.

9          MS. GLASHAUSSER:  May I continue, Your Honor?

10         THE COURT:  Yes, you may.

11         MS. GLASHAUSSER:  Thank you.

12         THE COURT:  I just want to make clear you

13   understand.  You are not reading his memo book into the

14   record, but you are asking him specific questions --

15         MS. GLASHAUSSER:  Right.

16         THE COURT:  -- about particular entries that he

17   made --

18         MS. GLASHAUSSER:  That's correct, Your Honor.

19         THE COURT:  All right.

20         MS. GLASHAUSSER:  Correct.

21         THE COURT:  Thank you.

22         Go ahead, Ms. Glashausser.

23   BY MS. GLASHAUSSER:

24   Q    So, Sergeant Donohue, when you wrote 92, does that mean

25   that somebody is arrested?

Donohue - Direct - Glashausser                    204

1    A    Yes.  That means somebody was placed under arrest.

2    Q    And that person was not Mr. Woodford, right?

3    A    It was not.

4    Q    You didn't write down anything about Mr. Woodford?

5    A    I did not.

6    Q    And you didn't write down anything about seeing people

7    associated with the 8 Trey Cowboy Crips?

8    A    I did not.

9    Q    And did you talk to the driver during this car stop, or

10   do you remember?

11   A    I don't remember.

12   Q    Do you remember if you talked at all to the driver or

13   the passenger during the car stop?

14   A    I don't remember me personally having a specific

15   conversation with either one.

16   Q    And so did you recognize either of the people in the

17   car?

18   A    I did recognize the passenger.

19   Q    Had you met the passenger before?

20   A    I hadn't.

21   Q    You had not?

22   A    I had not.

23   Q    How did you recognize him?

24   A    I knew him from his associates, and I had seen him on

25   YouTube as well.

Donohue - Direct - Glashausser                205

1   Q    And what do you mean by you knew him from his

2   associates?

3   A    The people who he associates with, the 8 Trey Cowboy

4   Crips, I know them, and he was in videos -- or a video with

5   them.

6   Q    Was the driver of the car somebody you recognized as an

7   8 Trey Cowboy Crips or associate?

8   A    He was not.

9   Q    So you said that you knew the passenger, you'd seen a

10  video of him.  Had you ever seen him in person before the

11  stop?

12  A    Not that I recall.

13  Q    I would like to turn to August 30th, Sergeant Donohue.

14  You had testified when you were here a couple of weeks ago

15  that you were working that day on August 30th; is that

16  right?

17  A    Yes, I was.

18  Q    Do you recall what hours you worked that day?

19  A    Can I refer to my notebook?

20  Q    Please.

21  A    I worked a tour of 13:40 hours by 22:15.  That's

22  4:40 in the afternoon to 10:15 at night.

23  Q    Was that your regular tour or did you have reason to

24  stay late that day?

25  A    I -- I don't know.  As the field intelligence officer,

Donohue - Direct - Glashausser                206

1    I work odd hours.

2    Q    Well, do you note in your memo book if you take any

3    overtime?

4    A    Yes.

5    Q    And did you take any overtime that day?

6    A    Yes.  I took 30 minutes of overtime.

7    Q    So maybe I heard you wrong, but you testified that your

8    shift ended at 10:15.  So is that before or after the

9    overtime?

10   A    My shift ended at 10:15, and I left at 10:45 taking 30

11   minutes at the end.

12   Q    And does your memo book indicate why you took extra

13   time that day?

14   A    No, we're not required to put that.

15   Q    Do you recall why you took extra time that day?

16   A    I don't.

17   Q    Well, on that day you learned that there had been a

18   shooting, right?

19   A    Yes.

20   Q    And the shooting was in the 6, 7 Precinct, the

21   67th Precinct, right?

22   A    Correct.

23   Q    And that precinct's next to your precinct; is that

24   right?

25   A    Yes.

Donohue - Direct - Glashausser                    207

1   Q    Is there a field intelligence sergeant in the role

2   similar to yourself in the 67th Precinct?

3   A    Yes, there is.

4   Q    And is that person's job like yours, to monitor the

5   crews and gangs in that precinct?

6   A    Same thing, yes.

7   Q    And is there any overlap between the gangs or crews

8   that the two of you monitor, you and your counterpart?

9   A    I'm confused by what you mean by "overlap."

10  Q    Well, do you share information with your counterpart in

11  the 67th Precinct?

12  A    Yes.

13  Q    And do they share information with you?

14  A    Yes.

15  Q    Specifically about gang members or crew members that

16  they are monitoring?

17  A    Yes, anything.

18  Q    And is there any sort of procedure about how that

19  information is shared?

20  A    No.  It's just through word of mouth.

21  Q    How frequently are you sharing information?

22  A    I -- I can't put an exact number on it.  It's whenever

23  we need to.

24  Q    Whenever you need to?

25  A    Yes.

Donohue - Direct - Glashausser                 208

1    Q    And you testified that on August 30th when you learned

2    about the shooting, you also learned the name of the person

3    who was shot, right?

4    A    That's correct.

5    Q    Did you learn that from your counterpart in the 6, 7?

6    A    I don't recall exactly where I heard it from, but I did

7    hear the name.

8    Q    Well, when there is a shooting -- let me step back.

9         When you heard the name, you believed the victim

10   was a member of the Folk Nation gang, right?

11   A    Correct.

12   Q    Okay.  And is the Folk Nation gang active in your

13   precinct?

14   A    In certain areas, yes.

15   Q    Okay.

16   A    But that's not their mainstay.

17   Q    But they are active in certain areas in the

18   70th Precinct?

19   A    Yes.

20   Q    And they're also active in the 67th Precinct?

21   A    Yes.

22   Q    Okay.  So the Folk Nation gang overlaps between your

23   two precincts; they're active in both precincts, right?

24   A    Yes.

25   Q    And so when something happens with a member of the

1   Folk Nation, is that the type of incident that would cause

2   you to report to the field intelligence officer of the

3   67th Precinct?

4   A    Yes.

5   Q    And vice versa, does the field intelligence officer in

6   the 67th call you or contact you if something happens with

7   the Folk Nation in their precinct?

8   A    Yes, normally.

9   Q    And you also knew the Folk Nation to be a rival gang to

10  the 8 Trey Cowboy Crips, right?

11  A    Correct.

12  Q    And the reason that you recognized the shooting

13  victim's name was because he was in the Folk Nation; is that

14  right?

15  A    Correct.

16  Q    But it is also because he was involved in a prior

17  shooting in your precinct, right?

18  A    Correct.

19  Q    And was that shooting related to the 8 Trey Cowboy

20  Crips?

21           MS. REID:  Objection.

22           THE COURT:  Is it a relevancy objection?

23           MS. REID:  Yes.

24           THE COURT:  Sustained.

25           MS. GLASHAUSSER:  Your Honor, may I explain why

Donohue - Direct - Glashausser                210

1    I'm asking the question?

2              THE COURT:  All right.

3              MS. GLASHAUSSER:  I'm trying to find out what

4    information the sergeant knew before seeing the video.

5              THE COURT:  Knew about what specifically?

6              MS. GLASHAUSSER:  About what was happening in the

7    video.  He knew the name of the victim, knew that person to

8    be a gang member in the Folk Nation, knew the Folk Nation

9    had a dispute with the 8 Trey Cowboy Crips.  This all goes

10   to what information he already had relating to his

11   identification before he viewed the identification video.

12             So I do think it's relevant if the prior shooting

13   was between the two -- the same two groups.

14             THE COURT:  All right.  Well, so you want to just

15   ask him whether or not the victim of the shooting

16   involved -- whether the shooting itself involved an

17   inter-gang shooting between the 8 Trey Cowboy Crips and the

18   Folk Nation?

19             MS. GLASHAUSSER:  The prior shooting, the one that

20   the victim in the August 30th shooting was the perpetrator

21   of.

22             THE COURT:  All right.  I'll let you answer that

23   question.

24             MS. GLASHAUSSER:  Thank you, Your Honor.

25             THE WITNESS:  Could you just say it one more time?

Donohue - Direct - Glashausser                    211

1    I'm sorry.

2              MS. GLASHAUSSER:  Yes, I'll ask it again, of

3    course.

4    BY MS. GLASHAUSSER:

5    Q    Okay.  The prior shooting that the victim was involved

6    in in your precinct, was that related to the 8 Trey Cowboy

7    Crips?

8    A    No, it was not.

9    Q    When did you learn the victim's name in the August 30th

10   shooting?

11   A    I -- I -- I don't know.  I don't recall.

12   Q    Well, what did you do when you learned the victim's

13   name?

14   A    Nothing.

15   Q    You didn't ask questions about the shooting?

16   A    I'm -- I might have asked questions.  I didn't do

17   anything physically.

18   Q    Okay.  What kind of questions did you ask?

19   A    I don't know.  I don't even -- I don't remember who

20   told me either.

21   Q    Okay.  But you were also told -- you were told where

22   the shooting was, right?

23   A    I believe so.

24   Q    And you also learned that somebody in the 67th Precinct

25   thought that an individual name Pudge Boom was somehow

Donohue - Direct - Glashausser                    212

1    involved in the incident, right?

2    A    Yes.  And that was -- that was later after I had left

3    work.

4    Q    Okay.  And how did you learn that information about

5    Pudge Boom?

6    A    My commanding officer, the -- I don't remember if he

7    called me, but he sent me an e-mail with the video.

8    Q    Did he send you an e-mail saying someone in the 67th

9    thinks Pudge Boom is in this video?

10   A    I don't remember if that was via e-mail, but he did

11   tell me that -- and, you know, that might have been over the

12   telephone.

13   Q    And Pudge Boom is someone you're familiar with?

14   A    Yes.

15   Q    How are you familiar with him?

16   A    He's another gang member in another command.

17   Q    In which command?

18   A    I believe in the 63rd.  I'm not 100 percent about that,

19   though.

20   Q    And what else did Palumbo -- that's your commanding

21   officer, right, Palumbo?

22   A    Yes.

23   Q    What else did he say to you other than the information

24   about Pudge Boom?

25   A    I -- I really don't remember.  I just -- I remember

Donohue - Direct - Glashausser                213

1  specifically that he said that they thought it was Pudge
2  Boom, and then they checked the e-mail.
3  Q    Did your commanding officer have an opinion about
4  whether or not it was Pudge Boom?
5  A    No, he doesn't now about that stuff.  He goes to me for
6  that.
7  Q    Okay.  So when you got the video, did you recognize
8  anyone in the video that -- well, let me just step back for
9  a second.
10        What video is it that your commanding officer sent
11 you; what did it show?
12 A    It was a video, street level.  Shows the victim walking
13 towards the camera and then other individuals walking
14 towards and then a fight ensues.
15 Q    And did you recognize anyone in that video?
16 A    I did.
17 Q    Who did you recognize?
18 A    You want to know all the people?
19 Q    Yes, please.
20 A    I recognized the victim.  I recognize Mike Williams.  I
21 recognized Tegan Chambers, and I recognize Darell Woodford.
22 Q    And how did you recognize Mike Williams?
23 A    I've known him for years.
24 Q    How?  In what -- how did you know him?
25 A    He's a known 8 Trey Cowboy Crips in my precinct.

Donohue - Direct - Glashausser                214

1   Q    So does that mean you had arrested him before; you had
2   talked to him; what does it --
3   A    I debriefed him.  I don't know if I've ever physically
4   arrested him, but I've been there when he was arrested.
5   Q    And the debrief is something that happens after an
6   arrest?
7   A    Yes.
8   Q    Okay.  And what about Tegan Chambers, how did you know
9   him?
10  A    The same, he's been around a long time.  Along with
11  Mike Williams, you know, they're pretty big rappers amongst
12  the Crips.
13  Q    So he's been around the precinct for some time.  Have
14  you debriefed him?
15  A    I believe so, yes.
16  Q    Had you arrested him?
17  A    Not physically, no.
18  Q    Were you there when he was arrested?
19  A    I -- I can't recall a specific incident.
20          MS. GLASHAUSSER:  I would like to play the video
21  that is marked -- it's already in evidence as GX8.  If we
22  could have the screen?
23  Q    Can you see the video, Sergeant Donohue?
24  A    Yes.
25          MS. GLASHAUSSER:  And, Your Honor, can you see the

Donohue - Direct - Glashausser                215

1   video.

2            THE COURT:  I can see it.

3            MS. GLASHAUSSER:  I'm going to play the video.

4            (Video plays.)

5   Q    Is this the video that we have been talking about that

6   your commanding officer sent you?

7   A    Yes, it is.

8   Q    I would like you to tell me when you recognize someone.

9   A    Okay.  Do you want me to say who?

10  Q    Yes.

11  A    I recognize the victim in the top of our screen.  He

12  has a pink do-rag on.

13           I recognize Mike Williams, he's at the bottom of

14  the screen with a black do-rag on.

15           And I recognize Tegan Chambers.  He's behind Mike

16  Williams with the bigger hair and a black shirt.

17           (Video stops.)

18  BY MS. GLASHAUSSER:

19  Q    The person you're describing in the black shirt as

20  Tegan Chambers, that person is turning and facing the

21  camera, right?

22  A    That's correct.

23  Q    And you can see his facial features, correct?

24  A    That's right.

25  Q    And the person who you described as Mike Williams in

Donohue - Direct - Glashausser                216

1    the black do-rag and maybe a blue shirt?  I apologize.  I

2    didn't hear what you said?

3    A    I believe I said black shirt.

4    Q    A black shirt.  He also turned to face the camera --

5    A    Correct, yes.

6    Q    -- a second ago, right?

7    A    Yes.

8    Q    And the victim, you can't see his face in this video,

9    right?

10   A    No.

11   Q    But you knew who he was when you were watching the

12   video?

13   A    I knew who he was because I have prior knowledge as to

14   who the victim was.

15   Q    Right.

16        Let me keep playing the video.

17        (Video plays.)

18        (Video stops.)

19   BY MS. GLASHAUSSER:

20   Q    And then at 29 seconds, the person you described as

21   Mike Williams turns and faces the camera again, right?

22   A    That's correct.

23   Q    And you can see his facial features?

24   A    You can.

25   Q    I'm going to keep playing the video.

Donohue - Direct - Glashausser                    217

1              (Video plays.)

2              (Videos stops.)

3    BY MS. GLASHAUSSER:

4    Q    And at 32 seconds, the person you described as Tegan

5    Chambers turns and faces the video as well?

6    A    That's correct.

7    Q    And you can see his facial features as well?

8    A    That's correct.

9              I recognize somebody else.

10   Q    Who?

11   A    They're not going to face the camera until they go up.

12   Darell Woodford.

13   Q    Okay.  And can you describe who?

14   A    He's a man, got no hat on, white shirt, black and white

15   shorts, basketball shorts.

16   Q    Okay.  And that person is not facing the camera; is

17   that right?

18   A    Not yet, no.

19              (Video plays.)

20              (Video stops.)

21   BY MS. GLASHAUSSER:

22   Q    Right there?

23   A    Oh, back.

24   Q    I'll back it up.

25              (Video plays.)

```
                 Donohue - Direct - Glashausser          218
```

1          (Video stops.)

2    A    Right there.

3    BY MS. GLASHAUSSER:

4    Q    You can't see that person's facial features; is that

5    right?

6    A    I know who he is by his body style and his face and his

7    hair.

8    Q    Can you see that person's facial features?

9    A    I can.  It's not clear, but I can see his face.

10         THE COURT:  You said you recognized him by his

11   hair and what else, his body?

12         THE WITNESS:  His hair, his body style.

13         THE COURT:  What is it about his hair that you

14   recognize?

15         THE WITNESS:  He's got a Cesar, close-cut hair.

16         THE COURT:  What is the Caesar close-cut?  Caesar

17   is what?

18         THE WITNESS:  Just a close-cut haircut.

19         THE COURT:  So is it uniformly short everywhere or

20   is there more hair other places.

21         THE WITNESS:  I mean, I guess a little shorter on

22   the sides, if that's described perfectly.

23         THE COURT:  Okay.

24   BY MS. GLASHAUSSER:

25   Q    And this person's face on the video is blurry; is that

Donohue - Direct - Glashausser                 219

1   right?

2   A    Yes.

3           MS. GLASHAUSSER:  Okay.  I'm going to close the

4   video.

5   Q    You had testified a couple weeks ago that you watched

6   that video on the side of the road, right?

7   A    That's correct.

8   Q    What did you do after you watched the video?

9   A    I believe I sent it to Vasilopoulos and then I called

10  him.

11  Q    Why did you send it to Vasilopoulos?

12  A    He's my assistant and we were talking about information

13  sharing.  It's how we go about things like that.

14  Q    What did you tell him when you sent it to him?

15  A    I said, Watch this.

16  Q    You said that -- well, how did you send it to him?

17  A    I don't remember if I e-mailed it or I texted it to

18  him.  I really can't recall.

19  Q    Okay.  And then you called him?

20  A    I called him or he called me, I don't remember, but we

21  were talked on the phone.

22  Q    And what did you say to him?

23  A    I let him watch the video and I remember his reaction

24  was something along the lines of, Oh, boy.

25  Q    So he watched the video while you were on the phone

Donohue - Direct - Glashausser                220

1   with him?

2   A    Yes.

3   Q    And he said, Oh, boy?

4   A    Something along those lines.  It was surprise.

5            THE COURT:  So he watched the video at the same

6   time he talked to you on the phone?

7            THE WITNESS:  Yes.

8   BY MS. GLASHAUSSER:

9   Q    When you called him, did you tell him that there had

10  been a shooting?

11  A    No.  He was aware of the shooting earlier, I believe.

12  Q    Well, did you tell him the victim's name?

13  A    I don't believe so.  I believe he already knew it.

14  Q    Did you tell him that the 67th thought that Pudge Boom

15  was in the video?

16  A    I'm sure I would have said that almost in a laughing

17  way -- like saying it in jest.

18  Q    And why would it be in jest?

19  A    Because the people in that video are very well-known in

20  Brooklyn South.

21  Q    Meaning you conveyed that you thought it wasn't Pudge

22  Boom in the video?

23  A    Correct.

24  Q    And did you tell him there are people in the video that

25  are very well-known in Brooklyn South?

Donohue - Direct - Glashausser                  221

1   A    I didn't have to.  Officer Vasilopoulos knows these

2   people better than I do.  He's probably the best one with

3   them.

4              THE COURT:  So the answer is you didn't talk to

5   Vasilopoulos while he was watching the video about who he

6   saw or for identifying anyone in the video?

7              THE WITNESS:  No.

8   BY MS. GLASHAUSSER:

9   Q    Well, what did he say other than, Oh, boy?

10  A    I'm -- I don't remember exactly.  I -- I know it was --

11  we were worried about retaliation, so we probably discussed

12  that.

13  Q    Why were you worried about retaliation?

14  A    Usually when something like that occurs between two

15  gangs, there's retaliation.  And being that the 8 Trey

16  Cowboy Crips are -- their mainstay is in the 70th Precinct,

17  we were worried about that.

18  Q    So you told him you were worried about retaliation?

19  A    I don't know if I said it specifically like that, but

20  yes, I definitely conveyed it.

21  Q    And that's one of the reasons you were having him watch

22  the video, right?

23  A    I don't know specifically.  I mean, I sent him the

24  video because he's my assistant, that's how was share our

25  information with one another.

Donohue - Direct - Glashausser                222

1    Q     Right.  Because you would need to share information if

2    you were worried about retaliation in your precinct,

3    correct?

4    A     Right.

5    Q     And you would want to make sure he had all the

6    necessary information to assess what to do?

7    A     Correct.

8    Q     So what gang might retaliate?

9    A     Correct.

10   Q     And who they would be retaliating against; is that

11   right?

12   A     Correct.

13   Q     Who else did you call after watching the video or

14   contact?

15   A     I definitely contacted one of my special operations

16   lieutenants, either Lieutenant Beaubois or

17   Lieutenant Epstein to just give them a heads-up as to where

18   our -- where our crime teams and whatnot should be

19   patrolling and covering to prevent retaliation.

20   Q     Were those people on duty at the time?

21   A     I believe -- I believe so.  I can't remember

22   specifically if they were.  They were south.

23   Q     Because Officer Vasilopoulos was already on his way

24   home, too, right?

25   A     I believe so, yes.

Donohue - Direct - Glashausser                    223

1  Q    Like you, right?

2  A    Yes.

3  Q    Well, did you call the lieutenants first?

4  A    I don't remember specifically who I called.

5  Q    What about your commanding officer?

6  A    I definitely would have called him.  I don't remember

7  specifically what I said, but I did relay the message to

8  him.

9  Q    What was the message to him?

10 A    That this is involving -- not involving Pudge Boom,

11 it's involving our 8 Trey Cowboy Crips.

12         THE COURT:  Did you tell us what gang, if any,

13 Pudge Boom was involved with?

14         THE WITNESS:  I believe he's a Blood.

15         THE COURT:  A what?

16         THE WITNESS:  A Blood.

17         THE COURT:  Thank you.

18         Go ahead.

19 BY MS. GLASHAUSSER:

20 Q    Did you call Officer Lopez?

21 A    I don't remember.

22 Q    The other people in your little -- your small team,

23 your small intelligence team?

24 A    Well, I -- I don't -- I don't remember if I called

25 Lopez or asphalt him, but the information was spread amongst

Donohue - Direct - Glashausser                    224

1   my team.

2   Q    Did you give the information to anyone in the

3   67th Precinct?

4   A    I believe I told the intelligence officer also.

5   Q    And what did you tell them?

6   A    I told them who was in the video.

7   Q    So we've been talking about that your commanding

8   officer, James Palumbo, sent you this video.  He sent that

9   in an e-mail, right?

10  A    I believe so, yes.

11  Q    I am going to show you what I will mark as

12  Defendant's Exhibit B for identification.

13        Do you recognize this as the e-mail that your

14  commanding officer sent you?

15  A    Yes, I do.

16        MS. GLASHAUSSER:  I would like to move

17  Defense Exhibit B into evidence, Your Honor.

18        MS. REID:  No objection.

19        THE COURT:  We will receive in evidence

20  Defense Exhibit B.

21        (Defendant's Exhibit B so marked and received in

22  evidence.)

23  BY MS. GLASHAUSSER:

24  Q    So looking at Defense Exhibit B, it looks like James

25  Palumbo sent you the video at 10:59, right?

Donohue - Direct - Glashausser          225

1   A     That's correct.

2   Q     Who else did he send it to?

3   A     I don't know.

4              MS. REID:  Objection.

5              MS. GLASHAUSSER:  It appears that the video was

6   sent to numerous people, but they are redacted.

7              MS. REID:  And I would object as grounds of

8   relevance, Your Honor, and...

9              THE COURT:  Well, was one of the redacted names

10  Officer Vasilopoulos --

11             THE WITNESS:  I --

12             THE COURT:  -- Ms. Reid?

13             MS. REID:  No, it's not, Your Honor.

14             THE COURT:  All right.

15         Why is it relevant to know who else got it when we

16  are disputing and moving to suppress the identifications of

17  Sergeant Donohue and Officer Vasilopoulos?

18             MS. GLASHAUSSER:  Well, Your Honor,

19  Sergeant Donohue doesn't remember how -- what was conveyed

20  to him or how he learned various things about the shooting,

21  and I'm trying to figure out how that information was

22  disseminated to him and to other officers in his team or in

23  the 67th Precinct.

24         And I -- I don't know what is under the redacted

25  box, but I am -- I think it is relevant.  If it was to

Donohue - Direct - Glashausser          226

1    members of his team or two officers in the 67th Precinct,

2    who else was also viewing the video and that -- perhaps that

3    would help refresh Sergeant Donohue's recollection of how he

4    came to learn about the shooting, the victim and the other

5    information about the shooting.

6              THE COURT:  Why don't you ask him first about how

7    he came to learn about the shooting, whether he learned

8    about it for the first time from Commander Officer Palumbo

9    as he was on route home or whether he learned about it

10   before he left work that day?

11             MS. GLASHAUSSER:  I believe the sergeant has

12   answered that question.  But I can ask it again.

13             THE COURT:  Thank you.

14   BY MS. GLASHAUSSER:

15   Q    Sergeant, you learned about the shooting while still at

16   the precinct, right?

17   A    Correct.

18             MS. REID:  And, Your Honor, I think he's testified

19   about his recollection of what he remembers.  I don't think

20   redacted e-mail addresses will change that and I don't

21   believe they're relevant.

22             MS. GLASHAUSSER:  Your Honor, I need to ask

23   Ms. Reid to bring the unredacted copy so that perhaps

24   Your Honor or Sergeant Donohue can look at it and see if the

25   names are relevant.  I'm not sure if they are because I'm

Donohue - Direct - Glashausser          227

1   not sure what the names --

2          THE COURT:  So what is at issue in this hearing is

3   the identification by Sergeant Donohue and

4   Officer Vasilopoulos.  So he testified as to what he did

5   when he received Mr. Palumbo's e-mail or whatever this is.

6   It looks like an e-mail, with the Nostrand Avenue D video

7   attached.

8          MS. GLASHAUSSER:  That is correct, Your Honor.

9          THE COURT:  And how he made the identification or

10  what he identified.

11         MS. GLASHAUSSER:  That is correct, Your Honor, but

12  he --

13         THE COURT:  So it's not really relevant what other

14  officers might have thought or seen, if they saw anything,

15  or gotten anything at all.

16         MS. GLASHAUSSER:  It's relevant what

17  Sergeant Donohue knew before watching the video.  And we

18  know he knew the shooting victim's name, where the shooting

19  was.  He doesn't recall how he learned that information and

20  perhaps knowing which other officers or wherever they are

21  were involved in this investigation at this stage may

22  refresh his recollection as to how he learned the

23  information and what additional information he learned.

24         THE COURT:  All right.

25         Did you speak to any other officers about the

Donohue - Direct - Glashausser          228

1   video before you watched it, Sergeant Donohue.

2          THE WITNESS:  No.  It would have only been

3   Inspector Palumbo.  He would have been the only one that I

4   spoke to.

5          THE COURT:  And when you received this from

6   Inspector Palumbo, you then watched the video?

7          THE WITNESS:  Yes, in my personal car.

8          THE COURT:  Did you reach your identification of

9   the various individuals that you named in the video from any

10  other source other than your own observation of it?

11         THE WITNESS:  I did not.

12         THE COURT:  I do not think the names of the other

13  recipients, assuming that is what was redacted are relevant,

14  Ms. Glashausser.

15  BY MS. GLASHAUSSER:

16  Q    So, Sergeant Donohue, the next day, August 31st, if we

17  go up in the exhibit, you e-mailed this video to

18  Officer Vasilopoulos, right?

19  A    Yes.  That's what it looks like.

20  Q    Why did you do that?

21  A    I -- I don't -- I don't remember.

22  Q    Well, this is the same video that you testified you had

23  sent to him on August 30th, right?

24  A    Yes, it is.

25  Q    And then if we keep scrolling up, you then -- it looks

Donohue - Direct - Glashausser                229

1   like you e-mailed it to yourself at some unknown date,

2   right?

3   A    Yes.

4   Q    When was that?

5           MS. REID:  Objection.  Your Honor, this is not

6   relevant.

7           THE COURT:  Okay.  I am giving you a lot of

8   latitude, Ms. Glashausser.  I am just not sure you are

9   focusing on or making a case for relevance.

10          He testified about getting the video, observing

11  it, and trying to identify who is depicted in it.  He

12  testified he had conversations after that, and he testified

13  about whether or not there were any conversations about the

14  video before he observed it.  What is your proffer of

15  relevance to ask him when he might have e-mailed this video

16  to himself?

17          MS. GLASHAUSSER:  Well, Your Honor, in

18  identification what information is known before the

19  identification and what information has been made after the

20  identification are both relevant to how suggestive or how

21  reliable the identification is.

22          THE COURT:  And we have gotten that from this

23  witness.  But then my question to you that you have not yet

24  answered is, why is it relevant as to when he e-mailed this

25  video or e-mailed something to himself -- it looks like he

Donohue - Direct - Glashausser          230

1    might have e-mailed the video to himself.

2         MS. GLASHAUSSER:  Honestly, Your Honor, I'm not

3    sure why he did.

4         THE COURT:  Well, why does it matter?

5         MS. GLASHAUSSER:  Because I believe that the

6    officer's credibility about the identification includes what

7    he did afterwards and what steps he took subsequent to

8    viewing the video.  That goes to how sure he felt in the

9    identification, how strong he believed the identification

10   was.  And the events that followed in the days immediately

11   subsequent to viewing the video are directly relevant to

12   that.

13        THE COURT:  But you just noted that this e-mail is

14   undated and it's not clear when he might have sent it to

15   himself.  I just -- look, we want to get this concluded,

16   right?  And I don't think you are necessarily pursuing

17   relevant information by asking the question regarding the

18   date, which is not apparent on the face of the video -- I

19   mean, of the e-mail.  The date is not apparently on the

20   e-mail as to when Sergeant Donohue e-mailed the video of

21   Nostrand Avenue D to himself.

22        MS. GLASHAUSSER:  I'll move on, Your Honor.

23        THE COURT:  All right, good.

24   BY MS. GLASHAUSSER:

25   Q    Sergeant Donohue, at some point you also received a

Donohue - Direct - Glashausser                231

1   video of the shooting, right?

2   A    Yes.

3   Q    When did you receive that?

4   A    I received it later on that night.

5   Q    Who sent it to you?

6   A    Once again, I'm sorry, I really don't recall that.

7           MS. GLASHAUSSER:  I would like to play for you

8   what's been admitted as Government's Exhibit 9A.

9           (Video plays.)

10          (Video stops.)

11          MS. GLASHAUSSER:  I apologize, Your Honor.  I'm

12  going to start it again with the video.

13          (Video plays.)

14          (Video stops.)

15  BY MS. GLASHAUSSER:

16  Q    Sergeant Donohue, is this the video you saw on

17  August 30th?

18  A    Yes, yes.

19  Q    And this seems to be a video that's recorded from a

20  computer, right?

21  A    Yes.

22          THE COURT:  What do you mean, from a computer?

23  Q    Well, at the top of the screen we have what looks like

24  the player of the computer and we hear people talking in

25  background, right?

Donohue - Direct - Glashausser                    232

1   A    Correct.

2   Q    Do you know who is speaking?

3   A    I don't.

4   Q    Do you know who recorded this video?

5   A    I do not.

6   Q    But this is the one that was sent to you?

7   A    I -- I would have to see the whole thing in whole, but

8   yes, I believe so.

9   Q    I'll play it.  It's short.

10              (Video plays.)

11              (Video stops.)

12  A    Yes.

13  Q    Okay.  So did you recognize that person speaking at the

14  end?

15  A    I didn't.

16  Q    And in this video you see a shooter, right?

17  A    Yes.

18  Q    You can tell it's a black man, right?

19  A    Yes.

20  Q    And you can see the person's clothing?

21  A    Correct.

22  Q    You can't see the features of the person's face in this

23  video?

24  A    Not the features of his face.

25  Q    Did you try to enhance this video to make the picture

Donohue - Direct - Glashausser                    233

1    better?

2    A    Not me personally, no.

3    Q    Did someone else try to enhance it?

4    A    I -- I believe -- I don't understand.  I'm sorry.

5    Q    To make the video clearer?

6    A    I don't know if anybody else tried to.  This was the

7    video I saw.

8    Q    Well, when you say that you personally didn't enhance

9    it, is the -- do you know that somebody else did?

10   A    No.  Well, I -- well, later I saw a clearer video.  But

11   not later that night.  That night this is the video that I

12   saw.

13   Q    And did you reach out with anyone in the facial --

14   excuse me.

15            Did you reach out to anyone in the facial

16   recognition unit?

17   A    I did not.

18   Q    And what did you do after reviewing this video?

19   A    Do like officially?  Official capacity --

20   Q    Yes.

21   A    Not anything.  That's all.

22   Q    And did you talk to Officer Vasilopoulos about this

23   video?

24   A    Yes.

25   Q    When?

Donohue - Direct - Glashausser                234

1    A    We were talking all night about this.  We were on

2    social media and whatnot to see if there was any chatter

3    regarding the incident.

4    Q    So were you talking with him while you were watching

5    this video?

6    A    I don't remember if we were talking specifically while

7    we were watching it, but we watched it.  We talked -- we

8    talk off and on all night.

9              THE COURT:  You talked all night, you said?

10             THE WITNESS:  Well, not all night, I'm sorry.  But

11   for a few hours, yes.

12             THE COURT:  Okay.

13   BY MS. GLASHAUSSER:

14   Q    So this video you saw on August 30th, right?

15   A    No.  I believe the morning of the 31st I would have

16   seen it.

17   Q    You were still in the middle --

18   A    Yeah.  Still during the same incident, yes.

19   Q    In the middle of the night?

20   A    Yes.

21   Q    In the early morning hours?

22   A    Early morning hours.

23   Q    So August 30th to August 31st, right?

24   A    Yes.

25   Q    And am I right that the first police report you made

Donohue - Direct - Glashausser                    235

1   about identifying someone in the video was on

2   September 15th?

3   A    If that's the date on my report, then yes.

4   Q    Okay.  I can pull up 3500 CD1 to refresh your

5   recollection.

6          Do you recognize that as your identification

7   report?

8   A    Yes, I do.

9   Q    And that's dated September 15th, right?

10  A    Correct.

11  Q    And that's the only identification report you made

12  about this case, right?

13  A    Yes.

14  Q    And September 15th was the day after you arrested

15  Mr. Woodford, right?

16  A    I believe so.

17  Q    When you recognized, or when you said that you

18  recognized the person in this video as Mr. Woodford, did you

19  notify his parole officer?

20  A    I didn't personally, no.

21  Q    Did someone else in your unit?

22  A    Not in my unit.

23  Q    Do you know, did somebody?

24  A    Well, I believe somebody did.  I don't know

25  specifically who it was, but somebody did because a warrant

Donohue - Direct - Glashausser                    236

1    was issued.

2    Q    Well, a parole warrant was issued in September; is that

3    right?

4    A    I believe the same day we arrested him, yes.

5    Q    September 14th?

6    A    Yes.

7    Q    Okay.  But on August 31st no one notified his parole

8    officer?

9    A    Not that I recall.

10   Q    And you didn't seek an arrest warrant for him?

11   A    I did not.

12   Q    Why not?

13   A    This was the 67th squad's case, not mine.

14   Q    Well, did you tell someone in the 67th Precinct what

15   you believed you had seen in the video?

16   A    I told my commanding officer and he -- I also told the

17   other field intelligence officer.

18   Q    And their field intelligence officer didn't seek an

19   arrest warrant?

20   A    Not that I know of.

21   Q    And after August 30th a wanted poster was made related

22   to this shooting, right?

23   A    Well, once again, if you show it to me, but I believe

24   so.

25   Q    I'm showing you what will be marked for identification

Donohue - Direct - Glashausser                 237

1   as Defense Exhibit C, as in "cat."

2           Can you see it --

3   A    Yes.

4   Q    -- if I put it up here?

5   A    Yes.

6   Q    And this is a wanted poster that was issued for the

7   shooting, right?

8   A    I -- I -- that's what it says, yes.

9   Q    And in the wanted poster it says that the person's name

10  is Unknown.  Unknown, right?

11          MS. REID:  Your Honor, I'm going to object.  It's

12  not in evidence.  I don't know that he can lay the

13  foundation for it.  It appears that he hasn't seen it

14  before.

15          MS. GLASHAUSSER:  Well, if I may, Your Honor?

16          THE COURT:  Go head.

17  BY MS. GLASHAUSSER:

18  Q    Sergeant Donohue, when wanted posters are issued, one

19  of the purposes is to get them out to as many people as

20  possible, right?

21  A    Yes.

22  Q    Both to officers?

23  A    Yes.

24  Q    And to the public?

25  A    Yes.

Donohue - Direct - Glashausser                238

1  Q    So that somebody may call in about information; is that

2  right?

3  A    Correct.

4  Q    And you can access wanted posters through the NYPD

5  police system, right?

6  A    I can.

7  Q    And you, as you said, had been up all night

8  investigating this shooting, right, or talking about the

9  shooting and what to do?

10 A    Correct.

11 Q    So this was something that was important to your

12 precinct as well?

13 A    Correct.

14 Q    So were you aware that a wanted poster was put out

15 about this shooting?

16 A    I was not.

17 Q    So you didn't follow-up on what was happening with this

18 investigation?

19       MS. REID:  Objection.

20 A    I did, but I didn't see a wanted poster, though.

21 Q    And no one from -- the field intelligence officer in

22 the 6, 7 didn't call you and say we're putting out a wanted

23 poster about the shooting?

24       MS. REID:  Objection, Your Honor.  I think it's

25 been asked and answered.

Donohue - Direct - Glashausser                 239

1            THE COURT:  Well, I will allow him to answer this
2    one.
3            Go ahead.
4    A    No, he didn't.
5    BY MS. GLASHAUSSER:
6    Q    Did you and that person, the field intelligence officer
7    continue to contact each other as this investigation
8    progressed?
9    A    Off and on, yes.
10   Q    All right.  So he kept you informed about what was
11   happening?
12   A    As much as he knew.  It wasn't his investigation either
13   even though it's his command.  It's the detective squad's
14   investigation.
15   Q    And the NYPD keeps Twitter accounts, right?
16   A    Yes.
17   Q    And you testified that you're familiar with social
18   media review, right?
19   A    Correct.
20   Q    Do you check the NYPD Twitter accounts?
21   A    Not frequently.
22   Q    Well, are you aware of what is posted on the NYPD
23   Twitter account?
24   A    No.
25   Q    When you create a wanted poster if you have a name of a

Donohue - Direct - Glashausser                    240

1    suspect, do you print it on the wanted poster?

2    A    I don't specifically create wanted posters.  That's the

3    detective squad's job.

4    Q    Okay.  Well, typically, do they put the name of the

5    suspect so that people can call in with information about

6    that person?

7    A    That's up to them with whatever information they have.

8    Q    Right.

9    A    I can't speak to what they do with on a specific

10   investigation.

11   Q    Right.  But if they have the information, that would be

12   something to put on the wanted poster?

13   A    I believe so.

14   Q    Mr. Woodford was not arrested immediately after the

15   shooting, right?

16   A    He was not.

17   Q    So he was arrested on September 14th, right?

18   A    Yes.

19   Q    And he was on parole, right?

20   A    Yes.

21   Q    So you at the NYPD knew where to find him; is that

22   right?

23   A    Do you mean like an address?

24   Q    Yes.

25   A    Yeah.

Donohue - Direct - Glashausser                241

1    Q    And a phone number?

2    A    I know about an address.  I don't know about a phone

3    number, but definitely an address is listed on his parole

4    contact.

5    Q    People on parole have to give a phone number as well,

6    right?

7    A    I can't say yes or no to that, I'm not 100 percent

8    sure.  Definitely an address, I don't know about a phone

9    number.

10   Q    You're not able to look up the phone number of people

11   on parole?

12   A    I'm not a hundred percent sure about that.

13   Q    Well, in this case, the 70th Precinct remained involved

14   in the case through Mr. Woodford's arrest, right?

15   A    Yes.

16   Q    And when he was arrested, he was taken to the

17   70th Precinct, right?

18   A    That's correct.

19   Q    And he was interrogated at the 70th Precinct as well,

20   right?

21            MS. REID:  Objection.

22            THE COURT:  Relevance again?

23            MS. REID:  Yes.

24            MS. GLASHAUSSER:  Well, Your Honor, I believe the

25   sergeant is saying that to some of the questions he doesn't

Donohue - Direct - Glashausser                242

1   know the answers because it was the 67th Precinct that was

2   investigating.  But I believe the record shows that the

3   70th Precinct was actively involved.

4          THE COURT:  Well, the point is whether his

5   post-arrest questioning at the 67th or the 70th bears on the

6   issues in this suppression hearing, which is whether or not

7   Sergeant Donohue and Officer Vasilopoulos made an

8   appropriate identification of Mr. Woodford.

9          So again, I think --

10         MS. GLASHAUSSER:  Yes, Your Honor, I'll move on.

11         THE COURT:  Ms. Glashausser, I mean, you would

12  save us all a lot of time if you could stay focused on the

13  issues that you have brought before the Court, which is

14  whether or not the identification by these two officers

15  should be suppressed.

16  BY MS. GLASHAUSSER:

17  Q    Sergeant Donohue, in this case you also saw another

18  video on September 14th, right?

19  A    I -- I believe so.

20  Q    And that was a video of a deli on Nostrand and

21  Avenue D, right?

22  A    If I could see like a photo from it to be able to say

23  yes?

24  Q    I'll show you what was marked as

25  Government's Exhibit 11.

Donohue - Direct - Glashausser          243

1          MS. GLASHAUSSER:  And I don't believe this was

2    admitted to into evidence yet.

3          MS. REID:  And I ask that it be marked eventually

4    as an defense exhibit.  We didn't put it into evidence,

5    Your Honor.

6          THE COURT:  All right.

7          MS. REID:  And I don't object to it coming in.

8          THE COURT:  Do you want to just mark it as a

9    defense exhibit, then, please, so we can save time.

10          What exhibit do you want to mark it as,

11    Ms. Glashausser?

12          MS. GLASHAUSSER:  Defense Exhibit D, as in

13    "David," Your Honor.

14          THE COURT:  If you want to move it in and there's

15    no objection, we'll receive it.  Thank you.

16          (Defendant's Exhibit D so marked and received in

17    evidence.)

18    BY MS. GLASHAUSSER:

19    Q    Sergeant Donohue, was this the video that you saw on

20    September 14th?

21    A    Yes.

22    Q    And you were with Officer Vasilopoulos when you watched

23    this video, right?

24    A    We were in the same office, yes.

25    Q    And you were also with an FBI agent; is that right?

Donohue - Direct - Glashausser                244

1    A    Yes.

2    Q    And that FBI agent was investigating the shootings,

3    right?

4    A    Correct.

5    Q    And how did this meeting get arranged?

6    A    I believe a special agent contacted

7    Officer Vasilopoulos and told us that he was coming to our

8    office to see the video.

9    Q    Did he tell you what the video was related to?

10   A    He did not.  He didn't give any of us any specifics of

11   it.

12   Q    Well, you knew he was investigating the shootings,

13   right?

14   A    Right.  That was the only case we were working on

15   together.

16   Q    You and the special agent?

17   A    Yes.

18   Q    So does he say anything else to you before showing you

19   the video?

20   A    No, just to watch it.

21   Q    And what was said between you and Officer Vasilopoulos

22   while you were watching it?

23   A    I can't recall anything specific being said.

24   Q    Well, who identified somebody first?

25   A    You know, I don't recall exactly who identified who

Donohue - Direct - Glashausser                    245

1   first.

2   Q    And did you watch this video before Mr. Woodford was

3   arrested; do you remember?

4   A    Yes.

5   Q    And in the same meeting with the FBI,

6   Officer Vasilopoulos pulled up an Instagram page from Tyrese

7   Battle, right?

8   A    Later on he did, yes.

9            THE COURT:  Later on that day?

10           THE WITNESS:  Yes, during the same interaction.

11           THE COURT:  And that was an Instagram or what was

12   it?

13           THE WITNESS:  I believe it was Instagram.

14           THE COURT:  And it was retrieved by

15   Officer Vasilopoulos?

16           THE WITNESS:  That is correct.

17   BY MS. GLASHAUSSER:

18   Q    Why did that happen?

19   A    I believe he recognized him in the video.

20   Q    Officer Vasilopoulos?

21   A    Correct.

22   Q    But you didn't recognize him in the video?

23   A    I'm not as familiar with Mr. Battle as

24   Officer Vasilopoulos is.

25   Q    And Officer Vasilopoulos didn't pull up any photos of

Donohue - Direct - Glashausser                 246

1   Mr. Woodford during that meeting?

2   A    I don't believe so.

3   Q    He didn't pull up Mr. Woodford's Facebook?

4   A    I don't believe so.

5   Q    Or his Instagram?

6   A    I don't believe so.

7   Q    And was there a point that you saw another video that

8   was from August 29th, the day before the shooting?

9   A    Once again, if you could show me that?

10  Q    Sure.

11           MS. GLASHAUSSER:  Your Honor, what is premarked as

12  Government's Exhibits A and B and it is becoming

13  Defense Exhibit E.

14           MS. REID:  And I wouldn't object, Your Honor.

15           THE COURT:  Defense B, as in "boy"?

16           MS. GLASHAUSSER:  E as in "elephant."

17           THE COURT:  Defendant's Exhibit E.  And this is

18  the video?

19           MS. GLASHAUSSER:  From August 29, 2018.

20  A    Yes, I saw this.

21  BY MS. GLASHAUSSER:

22  Q    And this is a video inside a deli at 1990 Bedford

23  Avenue?

24  A    I believe that's the location, yes, the address.

25  Q    When did you see this video?

Donohue - Direct - Glashausser                    247

1    A    I don't know.

2    Q    Well, how did you come to see it?

3    A    It was shown to me at some point.  I don't know who

4    showed it to me or -- or where.

5    Q    What information did you have about the video before

6    watching it?

7    A    I think I knew it was related to this entire incident,

8    but I don't remember a specific conversation.

9    Q    Did you write any sort of report about getting the

10   video?

11   A    Not that I can recall, no.

12   Q    Was there any sort of witness who had identified people

13   from this deli?

14   A    I -- I don't -- I don't know.

15   Q    You don't know.  Okay.

16          I have been asking you a lot of questions about

17   what exactly was said.  I recognize those are hard

18   questions.  When you're in your field intelligence unit,

19   you're really just sharing information among you and your

20   officers, right?

21   A    Correct.

22   Q    You work closely together, the four of you?

23   A    Yes.

24   Q    You speak often?

25   A    Very often.

Donohue - Direct - Glashausser                    248

1    Q    You know each other's personal phone numbers?

2    A    Not off the top of my head, well, but it's in my phone,

3    yeah.

4    Q    But you're able --

5    A    Yes.

6    Q    -- to contact each other --

7    A    Yes.

8    Q    -- even when you're off the job?

9    A    Yes.

10   Q    And you're sharing information as you get it; is that

11   right?

12   A    Yes.

13   Q    And when you get information, like on August 30th about

14   a shooting, you were worried about what would happen in your

15   precinct, right?

16              THE COURT:  It has been asked and answered.  He

17   has already testified to this.

18              My point is you are retreading testimony that has

19   already been put into the record, so you need not do that

20   again.

21              MS. GLASHAUSSER:  Understood, Your Honor.

22              Your Honor, I believe I have a few questions that

23   have not been asked, but I am sure Your Honor will tell me

24   if I have.

25              THE COURT:  Well, I am trying to just give you an

Donohue - Direct - Glashausser                    249

1   opportunity but not to repeat ground that you have already

2   covered.

3           MS. GLASHAUSSER:  Understood.

4           THE COURT:  He testified about his reaction on

5   August 30th after reviewing his video and his concern, so

6   you should move on.

7           MS. GLASHAUSSER:  Thank you, Your Honor.

8   BY MS. GLASHAUSSER:

9   Q    Well, Sergeant Donohue, you weren't holding back

10  information when you were talking to Officer Vasilopoulos on

11  August 30th; isn't that right; you wanted him to know what

12  you knew?

13          MS. REID:  Objection.

14          THE COURT:  Yes.  I think you need to rephrase

15  your question there.

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

Donohue - Direct - Glashausser                    250

1        THE COURT:  The question, you weren't holding back

2   information from Officer Vasilopoulos about what?  When?  I

3   just don't know --

4        MS. GLASHAUSSER:  Understood, Your Honor.

5        THE COURT:  Just reframe your question.

6        MS. GLASHAUSSER:  Thank you.

7   DIRECT EXAMINATION (Continued)

8   BY MS. GLASHAUSSER:

9   Q    On August 30th when were you talking to

10  Officer Vasilopoulos about this shooting --

11  A    Yes.

12  Q    -- you weren't holding back information that you knew

13  about the shooting, right?

14  A    No.

15  Q    You weren't worried that you might tell him too much

16  information.

17  A    No.

18  Q    You wanted to tell him everything that you knew.

19  A    When I sent him the video, I believe that said it all.

20  Q    But you also spoke to him, right?

21  A    Yeah.

22  Q    And you wanted him to know all the information about the

23  shooting that you knew.

24  A    Yes.  As I was learning it, yes.

25  Q    Right.  As you were learning it.  So you --

Donohue - Direct - Glashausser                251

1   A      Yes.

2   Q      So you could react, right?

3          Have you received training on identification

4   procedures at the NYPD?

5   A    I attended a detective bureau CIC course.  I believe that

6   was one of the things.  But I'm not a hundred percent.

7   Q    Well, did you receive training about how to take a

8   witness to do a lineup?

9          MS. REID:  Objection.  As to relevance, Your Honor.

10         THE COURT:  Yes, I -- we don't have a lineup

11  situation here, right?

12         MS. GLASHAUSSER:  That's right, Your Honor.

13         THE COURT:  So please.

14         MS. GLASHAUSSER:  One of the issues is how different

15  this was from a lineup situation.

16         THE COURT:  Well, we all agree it's different from a

17  lineup.

18         You don't have a number of individuals being viewed

19  by a witness or a victim.  You have officers who identified a

20  particular individual based on what they've testified about.

21  BY MS. GLASHAUSSER:

22  Q    And when do you a lineup you take precautions not to tell

23  the witness --

24         MS. REID:  Objection.

25         THE COURT:  This is not a lineup, Ms. Glashausser.

Donohue - Direct - Glashausser                    252

1    I think you know that.  So I don't know why you're asking

2    about a lineup.

3              MS. GLASHAUSSER:  Well, Your Honor, I believe that

4    the differences between what the correct identification

5    procedure would be like are relevant to this hearing in which

6    something very different occurred.

7              THE COURT:  Ask him what occurred here to the extent

8    he hasn't already answered your questions on that.  And you

9    can make an argument about whether or not you think there's

10   any issues regarding the way these officers identified

11   specific individuals after viewing videos or based on their

12   personal encounters or observations or investigations or other

13   videos they might have seen.  That's what we're at issue --

14   that's what's at issue here, not what happens in a lineup.

15             I don't think you can necessarily pigeonhole what

16   happened here into a lineup analogy.  It's just a different

17   situation.

18   BY MS. GLASHAUSSER:

19   Q    Sergeant Donohue, when you were having -- when you and

20   Officer Vasilopoulos viewed the video, the fight video on

21   August 30th, the first video that you viewed, at any point did

22   you or he say the names of the people that you believed were

23   in the video?

24   A    I don't believe we said specifically that's so and so,

25   that's so and so.  I believe the names came out as we talked.

Donohue - Direct - Glashausser          253

1   We both know who they were.  It wasn't necessary to just say

2   that, you know, oh, there's Mike Williams, oh, there's Steven

3   Chambers, oh, there's Darrell Woodford.  That wasn't -- we

4   know who they are.

5   Q    So you say the names came out as you were talking.  So

6   did you discuss who the people were?

7   A    We didn't.  I mean, we knew who they were.  We didn't

8   say -- I'm sorry, I'm kind of confused by what you mean

9   specifically.

10  Q    Well, what do you remember about the discussion with

11  Officer Vasilopoulos about who was in the video?

12  A    That we were talking about it and then we started

13  checking our social media as well as of their associates.

14  Q    So checking social media, is that a big part of your job?

15  A    Very big.

16  Q    And were you trained in how to that a social media

17  review?

18  A    No.

19  Q    Well, how did you learn what to do?

20  A    From my personal life, I know how to use social media; my

21  personal experiences.

22  Q    But how do you use it in your official capacity is

23  different than how you use it in your personal life, right?

24  A    I don't believe so.

25  Q    Well, how do you use social media in your official

Donohue - Direct - Glashausser                    254

1   capacity?

2   A     Just viewing what people are posting to their pages.

3   Q     Why?

4   A     Because people put a lot of their personal business on

5   the social media accounts.

6   Q     Were you checking social media while you were watching

7   the video on August 30th of the defendant?

8   A     Not at the same time, no.

9   Q     While were you having this discussion with

10  Officer Vasilopoulos?

11  A     Not after the initial conversation.  I didn't check

12  social media until I got home.  Like I said, I was driving.

13  Q     And so what do you do with the information you learn from

14  social media?

15  A     If it's something major, I'll disseminate it.

16  Q     How will you disseminate it?

17  A     Word of mouth.

18  Q     Well, social media is largely pictures, right?

19  A     No.  Social media is people writing stuff as well.

20  Q     Okay.  But a big part is pictures and videos, right?

21  A     Yes.

22  Q     Do you send the pictures and videos around when you're

23  trying to disseminate information?

24  A     If I -- if there's a picture that I feel that needs to be

25  sent out, yes.

Donohue - Direct - Glashausser                255

1   Q    And how did you do that?  Through what method of

2   communication?

3   A    Through text message.  Or through email.

4   Q    Do you use your official email accounts to do it?

5          MS. REID:  Objection.

6          THE COURT:  I will allow the question.

7   A    If I'm sending it out to the command, to the entire

8   precinct, yes, I'll use my official account.

9   Q    What if you're just sending it to the other three members

10  of your field intelligence unit?

11  A    It depends.  I can send it from my official account or

12  from my phone.

13  Q    You mentioned that you had seen one video -- sorry.

14         Moving your attention back to July, before the

15  July 17 car stop, you said you had seen one social media video

16  of the passenger before the stop, right?

17  A    Correct.

18  Q    Do you remember what that video was?

19  A    It was a "Sheff G" video.  I believe it was *The*

20  *Realest*."

21  Q    And that was the only video you had seen involving the

22  passenger before that stop?

23  A    The only one that I remember, yes.

24  Q    Subsequent to the stop, do you remember seeing additional

25  social media that was relevant to this case?

Donohue - Direct - Glashausser                256

1   A    Not -- not that was relevant to this case.  Probably to
2   the arrest.
3   Q    I'm sorry, can you say that again.  Prior to the
4   arrest --
5   A    Prior to the arrest --
6   Q    -- you had not seen --
7   A    Not that was relevant.  Not that I recall.
8   Q    Well, do you remember seeing other social media involving
9   Mr. Woodford?
10  A    I mean, there's other videos within that, yes.  I
11  don't -- I can't pick a specific but, yeah.
12  Q    When did you see other videos with him in it?
13  A    We look at social media daily and I don't remember
14  exactly one.
15  Q    Well, do you remember seeing anything -- is there any
16  video that you can describe that you remember seeing
17  Mr. Woodford in?
18  A    I know there's one where they're in a house and they're
19  coming out dancing with bathrobes, and standing by Steven
20  Chambers and somebody else.
21       I really think that's the one that's coming to mind.
22  I can't think of anything else off the top of my head.
23  Q    Had you seen photos of Mr. Woodford prior to August 30th
24  in the recidivism database?
25       MS. REID:  Objection.

Donohue - Direct - Glashausser                    257

1          THE COURT:  I'll allow the question.

2    A    I don't recall if -- if it was prior to the incident or

3    after.  But I do remember seeing him in that.  Like I said, I

4    just don't remember if that was before or after August 30th.

5          MS. GLASHAUSSER:  If I may have one moment, Your

6    Honor.

7          (Pause.)

8    Q    Sorry.  Do you share the same social media account with

9    Officer Vasilopoulos?

10   A    We use the same one, yes.

11   Q    So do the four people in your precinct -- excuse me, in

12   your field intelligence unit, you share the same account?

13   A    We do.

14   Q    So Sergeant Donohue, you've testified that you viewed

15   videos of this violent incident on August 30th and that you

16   identified a number of people in the videos, right?

17   A    Yes.

18   Q    Why did you not arrest those people?

19   A    The investigation is not mine and when there's an

20   investigation involving a shooting, that's the 67th Precinct's

21   squad's case.  I don't have authority to do that.  Unless

22   something happens in front of my face, it's their

23   investigation.

24   Q    Did you convey to them that you believed that they should

25   arrest the people in the videos -- excuse me, the people that

1   you told the 67th that were in the videos?

2   A    I'm not part of their unit.  I can't tell them to do

3   that.  Their supervisor outranks me, so it's their call.

4             (Pause.)

5             MS. GLASHAUSSER:  I think I have nothing further,

6   Your Honor.

7             THE COURT:  All right.  Does the government want to

8   sum up?

9             MS. REID:  I have a couple of questions, Your Honor.

10            THE COURT:  All right.

11            MS. REID:  Thank you.

12  CROSS-EXAMINATION

13  BY MS. REID:

14  Q    Good afternoon, Sergeant.

15  A    Good afternoon.

16  Q    I'd like to use the ELMO or I can come up whatever

17  easiest.

18            THE COURT:  The ELMO's there.

19  Q    Sergeant, I just want to show you what's already in

20  evidence as Government Exhibit 2.

21            (Exhibit published.)

22  Q    Do you recognize that?

23  A    I do.

24  Q    And what is that?

25  A    That is Mr. Woodford.

Donohue - Cross - Reid                                259

1    Q     And is this a picture from a Facebook account from June
2    of 2018?
3    A     It is.
4    Q     And did you see this picture in the summer of 2018?
5    A     I had seen it before.  I don't remember specifically when
6    I saw it, but it was right around that time, yes.
7    Q     You also testified about watching a YouTube video called
8    "*The Realist*"; is that right?
9    A     That's correct.
10   Q     Did you see that video more than one time?
11   A     Yes.
12   Q     Did you see the defendant on that video?
13   A     I did.
14   Q     And approximately how many times did you watch that
15   video?
16   A     Many times.
17   Q     Did you watch the video many times over the summer of
18   2018?
19   A     Yes, I did.
20   Q     And I believe you testified that included before the car
21   stop on July 17th; is that right?
22   A     That's correct.
23   Q     And when you saw the defendant during the car stop on
24   July 17, you did you recognize him?
25   A     I did.

Proceedings                                            260

1            THE COURT:  Just for clarification.  This is in

2     reference to the passenger.

3            That passenger, is that the one you identified?

4            THE WITNESS:  Yes, it was passenger.  I'm sorry.

5            THE COURT:  That was who?

6            THE WITNESS:  It was the passenger.  That was

7     Mr. Woodford that I recognized.

8            THE COURT:  Okay.  Thank you.

9            MS. REID:  I have no further questions, Your Honor.

10           THE COURT:  All right.  Anything else,

11    Ms. Glashausser?

12           MS. GLASHAUSSER:  No, Your Honor.

13           THE COURT:  Okay.  So you're excused.  Thank you for

14    your time.

15           (Whereupon, the witness was excused.)

16           THE COURT:  All right.  So let's talk about where we

17    go from here.

18           I know that there were a number of letters found and

19    the identification by the parties.  I think starting in --

20    starting on July 11th, 2019.

21           Oh, yes, would Mr. Woodford like to join his lawyer

22    at the table?

23           MS. GLASHAUSSER:  Thank you, Your Honor.

24           (Defendant enters the courtroom.)

25           THE COURT:  All right.  Mr. Woodford is present.

1   Thank you.

2            At the conclusion of the first session of the

3   suppression hearing, I asked the government to find out what,

4   if any, logs the NYPD maintained regarding the officers' use

5   of social media to conduct investigations.  Ms. Reid wrote a

6   letter indicating that logs were not maintained by the NYPD

7   that documented social media use by its officers as part of

8   their official duties.

9            The letter from the defendant dated July 11th, 2019,

10  which a document 44 in the docket, asks that -- the defendant

11  still believes that the evidence log does exist.  The

12  government has access to it and that some sort of hearing must

13  be conducted.

14           I'm concerned that the parties may be talking about

15  two different things.  The government has confirmed that the

16  NYPD itself does not have a log documenting the use of social

17  media.

18           Ms. Glashausser may believe that such a document

19  exists, but the government has represented that it doesn't

20  exist.

21           But Ms. Glashausser, later, I think refined her

22  request to talk about extracting information from the social

23  media accounts used by officers in Sergeant Donohue's unit at

24  the time to access social media.

25           And she described search histories which I think are

Proceedings                                              262

1    different than documentation about visiting certain users of

2    social media.

3              So the search history would, according to Mr. Weil's

4    own search of his search history, indicated what he searched

5    for when using his social media account, correct, Mr. Weil?

6              MR. WEIL:  Yes, Your Honor.

7              THE COURT:  But if you have regular people on your

8    social media account whose pages, or whatever they're called,

9    you visit regularly, that wouldn't necessarily pop up in the

10   search history, would it?

11             MR. WEIL:  I -- I don't know if the Court prefer if

12   stand or I remain seated.

13             THE COURT:  Whatever you prefer.

14             MR. WEIL:  That did not pop up with the experiment I

15   did.  There's no question that information is maintained.  The

16   government's search warrant indicates that information is

17   maintained.

18             So the government indicated the response letter that

19   that it may be that pages were viewed without the search being

20   done.  They indicated that in the most recent letter.

21             And if that is the case, the government's search

22   warrant clearly indicates that Facebook maintains in their

23   search warrant for Facebook, the Facebook profile, that

24   Facebook maintains a record that each time a page is visited.

25   So if they were to Mr. Woodford's Facebook account page, there

Proceedings                                                    263

1   would be a record of when they did that, maintained by

2   Facebook.

3           THE COURT:  All right.  I'm trying to understand the

4   defendant's view.

5           If the officers testified that they visited

6   different social media accounts of individuals whom they

7   believed were associated a the Eight Trey Cowboy Crips.  Two

8   times, may be five times, but if it turns out that it's once,

9   am I to find that they're not credible and, therefore, the

10  identification is not reliable, if they visited a social media

11  account and learned or viewed people who might be associated

12  together, and were then later, through subsequent observation

13  while on patrol, or subsequent viewing of videos, were able to

14  associate those same individuals?

15          I mean, I think what's at issue is was the

16  identification of Mr. Woodford by the officers who we heard

17  from today reliable and did they unduly influence one another

18  or did somebody unduly influence them to identify

19  Mr. Woodford, correct?

20          MR. WEIL:  Your Honor, that is the narrow issue at

21  the *Wade* hearing.  There's no question we indicated this in a

22  footnote that the -- that we are -- the defense intends to,

23  depending on the outcome of this hearing, but if the Court

24  were to rule that the identifications were not suggestive, the

25  defense intends to argue that the officers lack sufficient

Proceedings                                        264

1   familiarity with Mr. Woodford to be permitted to take the step

2   of offering lay opinion testimony as to his identity.

3          They -- the government is proffering that these

4   officers are going to watch videos hoping to put before the

5   jury and the defendants will also be before the jury, and be

6   permitted to say, even though you members of the jury can see

7   those videos for yourself, I am sufficiently familiar with

8   Mr. Woodford, that I am telling you it's him in this video.

9   And that familiarity rises, in large part, and I know the

10  government said there was some observation but in large part

11  from the viewing of social media by these officers.  And,

12  again, some of that social media will be available for the

13  jury to view as well.

14         So the issue of their familiarity with him is going

15  to be a critical issue in this case.

16         And there is -- their testimony on that issue was

17  without even raising an issue of their credibility, vague

18  imprecise and subject to the flaws of human memory.  And

19  instead of that, we are in a position here to rely on a

20  computerized log that will reflect every time these pages

21  were -- were viewed.  Evidence that is routinely seen as more

22  reliable than people's memory of such things, because why

23  wouldn't somebody remember something, whether they did it

24  twice a week, or five times a week, or however many times they

25  did it?

Proceedings                                        265

1          And --

2          THE COURT:  But Mr. Weil, I would agree with you if

3    all we're talking about was identification based on social

4    media views.  But that's not what we have here.

5          We have testimony that they visited social media of

6    associates of Mr. Woodford.  They learned from social media

7    before he was released from his state custody that he was

8    coming home.  They viewed social media where he appeared.

9    They -- both officers were involved in a car stop which took

10   15 minutes, in which Mr. Woodford presented a pseudonym and

11   ultimately indicated his true name.

12         I mean, they remembered specifics, and they were

13   regularly patrolling their precinct and observing Mr. Woodford

14   and others in their precinct.  We don't have just a single or

15   two or five social media views.  We have, again, a totality of

16   circumstances that led these officers to the conclusion that

17   Mr. Woodford appeared on certain of these videos involving the

18   August 30th shooting.

19         MR. WEIL:  Your Honor, Officer Donohue, for example,

20   testified that the car stop was his first and only viewing of

21   Mr. Woodford, unlike Officer Vasilopoulos, that he testified

22   that was his only viewing of him.  This was a brief encounter

23   on the street.

24         THE COURT:  Well, I think we established on the

25   record, at least there's evidence in the record, that this was

1   a 15-minute stop and there was questioning that Mr. -- that

2   officer -- I'm sorry, Sergeant Donohue observed by

3   Officer Vasilopoulos of Mr. Woodford in which he was trying to

4   ascertain his identity.

5           Cases, I understand that there's a lot of challenge

6   to eyewitness identification, but that's especially concerning

7   when you have a victim or someone, a witness, who's not

8   familiar with the particular defendant and observes, you know,

9   an individual with whom they're not familiar for the first

10  time in a brief period where their attention on the

11  identifying details of an individual may be distracted by the

12  fact that the person is holding a weapon or pointing a weapon

13  at them and their focus would be on a weapon.  Or some other

14  thing that doesn't have to do with facial or physical or other

15  characteristics that would assist in the identification.

16          These are officers who are watching social media,

17  who are out on patrol.  They're observing Mr. Woodford and his

18  associates.  They understand who the group is in terms of the

19  Eight Trey Cowboy Crips who are operating in the

20  70th Precinct.

21          And I'm just concerned that we're getting hung up

22  and wanting to dig deep into NYPD investigative files over an

23  issue that is really a part of the overall identification.

24          MR. WEIL:  Your Honor, it is -- it's a significant

25  piece of it and the government and the witnesses rely

1  significantly on their familiarity with it from social media.

2  There may be -- I understand the Court's point that there's

3  other familiarity as well.  But we're ultimately in this case

4  not going to be dealing just with an identification because

5  the officers are were not witnesses to the crime any more than

6  the jury is.  They're viewing videotape.

7          So we're not merely dealing with an issue of can

8  these officers make an ID if they were witnesses to a crime

9  and just suggested this.  We're dealing with what the

10  government is going to pose, lay opinion testimony and say

11  that these officers are so familiar with Mr. Woodford, so

12  familiar with him, that they should be able to take the step

13  of pointing him out in court and saying that's the man who

14  committed this crime.

15          And the test for lay opinion testimony about

16  identity differs from whether or not -- from the issues at

17  this *Wade* hearing and it goes beyond it.

18          There's no question that their familiarity with the

19  defendant is going to be a critical issue at trial.

20          THE COURT:  Doesn't every case involve testimony by

21  a law enforcement witness who says this is how the defendant

22  came to be in federal custody?  I mean, there's always a

23  factual explanation to the jury how this person comes to be

24  before the court and what probable cause the officers had to

25  arrest the defendant.  That's usually part of a trial.

Proceedings                                    268

1      Whether they're going to say this individual on a

2  shooting video, you know, where the victim is seen being shot

3  and on the ground, and the shooter is seen, you know, coming

4  back several times to fire another shot at the victim, I don't

5  know whether the officers are going to say this is

6  Mr. Woodford.  But they may argue to the jury that here's

7  Mr. Woodford in black and white shorts, and a white top, and

8  high-top sneakers.  The day of the shooting --

9      MR. WEIL:  But they plan on taking the step of

10  identifying Mr. Woodford in a video, and then in a video that

11  is going to be before the jury anyway.  All of the videos

12  we've seen from the -- from by the subway station where the

13  fight broke out, to the shooting, are going to be before the

14  jury at trial.

15      And every case does not involve a lay opinion

16  testimony as to a person's identity where a police officer

17  comes in and says that's the person in the video.  Normally a

18  court will give an instruction how the person came before the

19  court or was arrested is not the jury's concern, the propriety

20  of an arrest, or a search, are not the jury's concern, those

21  instructions are given routinely.

22      THE COURT:  Right.

23      MR. WEIL:  Lay opinion testimony, Your Honor,

24  requires a sufficient familiarity with the person that the

25  witness is offering something that the jury does not have on

Proceedings                                        269

1    their own.

2              THE COURT:  Well, not insufficient familiarity, but

3    just something about the person identified that would lead a

4    witness or a victim to say this is the person, right?  I mean,

5    I don't think sufficient familiarity; i.e., a history or a

6    prior relationship or a prior knowledge is required to make an

7    identification that would be within the bounds of the

8    constitution.

9              MR. WEIL:  Your Honor, but these officers, not only

10   if the government disputes this, these officers were not

11   witnesses to the crime.  So, of course, a witness to a crime

12   can come into court and say that's the guy who robbed me and

13   they could never have met him before in his life.  We're not

14   dealing with that situation.  We're dealing with a situation

15   where there's going to be a video in front of the jury, that

16   even though the officers didn't see it, anyone that did the

17   crime any more than the jury did, but the government wants the

18   officers to say that's Darrell Woodford, that's him in this

19   earlier video and you can tell, and you'll see in this later

20   video, he has the same clothes and government would then argue

21   that must be him.

22             But it's the officer looking at a video that is in

23   front of a jury and making -- and giving lay opinion testimony

24   about that, that is going to be a critical issue in the case

25   and, thus, the records of -- of -- from Facebook, whether they

Proceedings                              270

1    have sufficient familiarity with them to do that, but they

2    were really viewing his stuff every day, are critical to that

3    issue.  And so it's not in the defendant's ability to counter

4    that.  We're going to argue they shouldn't be permitted to do

5    that in the first instance, Your Honor.  But our ability to

6    make that argument and our ability to counter that testimony

7    if the judge offers, it is dependent on these exact records

8    which show exactly how much they were at this page, and

9    there's no interest in the government's in the investigative

10   files but for the fact that they plan on introducing the lay

11   opinion testimony.

12          We're not -- there's no issue about the probable

13   cause for his arrest.  The government can play all those

14   videos to the jury and let the jury draw their own conclusions

15   about who's depicted in this --

16          THE COURT:  Well, are you arguing a moment *in limine*

17   now that hasn't yet been made or are you arguing that we

18   should require a deeper dive into the social media accounts

19   maintained by the officers and Sergeant Donohue's unit?

20          MR. WEIL:  We are -- we're entitled to discovery

21   now.  In other words, we're preparing the case now.  We're

22   arguing it's going to be relevant to the familiarity for

23   purposes of instant motion, it may matter.  But it certainly

24   matters for trial, which we're in the process of preparing

25   for.

Proceedings                                        271

1           So if it's a -- I agree with Your Honor, it may come

2    up as a motion *in limine* later on.  It may be that the Court,

3    since we raised the issue, wants us to brief it in conjunction

4    with the *Wade* issues now.  Maybe that make sense.  I don't

5    know, but either way, it's discovery that we should be

6    entitled to.

7           THE COURT:  Is it your theory that the officers did

8    not see these videos or photographs of Mr. Woodford before the

9    arrest?

10          MR. WEIL:  Our claim is the frequency of their

11   viewing -- I don't know.  But their testimony on the issue of

12   how much they viewed the social media was imprecise and the

13   frequency with which they viewed this material is clearly

14   material to the defense in this case, and the defense should

15   have it.  If they can't -- it's in -- in one form that they

16   have the password, it's in the government's custody and

17   control.  If that won't get us the material we need, then the

18   Court should order them to disclose the account.

19          THE COURT:  Let me ask you this:

20          Suppose they saw the photo of Mr. Woodford in front

21   of the vehicle when he's dressed in the white shirt and the

22   white shorts, June 18th, 2018, the photograph.  They saw that

23   once.  And they also saw the dancing in the bathrobe video

24   once.  And they saw the interior of the car with Mr. Woodford

25   in the back once.

Proceedings                                    272

1        Would we require any eyewitness to say I must have

2   seen this many times in order to be sure of my identification?

3   Or would we allow the witness to say I saw this person briefly

4   during a particular incident that I observed and I'm

5   identifying this person?

6        I don't think that repetitive viewing is necessary

7   to an identification that could be valid in front of a jury,

8   but it seems the fact that they are arguing that they had to

9   have seen this more than the two to five times that they

10  testified to in order to accept that as a valid

11  identification.  But in reality, given the unique nature of

12  this case, most eyewitnesses have a one -- one opportunity of

13  observation of a particular individual.

14       MR. WEIL:  Your Honor, I apologize, and I think the

15  fault is mine for not articulating myself clearly.

16       But simply put, they are not eyewitnesses.  This is

17  not eyewitness testimony that the government is offering from

18  these officers.  And that is the difference, Your Honor.

19       Normally people testify based on personal knowledge;

20  that they have some personal knowledge that the jury doesn't

21  have, that they come in.  I was a witness to the crime and

22  this is what I saw.

23       They're not eyewitnesses.  They are giving an

24  opinion when they're watching the video and giving opinion

25  testimony based on it, and that's what distinguishes this

Proceedings                                          273

1    case, Your Honor.

2          So I agree with you.  You're certain of an ID, you

3    don't have to ever have seen the person before, and the jury

4    decides what weight to give to it.  But as to the lay opinion

5    testimony about an identification, the Court plays a

6    significant gatekeeping role as to whether it's going to allow

7    that to take place.

8          So that's the critical distinction I'm trying to

9    make, Your Honor, and I'm not making it well.  But they are

10   not eyewitnesses and I -- and if the Court would like, we can

11   brief that as part of our briefing -- on post-hearing briefing

12   on this.  Because I think it does make sense as we're

13   discussing these issues to lay it all out now, and it will be

14   clear to the Court why -- why, if that testimony is going to

15   be offered by the government, 100 percent reliable evidence

16   about those social media viewings is absolutely necessary to

17   the defense to both make our arguments to counter the

18   government's proof at trial and to make our arguments about

19   why that testimony should not be allowed.

20         But special familiarity isn't for lay opinion

21   testimony, just like special expertise is needed for any sort

22   of opinion testimony.

23         THE COURT:  Well, Ms. Reid, maybe you don't want to

24   answer this now, but do you have eyewitnesses to the fighting

25   on the street, to the shooting that you would be presenting at

Proceedings                                    274

1   trial in conjunction with the videos?

2              MS. REID:  Your Honor --

3              THE COURT:  I mean, they, at some point, are

4   entitled to know if there are such witnesses, and what they

5   might have said.

6              MS. REID:  Your Honor, I prefer not to answer now.

7   But I think what's important is that the social media views

8   are not the only evidence and there's other evidence that has

9   not come out at this trial, but -- which the defense has,

10  including cell site records which place the defendant there at

11  the scene of the shooting.  Phone records which have him

12  calling associates who are on the videos with him around the

13  time of the shooting.  So there's other evidence, Your Honor,

14  that hasn't even come out at this hearing.

15             I do want to just note.  In addition, I think

16  Mr. Weil has made it -- has overemphasized the difference in

17  this case from an identification case.

18             This case is not unusual.  It's not unusual for

19  officers to view a video and make an identification.  That

20  happens.  And that's evaluated under the same rubric that

21  identifications are evaluated under any files in the Tenth

22  Circuit case that the government cited in its motion papers.

23  It's *United States v Williams*, *396 Fed. Appx. 516*.  It's from

24  2010.  And in that case a forest officer identified a

25  defendant from a video.  This exactly is this circumstance,

Proceedings                                                    275

1    Your Honor.

2            And he did so after he had interacted with the

3    defendant on six occasions over three years where the

4    interactions with the defendant had been angry.

5            Your Honor, that case shows the rubric is the same.

6    We look at suggestiveness and reliability.  There's nothing

7    unique about this situation I think as Mr. Weil suggesting.

8    The analysis we've been applying is the appropriate one.

9            And here I think, as the Court has squarely said,

10   that there's plenty of evidence that the reliability of the

11   identifications are separate and apart from that

12   suggestiveness question.

13           So, Your Honor, I just want to note that I don't

14   agree and I don't think there's -- the defense is cited any

15   cases to support their argument.  And I do want to note that

16   their motion was a motion to suppress the identification

17   testimony and preclude an inquiry of that identification.  And

18   the government responded to that.  So I think this is the

19   appropriate time for the briefing on that to occur.

20           MR. WEIL:  Your Honor, the defense would agree that

21   now would be an appropriate time to brief all of these issues.

22   So -- and the defense is happy to brief had the *Wade* issue,

23   the appropriateness of the lay opinion testimony, and the --

24   and I think the discovery issue will be -- we've already

25   briefed it some, but the significance of it will be apparent.

Proceedings                                    276

1          THE COURT:  You're using the term lay opinion and

2     I'm just curious as to what you mean when you say that.

3              Are you equating the officers with any other witness

4     to an offense?  Or any other witness who says -- so suppose

5     there's a video that shows on the news.  Here's the video of a

6     person, you know, sucker punches somebody who dies on the

7     street.  And somebody comes forward based on that video and

8     says I think after seeing it one on the evening news that

9     person is so and so.

10             That person's a lay witness, right?  And when you

11    use the term lay witness in the context of the officers, what

12    are you saying?  That they are like that kind of a witness

13    or --

14             MR. WEIL:  Well, that's fine example, Your Honor.

15    Then the next question would be, are you sufficiently

16    familiar?  Are you offering any special familiarity with that

17    person?  Say how well do you know him, right?  And that's the

18    first thing a police officer would say when the person came

19    into the precinct and said I saw that surveillance video, I

20    know that guy.  The first question would be, how do you him?

21    How well do you know him?

22             And the court, before allowing someone to come in

23    and comment on a video that's before the jury before and point

24    him out in court, would have to assure itself that that the

25    person has -- had a sufficient expertise of this person, for

Proceedings                                                277

1    lack of a better term, right, sufficient expertise that his

2    opinion on that have value that would -- would have value for

3    the jury that would overcome the prejudice of somebody viewing

4    something before the jury.

5               It's even extra complicated here, Your Honor, by the

6    fact that, in this case, the familiarity is coming from, in

7    large part, other evidence that's going to be before the jury

8    as well, right?

9               So in other words, the government could play those

10   same videos to the jury, not of the shooting, but from YouTube

11   and Facebook and other places.  They presumably are going to

12   try to do that and say, see, that's Mr. Woodford.

13              THE COURT:  In a vacuum of the video, or the videos

14   of him in the grocery store, are not going to be necessarily

15   relevant unless it's connected to the fact that this video in

16   the grocery store was taken even the day of or close in time

17   to the shooting, and this is what someone's wearing in this

18   video, or in the punch, you know, the fight later on in the

19   street.  And this is what the shooter's wearing.

20              I mean, I think those videos would be relevant to

21   the jury's task of deciding whether or not the government can

22   prove Mr. Woodford -- they were not even proofing he's the

23   shooter the indictment charges him with an ammunition charge,

24   doesn't it?

25              MS. REID:  That's right.  Felon in possession of

Proceedings                                    278

1  ammunition.

2          MR. WEIL:  For all practical purposes, Your Honor,

3  there's no other evidence that -- that -- the only evidence

4  they have that the defendant would have possessed ammunition

5  is whatever is seen on the video.  There's not nothing else

6  that they've -- there's -- nothing was recovered from

7  Mr. Woodford, so it comes down -- it ultimately is going to be

8  similar issues, Your Honor.

9          I mean, we'd like -- I think I'm getting ahead of

10 myself here, Your Honor.  The defense is requesting the

11 opportunity to brief these issues.  And I think the need for

12 the discovery will be apparent when --

13         THE COURT:  Well, I think you briefed the discovery

14 issue, hadn't you?

15         MR. WEIL:  Yes.

16         THE COURT:  I guess my view is this:  Why is the

17 number of times an officer viewed social media relevant to

18 whether or not the identification is reliable and not

19 suggestive?

20         If the social media showed that they had no

21 familiarity because they never viewed any social media that

22 involved Mr. Woodford before the shooting, I would think that

23 would be an important fact.

24         But the number of times, I'm not sure, is relevant

25 or critical to whether or not the identification is reliable

Proceedings                                              279

1   and not suggestive.

2          MR. WEIL:  And, Your Honor, that's the question

3   exclusively as to the hearing and the issues at the *Wade*

4   hearing, and I'm being repetitive.

5          The issue as to whether or not their testimony is

6   going to be used at trial is the lay opinion testimony, I

7   disagree with the government, is not simply is it suggestive

8   or -- or reliable?  In other words, otherwise, any person

9   could come in and view a video and say, yeah, that's John

10  Smith in the video, and the Court, with the non-eyewitness, is

11  going to have a gatekeeping role to see if that is aiding the

12  jury or not usurping their function.  That's the concern,

13  Judge.  It's different kind of testimony sort of lay opinion.

14         The witness is taking the role of the jury and

15  giving it an opinion about evidence that is in front of the

16  jury and that's how it differs from a regular eyewitness.

17         But even as to the *Wade* issue, Your Honor -- again,

18  we're happy to brief it.  Even as to the *Wade* issue, this was

19  an unusual procedure.  As the Court noted, it wasn't like an

20  ordinary -- there wasn't an ordinary lineup.  These are police

21  officers who -- who work together, who know each other.

22  They're viewing something together, even normally evaluating

23  this under typical identification standards, we said, no, you

24  can't do a joint ID in that fashion, that would be improperly

25  suggestive to have two people simultaneously view a suspect.

Proceedings                                          280

1          In a vacuum we'd say, well, that's a problem to have

2    two people view a suspect at the same time.  We might even say

3    that's a problem -- I think we would say to have you view four

4    people and do a -- to view the four people who were suspects

5    at the same time.  I think the group show up that there's some

6    case law saying that the police can't haul four guys in front

7    of a witness and say are these the four guys who robbed you?

8    That that too is suggestive.  So everything about the

9    identification procedure itself is only cured -- is only cured

10   if that familiarity is there.

11         So even applying just the -- even just looking at

12   the issues of *the Wade* hearing, if it is going to come back to

13   the officers' familiarity with the -- with Mr. Woodford, such

14   that we're going to -- the Court's going to determine that

15   it's acceptable for them to make an identification

16   simultaneously.

17         THE COURT:  Right.  So I want to get back to the

18   discovery issue, right, because that's what we're all arguing

19   about at this point.

20         It doesn't seem to me that the search history is

21   necessarily going to shed light on your issue.  I mean, it

22   will certainly shed light as to whether or not they searched.

23   But -- and so I think one concern that the government

24   indicated and it struck me with -- it seemed to be at first so

25   overly broad as to be unacceptable.

Proceedings                    281

1          All right.  We confirm that the NYPD itself doesn't

2    have a log, but based on the social media accounts and what we

3    know is retrievable from social media in terms of search

4    histories, or even form Facebook regarding what sites or pages

5    or friends or whatever you call them, were visited, that may

6    be information that could be narrowly tailored.

7          Where Facebook -- or was it Twitter?  Were those the

8    two social media accounts?

9          MR. WEIL:  Instagram.

10         THE COURT:  Instagram.  Thank you.

11         Where they might have the ability to extract how

12   many times user X, whatever the name was that the NYPD was

13   using, in certain social media accounts prior to August 30th

14   and immediately thereafter during that time frame.  It's got

15   to be pretty narrowly tailored and I know that a lot of the

16   information based on testimony that the officers believed was

17   not from any particular social media account of Mr. Woodford,

18   but rather from his cohorts, people that they knew were

19   friends with him or associates who been observed with

20   Mr. Woodford in the days preceding the shooting.  So it would

21   be, I think, appropriate if Ms. Reid could provide or seek

22   information, either from the officers, and that information

23   isn't there, in the search history, to get information

24   regarding, you know, what pages they visited or sites.

25         MS. REID:  And, Your Honor, I don't want to belabor

1    it.  I do want to reiterate my objection to this.  I just

2    don't believe it's material.  And, arguably, it's not in the

3    government's possession.  We would be getting this from

4    Facebook.

5            THE COURT:  Right.  What would stop me from ordering

6    a subpoena tendered to Facebook?  And I would ask if that were

7    going to be the procedure, that the parties work together and

8    come to some narrowing of the request to a time frame that

9    would involve a period before the shooting and the day of and

10   at some stop point after the shooting.  And it would also be

11   narrowly tailored as to certain individuals whom the officers

12   have identified, Mr. Williams, Mr. Chambers.  I don't know

13   whether there's any -- Mr. Woodford I don't -- I don't recall

14   that from this witness.

15           MS. REID:  Your Honor, I just -- I think what's

16   happened now is that the request has become even more

17   burdensome and large, because I agree, as the government

18   argued, the search history would not be complete and the

19   defense describes this as a perfectly accurate electronic

20   record, but that would not be complete, of course.

21           But asking for Facebook to produce, and for the

22   government to go through every single site, every single

23   Facebook page, for example, that any of these four officers

24   visited, even in a two-month period, is an extreme burden on

25   the government, Your Honor, not to mention it's a lot for

Proceedings                                    283

1   Facebook to produce, but it's an extreme burden on us, Your

2   Honor, and I don't believe it's material.

3           THE COURT:  Well, couldn't the search or the

4   subpoena to Facebook say that you're only interested in

5   visiting -- or information regarding visits to -- by this

6   particular account, Woodford, by the NYPD officers to these

7   particular sites.

8           MS. REID:  I don't know if Facebook can narrow that,

9   Your Honor.

10          THE COURT:  I think they're capable of it, honestly.

11  I'm -- I'm not a social media user.  I know nothing about

12  social media.  I do have a little bit of knowledge that

13  they're capable of extracting information in a very granular

14  way.

15          MS. REID:  Okay.  Your Honor, well, I also just want

16  to extract another thing that came up today which is that

17  Sergeant Donohue has testified that at least four people use

18  this account.

19          So, again, I don't see how any results that come up

20  would necessarily be relevant to these officers.  We won't

21  know who these people are who are searching, Your Honor.

22  We're looking these pages up.

23          Four different people use this account to search

24  daily and monitor people daily.

25          THE COURT:  It is a part of a very small unit they

Proceedings                                      284

1   share information orally when if they come up with something

2   relevant.

3           MS. REID:  Yes, Your Honor, but the whole issue is

4   whether the material is -- it can't be material if it's about

5   people who are not even testifying, Your Honor.

6           And, obviously, the government has stressed this

7   materiality.  I truly don't think that there's any difference

8   between this request and requesting all of the other things

9   that the government listed in its recent motion, Your Honor,

10  cell site records for the police officers on any particular

11  day over the summer of 2018, to somehow possibly challenge

12  whether or not they did patrol on that day, Your Honor.  Car

13  records for their cars, for the same reason.

14          And I think it's a very slippery slope when the

15  Court thinks about granting a request like this.  And I think

16  in this day and age, Your Honor, as the Court is aware,

17  Facebook, Instagram, the majority of people use these sites

18  and investigators look suspects up on them.  This happens all

19  the time.

20          And my concern is this is setting a very dangerous

21  precedent where the government is going to have to get an

22  extremely large amount of records, cull through them, and

23  provide them in any case going forward where investigators

24  looked up people on Facebook.  And it's just not allowed under

25  the discovery rules, Your Honor.

Proceedings                                         285

1          The government would get nothing done if that were

2     the rule, and as the Court noted, there's just no obligation

3     to provide every investigative step.

4          So, Your Honor, I would just reiterate all the

5     objections that the government has made, and I think

6     especially in light of the testimony today, it's just not an

7     appropriate request.

8          THE COURT:  Well, I think the defense does have a

9     problem which is -- it came up for the first time today the

10    information that Sergeant Donohue testified to that all

11    officers in his unit use the same social media account to view

12    the posting of the individuals that they're investigating.

13    And how they can figure out who did what.

14         MR. WEIL:  Your Honor, that may be a problem we need

15    to address.  If we get to the point where we're using this --

16    the officers may need to be called and that this record says

17    this account went to Facebook 50 times, how many of those do

18    you think were yours?  They might be stuck with that answer

19    and not that something more precise than that.

20         THE COURT:  I hear you, but you're getting to

21    credibility because the whole reason for this request, as

22    Ms. Glashausser laid out was, this is about credibility.  I

23    need to test the credibility and my question is whether it's

24    once, twice or five times or more than five times, what

25    difference does it make?

Proceedings                                                286

1        MR. WEIL:  Your Honor, I think -- I don't think it's

2   just --

3        THE COURT:  Well, that's --

4        MS. REID:  -- request we have, but credibility plus

5   familiarity, Your Honor.  I mean, ultimately when we get to

6   this lay opinion issue which, again, we're going to brief it,

7   it's going to be credibility coupled with just their

8   familiarity, are they sufficiently familiar with him, which --

9   which may be something we want to argue to the Court, or if

10  the Court permits that testimony, something we may be able to

11  argue to the jury.

12       For example, Your Honor, let's say it was once,

13  right?  Let's go with Your Honor's hypothetical, say it was

14  once.  They saw this once.  And Your Honor has allowed the

15  testimony in, which we hope you would.

16       We're going to want to argue to the jury that they

17  don't know any more about this than the ladies and gentlemen

18  of the jury, look at this Facebook record.  They visited this

19  site once.  You can see it for yourself.  Can you identify the

20  person in that video?  Or they can put up a still from

21  Facebook or a photo from Facebook and say now you have as much

22  information as -- as the officers do, and if you're not

23  certain who it is, why would you rely on them?  What's the

24  point?  The defense has to be able to make those sorts of

25  argument, Your Honor, about identification in this case.

Proceedings                                287

1          THE COURT:  Well, all right, then we have to forget
2    about all the social media.
3          MR. WEIL:  I'm sorry?
4          THE COURT:  Forget about all the social media, you
5    have a specific group of officers devoted to monitoring gang
6    activity in their precinct, and they are out on patrol on a
7    daily basis, sergeant and the officers.  They have this very
8    lengthy car stop in which they specifically were conversant
9    with Mr. Woodford about his identification and who he is and
10   what his true name is.  And to have the officers' familiarity
11   with Mr. Woodford's friends and associates based on prior
12   arrests, debriefing and patrol observations.  I mean, they're
13   familiar with the individuals, separate and apart from any
14   social media.
15         MR. WEIL:  I mean, Your Honor, the government had to
16   rely on the familiarity from social media both at this
17   hearing --
18         THE COURT:  Among other factors.
19         MR. WEIL:  Among other factors.
20         THE COURT:  Not just that.  I could forget about the
21   social media, I think and make --
22         MR. WEIL:  Your Honor --
23         THE COURT:  -- hear what arguments you have to make
24   about all the other circumstances that led the officers to be
25   familiar with Mr. Woodford.

Proceedings                                                    288

1          MR. WEIL:  If you look at small selection of cases

2    the government has and we'll get our own on this issue that

3    where witnesses have been able -- non-eyewitnesses have been

4    able to offer lay opinion testimony to someone's

5    identification, there is greater face-to-face contact than

6    there was here.

7               And on top of that, Your Honor, if they are making

8    an identification based on guilt by association, we've seen

9    these people before, even though I can't see him in this

10   video, it doesn't really matter because we know those are his

11   friends.  That in itself is going to be problematic from the

12   defense's perspective.  So exactly what their basis for

13   knowing him is going to -- is going to be significant.  And

14   the government has relied on the social media familiarity

15   throughout this hearing, and part of their direct testimony

16   with Officer Vasilopoulos on the first day, and in their

17   papers, I assume they intend to do so at trial.

18          THE COURT:  Well, this is what I'm going to suggest.

19               I understand the government objects, but I think

20   that the two of you and -- the government and the defendant --

21   should sit down and talk about what very narrow search

22   criteria could be provided to Facebook that would not require

23   either Facebook or the government to incur undue burden.  I

24   think if you narrow it as to time frame, as particular social

25   media pages visited, you could get there.

Proceedings                              289

1          MR. WEIL:  The defense has to be clear, Your Honor.

2    The defense has no interest in who else these officers are

3    monitoring.  What else they're looking at.  It's exclusively

4    pages on which they are relying in their testimony.

5          THE COURT:  Well, I think you could look at the

6    transcript and see which pages that they said they --

7          It's not more than, I think --

8          MR. WEIL:  Four or five.

9          MS. REID:  On a daily basis, Your Honor, I just

10   wants to reiterate.  It's on a daily basis.

11         THE COURT:  Right, but they may find there is no hit

12   on any visits to a page of a certain person on a particular

13   day.

14         MS. REID:  And I just want to reiterate, Your Honor,

15   I think that might be incomplete, even with those records.

16   Your Honor, in Facebook, for example, if you're friends with

17   people, you will get a news feed, and you don't have to click

18   on anything in order to see what someone posts on their

19   Facebook.  You can just go to your home page and see a feed of

20   people that you follow, and those people's posts will just pop

21   up.  You can just watch it.  So all of these records, I think,

22   will be incomplete, Your Honor.

23         And I just want to reiterate what I said in the

24   papers which is, I don't see any reason why the defense can't

25   make these arguments to the jury without the records.  I think

Proceedings                                           290

1   that's the standard under cases the government cites about

2   whether something is material or cumulative.  The *Germain* case

3   *33 Fed Appx. 555*, from the 2nd Cir, 2002.

4           Your Honor, I just -- they are making good argument,

5   Your Honor, and they are free to make those to the jury.

6   There's nothing about these records, which I will reiterate,

7   is an extremely burdensome job for the government to get and

8   sets a very bad precedent.  There's nothing about those

9   records that will change or significantly improve those

10  arguments to the jury.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                            291

1    (Continuing)

2         THE COURT:  So the feed that you described -- and,

3    again, I am not familiar with it, but suppose I have a

4    Facebook account or something and I get notice that there's

5    something posted by someone I follow, are you saying that I

6    can read the whole thing or see the whole thing without

7    clicking on it; it would just be there?

8         MS. REID:  Yes.

9         THE COURT:  All right.

10        And it would not record as a visit or a hit?

11        MS. REID:  I don't believe so, Your Honor.  I don't

12   think the records would be complete in terms of showing all

13   the times that someone saw something on someone's page for

14   that reason.

15        MR. WEIL:  Your Honor, I'm not sufficiently familiar

16   with Facebook's recordkeeping to know if that's the case.

17   Again, I don't know that -- this is speculative on the

18   Government's part.  I don't know that that was going on --

19        THE COURT:  Well, you have a Facebook account, so

20   when you get a notification that your niece has posted a

21   video, do you have to click on her site, or can you just open

22   her Facebook page and see it?

23        MR. WEIL:  I will see -- in my account, Your Honor,

24   I will see, like, a snippet.  So, in other words, there will

25   be something, and it will be small, and if I want to watch it,

*Proceedings*                                                    292

1    I will click on it and it will take me to her page.

2              THE COURT:  Okay.  So it still requires the viewer

3    go to the page; is that right?

4              MR. WEIL:  That's -- I can see a small version of it

5    on my screen and then I have to click on it to go on the page

6    and I --

7              MS. REID:  If there's a photo, you will see the

8    photo, Your Honor.  You don't have to click on anything to see

9    a photo; it's just there.

10             THE COURT:  Right.  They might want to see more than

11   a photo.  I would imagine the officers want to see text.  In

12   fact, the officer said, it's not just photos, it's --

13             MS. REID:  You can see a caption, Your Honor, on the

14   home page.  And, in addition, the whole point is this is an

15   accurate -- the whole point of the request is it's an accurate

16   record and it's not, Your Honor, it's just not, for all these

17   reasons.  And Mr. Aganga-Williams has Instagram and Facebook,

18   I mean, he's a good -- he can report to the Court what

19   happens.

20             MR. AGANGA-WILLIAMS:  Judge, I'm happy to speak to

21   that, and to the extent Your Honor will take judicial notice,

22   I'm happy to show Your Honor how Facebook and Instagram

23   timelines work on my phone I have here.

24             Your Honor, it's a free flow of information, so Your

25   Honor is correct.  In certain circumstances a user can click

*Proceedings*                                                          293

1   on a profile or click on a post to get more information, but

2   there are plenty of posts.  For example, if someone were to

3   post a photograph on Instagram, the whole point of it -- you

4   get on your Instagram, and there's a timeline, a free flow,

5   you open it and you see all my friends -- one, two, three,

6   four -- have posted these things today, and I just scroll.

7   Without clicking, without touching further, you just scroll.

8            Moreover, Your Honor, on Facebook, individuals can

9   post photographs, they can post text, they can post

10  photographs with text the same way with a timeline.  Unless

11  that text is substantial in nature where the caption preview

12  would make it -- it's a full essay -- there's no need to click

13  on expansion because it comes up again on your timeline of

14  free flow information.  But, in both circumstances, anyone

15  who -- especially when you are reviewing social media on a

16  daily basis, the whole point of how these platforms are made

17  are the constant reception of information without further

18  action.  So an individual would go on there and see you have

19  12 friends and you just see the information and I think that

20  he would -- in a situation like this where these accounts are

21  not made for personal use, you're basically looking at certain

22  individuals.  It's more likely the information you are looking

23  at would all be relevant in your timeline and wouldn't require

24  further action, so I think any kind of data pool that involves

25  searchs or clicks would necessarily miss out on a large piece

*Proceedings*                                                     294

1   because if I was looking at the flow, I can see John Smith

2   today posted a picture of a basketball.  I wouldn't have to go

3   click that further.  I would just -- that person would keep

4   going, I would keep scrolling, Jane Doe posted a picture of

5   flowers or her lunch, I would see that, so I think -- and

6   that's the norm, and I think -- and to the extent Your Honor

7   wants to take judicial notice, I think it's clear by the way

8   these applications work.  If one were to open up Instagram now

9   which, you know -- to the extent Your Honor wants to see these

10  platforms, I'm happy to show, that's how it works.  Not to say

11  there are not instances where you do take an affirmative

12  action of clicking on something, that could be.  One can

13  search specifically for Jane Doe and decide I want to see

14  what's happening because I haven't logged in to Instagram in

15  six months and I don't know everything they have done, so I

16  can go click, but if you are looking on a daily basis, you

17  wouldn't need to do that.

18          THE COURT:  So would you have to be following

19  somebody or just be a friend?  How do you end up getting the

20  flow?  If you have 10,000 followers or whatever, are you going

21  to get flows from all those people, or do you have to have a

22  special relationship.

23          MR. AGANGA-WILLIAMS:  It depends on the algorithms,

24  Your Honor.  So for Instagram, if you are searching on your

25  own page, you will see the people you follow.  Now, you may

*Proceedings*                                                          295

1    follow 3,000 people, so at that time, it depends, one, have

2    those people posted, and whatever algorithm that the company

3    uses to show you what order they show you them in, so that's

4    more data that I'm familiar with.

5            With Facebook as well, you are only seeing people

6    specifically that you are friends with.  So the lingo with

7    Facebook, you are friends -- with Instagram, if you don't

8    follow someone on your timeline, they don't show up.  So you

9    can follow a celebrity, for example, they don't follow you

10   back, but you still see their posts as they happen.

11           With Facebook, you can both follow someone and they

12   are not your friend; or if you are friends, then they can show

13   up on your timeline.  There's algorithms with both that

14   would -- that can impact the order with which you would see

15   someone, how numerous -- the numerous times they show up, and

16   that's my understanding.  I think that's widely documented in

17   the media.

18           For example, if I interact with someone on social

19   media by looking at the profile a lot, the algorithm is now

20   aware that I like to see that person and they would show up

21   more prominently for my page because that's a person I access.

22           THE COURT:  Well, if the officers -- since we have

23   the issue of familiarity here, and I think his credibility now

24   has fallen to second place in the strongest argument the

25   defense wants to proffer, what would be the best and least

*Proceedings*                                                              296

1    intrusive way that the Government could ask the officers who

2    have control of this account to just show how often they

3    visited or viewed the media pages of the small group of less

4    than five individuals that they were monitoring in relation to

5    the 8 Trey Cowboy Crips?

6              MS. REID:  Your Honor, I don't believe there is a

7    way to give a complete record without being very burdensome.

8              THE COURT:  Mr. Aganga-Williams might know since he

9    has this.  I mean, if I were to tell you, hey, tell me how

10   many times before today you checked in on so-and-so, you're

11   sister --

12             MR. AGANGA-WILLIAMS:  I think, Your Honor, the best

13   way the Court would know is the way the Court did learn,

14   through testimony.  If Your Honor wanted to know how often I

15   see someone through my Instagram, that number could change

16   dramatically based on how bored I am that day and how often I

17   scroll through the same pictures.  That can happen, too, Your

18   Honor.  It's a cycle of a flow.

19             THE COURT:  What if I said, show me whether you have

20   done this, whether you visited someone's page every day, how

21   would you do that?

22             MR. AGANGA-WILLIAMS:  Your Honor, there's no way I

23   know to do that because what happens, Your Honor, is that you

24   often are seeing information -- I can speak to this

25   personally, and I think anyone with Instagram and Facebook,

*Proceedings*                                                    297

1   especially when you use it on a phone -- you are seeing

2   information daily without any affirmative action on your part.

3   So the typical way, you open up your phone, for example, and

4   your Instagram timeline flows and pictures come up.  You're

5   scrolling literally on your phone as such, but you are not

6   typically interacting unless you were, for example, like a

7   photo otherwise through affirmative action.  But merely

8   visually seeing the information doesn't require you to do

9   anything because the whole basis of both platforms is the free

10  flow of information from the people you are socially connected

11  with.

12          So I think if someone were to fully want to know how

13  much an individual is interacting with these platforms, it

14  would be through the testimony.  It would be, say, I click,

15  but also I look, I scroll, here's how often I do it.  I think

16  that would be the most complete way, which is what we have

17  here already.

18          THE COURT:  All right.

19          So, Ms. Glashausser, you did have an opportunity to

20  make all these inquiries.  Why didn't you do it?  To get the

21  details, like, all right, you said you visited every day, what

22  specifically did you do?  Was this a flow?  Was it a click?

23  Was it a response on your part?  Did you just get pop-ups on a

24  daily basis from these people?  How did you do it?  Why

25  wouldn't you ask that?

*Proceedings*                                                    298

1        MS. GLASHAUSSER:  I believe I did ask some of those

2   questions.

3        THE COURT:  If you had asked those questions --

4   look, maybe we just need some more limited briefing on this

5   issue.  I mean, look, I'm -- yeah.

6        MS. GLASHAUSSER:  Officer Vasilopoulos testified

7   that he went to the specific pages, that's how he testified --

8        MS. REID:  On some occasions.  He also testified he

9   got notifications, Your Honor, from some people, so I don't

10  believe that's an accurate characterization of all the

11  testimony.

12       THE COURT:  Both of you are going to have the

13  transcript shortly, so why don't you do this, limited

14  briefing, because I want to try to get to what the defendants

15  say they need, but, on the other hand, I'm not sure that the

16  best way wouldn't have been through more detailed questioning

17  of the witnesses because it sounds to me like whatever burdens

18  we put on these nonparties, these social media platforms,

19  whatever burdens we put on them, it's still not going to

20  really be helpful to get to the question you all want to

21  ascertain, which is familiarity, because if they're flowing on

22  the page, or whatever Mr. Aganga-Williams described, it's just

23  not going to show anything, it's not going to be recorded.

24       MR. WEIL:  Your Honor, again, we don't know now that

25  that problem is going to arise.  We don't know how -- how they

*Proceedings*                                                          299

1   view the pages.  There was some testimony that they visited

2   the pages.  We're certainly going to know how often they were

3   logging in to Facebook.  That -- we are going to see that, how

4   often they're going on Facebook, period.  Right?  We get some

5   indication of that, I believe.

6                THE COURT:  Could you extract that from your own

7   records?  In your account, could you go home tonight and say,

8   how many times have I logged on to Facebook between a certain

9   period of time?

10                MR. WEIL:  I think I would have -- I don't know how

11  to do that.  I think I would probably have to get that from

12  Facebook --

13                MR. AGANGA-WILLIAMS:  Judge, as far as Facebook and

14  Instagram, I've had those for years and I haven't put a

15  password into either one in literally probably years because

16  you don't -- if you log on to a computer, as I imagine would

17  be here where certain officers are in a small setting, they're

18  using the same profile, they wouldn't be looking at when you

19  log in and log out, would not speak to the use, because you

20  may log in on Tuesday and remain logged in on a device for

21  weeks, months, or even years without having any need to log

22  back in.  So I think Your Honor is observing the issue here is

23  that these records, which, as Ms. Reid mentioned, would be

24  burdensome to get, do not get to the question at hand whether

25  it's the credibility of the officers, which Your Honor has

*Proceedings*                                                    300

1   noted, there are multiple ways the officers were familiar with

2   Mr. Woodford, or to the point of the more specific analysis, I

3   guess, which is a question that what would be material here,

4   because it would not provide a full picture.  What we would be

5   doing is the Government is undertaking a burdensome effort to

6   either create materials that don't exist, which the Government

7   has the obligation to do, or to ask Facebook, therefore, to go

8   and collect and craft information that is then only going to

9   be a piece of the puzzle, and what we're left with is where we

10  are now, which is that the witnesses can be questioned about

11  what they did and how they did it, and I think the defense had

12  that opportunity to do that already.

13              THE COURT:  Well, couldn't I find, as a matter of

14  law and fact, that testimony on a particular point is credible

15  and that one visit, two visits, five visits, whatever it might

16  be, coupled with everything else the officers did to

17  familiarize themselves with the 8 Trey Cowboy Crips and those

18  who associated with them, including Mr. Woodford, would be

19  sufficient for me to accept that their identification was

20  reliable and not unduly influenced by another person?

21              MR. WEIL:  I mean, Your Honor, we still -- that

22  still leaves us with a trial -- even if you were to find that,

23  which we don't think you should, it still leaves us with a

24  trial issue, I would just note.  It doesn't solve the issue --

25  even if the Court decides to allow the lay opinion testimony,

*Proceedings*                                                    301

1    we have to be able to subpoena documents to confront

2    witnesses, and that the Facebook custodian of records is a

3    necessary defense witness that we have to be able to get at

4    that the Government, we believe, under *Ravirio* and its progeny

5    has to disclose in this case.

6            And, Your Honor, the Government has raised arguments

7    about burden.  Facebook has a team of lawyers who can tell us

8    what they can and cannot do.  It's a very wealthy company;

9    this is no burden on the Government.  Our understanding, Your

10   Honor, is that Facebook has a tremendous amount of data, that

11   they know how long you are scrolled on to a page.  If I look

12   at Ms. Glashausser's page if we're friends on Facebook, if I

13   look at her page a lot, I will get a suggestion of her sister

14   as a friend.  They track how long your eyeballs are on things,

15   that's how they sell advertising.  They have a tremendous

16   amount of information which has raised so many concerns about

17   them among the public, but we are putting the cart before the

18   horse here.  The Government may have an argument that what we

19   get back shouldn't be admitted, that what we get back isn't

20   informative.  They may have all of those arguments.  We don't

21   normally make those arguments before we have the information

22   or we've gotten the response or the motion to quash.

23           So we have this parade of parables without having

24   the information in front of us, and I think we're putting the

25   cart before the horse.  Let's serve the subpoena, agree on its

*Proceedings*                                                              302

1    terms, and see what Facebook says; and then if the Government

2    wants to call the officer and have him say, well, no I didn't

3    view it that way, it just flowed through my phone like it does

4    on the U.S. Attorney's phone, then we will have that answer

5    and we will have to address it then.

6            MS. REID:  Your Honor, the horse that needs to come

7    first is the actual basis for the request.  They have to

8    establish that they are entitled to the records, Your Honor.

9            THE COURT:  Well, look, they have made, I think, a

10   decent argument that, in defending this case, they have the

11   right to be able to test the credibility of the witnesses and

12   also to challenge whether or not they were familiar enough

13   with Mr. Woodford based on the social media and all the other

14   factors to identify him in some of these videos, and I think

15   that -- if I understand their papers, they've argued that it's

16   necessary and critical to their defense, it's material to

17   their defense, the identification of Mr. Woodford in a grainy

18   video where an individual is seen shooting a victim, is, in

19   fact, Mr. Woodford.

20           MS. REID:  And, Your Honor, there are so many other

21   issues, issues related to that core issue, which I absolutely

22   agree is the core of the case at this point, but, Your Honor,

23   that are just not material and so they would not --

24           THE COURT:  You say over and over it's not material,

25   they say over and over it is material, so it's not really

*Proceedings*                                                    303

1   advancing the argument.  It either is or isn't material.  I

2   think identification is material.  I think that their ability

3   to defend is material, and the question is what universe of

4   information falls into that because it is possible if this

5   were a different case and there was no social media, that the

6   officer's identification could still be upheld if I found them

7   credible based on their patrols, their prior debriefings of

8   other people, their 15-minute conversation with the defendant,

9   et cetera.  I mean, Officer Vasilopoulos did identify the

10  physical characteristics of Mr. Woodford that he was familiar

11  with and that he observed on the video, as did Sergeant

12  Donahue.

13          So I could decide one way or the other even without

14  the social media.  I understand the point that the defendants'

15  view is that the officers seemed to rely pretty heavily on

16  social media, at least up until the time prior to the

17  shooting, and even right after they were looking to see what

18  might have been said, and I understand the Government has a

19  whole host of other evidence which they believe is going to

20  prove their case beyond a reasonable doubt.

21          But I would like to do this since we've been having

22  a lot of argument.  Do you want another opportunity to submit

23  limited briefing as to why or why not this social media

24  subpoena is important not just to the identification issue but

25  also to the way you see the trial unfolding in the future?  If

*Proceedings*                                                                304

1   you don't, that's fine, but part of that might be information

2   that we can get from social media providers -- Twitter and

3   Facebook -- I'm sorry, Instagram and Facebook, I don't even

4   know the difference, but okay -- Instagram and Facebook as to

5   what this will show, what they're capable of extracting.  I

6   would encourage the parties to try to work out a limited

7   narrow subpoena that would assist.  We don't know -- I mean, I

8   just don't know enough to know how big of a burden it would be

9   and whether this would be a subpoena that I would so order on

10  behalf of the Government or on behalf of the defense and who

11  would shoulder the burden of going through the results of that

12  subpoena.

13          MS. REID:  Your Honor, I just want to raise an

14  issue, which is that obviously there was testimony that the

15  account that was used by this unit of officers is like an

16  investigatory tool.

17          THE COURT:  Exactly.

18          MS. REID:  Obviously, the Government would oppose

19  the release of the actual account name.

20          THE COURT:  Understood.

21          MS. REID:  So I think that by definition, the burden

22  would then fall on the Government.

23          And, Your Honor, I just want to reiterate, I'm

24  concerned not only about this case but the precedent this sets

25  because this will come up in many cases.

*Proceedings*                                                    305

1          THE COURT:  Well, you know what, I think that social

2    media has started to play such a big role in all litigation,

3    civil and criminal, and so it will arise, if not in this case,

4    in some other case --

5          MS. REID:  Yes, Your Honor, and so --

6          THE COURT:  -- and judges may or may not agree with

7    my decision or they may decide differently, but we can't avoid

8    it just because it's there.

9          MS. REID:  I agree, Your Honor.  I just think it

10   requires an extreme dedication to what the rules allow for

11   because it will set a precedent, Your Honor, and I've already

12   explained why I believe it's not met in this case.

13         THE COURT:  All right.

14         So how do you want to proceed?  Do you want further

15   briefing opportunities on either side, or do you want to just

16   try to talk first about whether you can agree to the narrow

17   terms of the subpoena?

18         MR. WEIL:  I don't see any conflict around the

19   terms.  The defense 100 percent agrees with the Court that we

20   are not interested in any ongoing investigations, we are not

21   interested in anyone else's page who hasn't been mentioned in

22   this Court, we are not interested in any time period before

23   they started viewing Mr. Woodford and -- or hearing about him,

24   so it would be a couple-month time period, five people's

25   pages.  I'm happy to put in any parameters in the subpoena to

*Proceedings*                                                        306

1    say, please indicate length of time viewed or whatever other

2    information Facebook has.

3              THE COURT:  I think it would certainly not start

4    before the time that the first post was observed indicating

5    that Mr. Woodford was going home that particular -- I don't

6    think it can be earlier than that.  I mean, I hope that you

7    can come to some mutually agreeable decision on that and it

8    would not foreclose you from arguing because I may just decide

9    after I read further briefing that this isn't a good idea or

10   it's not warranted by law, but I think that your efforts to

11   craft the terms would be helpful to me as well, and if there

12   are particular reasons why one side or the other insists or

13   resists a search parameter, I would rule on that, because

14   ultimately I will be so ordering the subpoena.  All right?

15             So how much time do you need for all this?

16             MS. REID:  Your Honor, the way I understand it, the

17   defense briefing -- additional briefing -- and suggestions for

18   a subpoena would go first, so I guess I will let you answer

19   first.

20             MR. WEIL:  Your Honor, we are happy to draft a draft

21   subpoena to provide to the Government to raise any objections

22   to.  We're happy to simultaneously brief the issues from this

23   hearing.

24             Is that fair?

25             Hold on.

*Proceedings*                                                    307

1          (Pause.)

2          MR. WEIL:  So I think we can submit a draft subpoena

3    in a week for the post-hearing briefing.  We require the

4    transcript in, I think, a few weeks, and while those issues

5    are percolating, I just wanted to ask the Court if it would

6    like us to, since we are discussing identification, brief our

7    other concerns about the identification beyond those, you

8    know, that are in the nature of a -- more in the nature of a

9    motion in limine.

10         THE COURT:  Yes, I mean, one concern I have is you

11   might be making motions on matters that aren't even going to

12   be at issue in the trial.  I don't know if you talked to the

13   Government or whether they've told you what they're going to

14   do or how they are going to present the videos or the

15   testimony of the officers.  It may not be an issue.  I don't

16   know whether Ms. Reid and Mr. Aganga-Williams are willing, at

17   this point, to say what they are going to do, but there's a

18   lot of emphasis on what the Government may do in court before

19   the jury, and I don't know whether they're going to do that,

20   or I don't know exactly what you are envisioning when you

21   describe an in-court identification of the defendant coupled

22   with the videos.  I think you need to understand before you

23   challenge something what's going to actually happen, if you

24   know, or if the Government has been willing to share that.

25         MS. REID:  Well, Your Honor, the original motion was

*Proceedings* 308

1    to suppress the actual identification --

2              THE COURT:  Yes.

3              MS. REID:  -- of the video and any in-court

4    identification made by these witnesses, so I think it makes

5    sense to handle both those issues now as opposed to wait for a

6    motion in limine.

7              THE COURT:  Okay.

8              MR. WEIL:  Your Honor, I don't think there would

9    have been -- again, there was no -- and this is why this is

10   different than just an investigative file.  The defense was

11   not disputing the manner in which Mr. Woodford was arrested.

12   The issue for the defense is the in-court ID, which -- and we

13   wouldn't have even been able to late hearing but for the

14   Government's proposal to proffer that testimony.  So I think

15   the issue is joined and we should -- and I agree with the

16   Government we should brief it.

17             THE COURT:  All right.

18             So how much time do you need for the briefing that

19   you are going to order the transcript from the court reporter

20   and she will give you -- I think you have an idea what her

21   time frames are.

22             MR. WEIL:  How is August 13th, Your Honor?

23             THE COURT:  What did you say?

24             MS. GLASHAUSSER:  August 13th, Your Honor.

25             THE COURT:  So when you say in-court ID, you mean

*Proceedings*                                                      309

1    that the officers would say this is Mr. Woodford, the very

2    same person who we identified in the video, they would

3    identify him -- as in court -- and pointing to him and

4    identifying a garment that he's wearing in court at the trial

5    as well as identifying him from the video?  I'm not quite sure

6    what you're --

7              MR. WEIL:  That doesn't even -- yeah, I mean, it's

8    all -- to me, it's the same.  They're being permitted to look

9    at the video and say who they believe it is.  To look at a

10   piece of evidence that's already in front of the jury and

11   indicate who they believe it is regardless of whether they

12   point at him, it doesn't really -- it doesn't really matter.

13   Either of those things would constitute an in-court ID, but I

14   defer to Ms. Glashausser for this.

15             MS. GLASHAUSSER:  Right.  Just, I think, to answer

16   Your Honor's concern, that's what we're challenging, what

17   Mr. Weil described, just pointing to the video and saying I

18   identify that person in the video as Mr. Woodford.

19             MS. REID:  Your Honor, the Government would intend

20   to have the officers watch the videos and identify the

21   defendant from the videos as they did in court during this

22   hearing and to look at the defendant seated in court and

23   identify him in court just the way that we do all the time

24   with other kinds of witnesses.

25             THE COURT:  All right.

*Proceedings*                                                    310

1          So if the defense provides the briefing by

2    August 13th, how much time does the Government need to

3    respond?

4          MS. REID:  Two weeks would be fine, Your Honor, so

5    the 27th?

6          THE COURT:  Okay.

7          Will the defense want a reply?

8          MS. GLASHAUSSER:  Yes, Your Honor, please.

9          THE COURT:  Okay.

10         Listen, don't keep submitting things after this

11   because I feel like, you know, seven or eight letters on the

12   same thing, one after the other every other day gets to be a

13   little crazy.  I mean, we're setting up a briefing schedule

14   for this, so how much time do you need for a reply.

15         MS. GLASHAUSSER:  I would ask for two weeks, Your

16   Honor, September 10th?

17         THE COURT:  Okay.

18         And in part of this briefing, will the parties be

19   raising the -- I know the Government has raised a lot of

20   arguments as to why this should not -- the third-party request

21   of social media should not be allowed at all, but is there any

22   other briefing on that issue?

23         MR. WEIL:  We are going to submit the request for

24   the subpoena, Your Honor.  I feel that --

25         THE COURT:  All right.

*Proceedings*                                                          311

1          MR. WEIL:  -- the Court is familiar with that issue.

2          THE COURT:  Okay.

3          So once the Government gets the proposed subpoena,

4    what time frame does the Government need to respond?

5          MS. REID:  Your Honor, I think a week would be fine.

6          THE COURT:  Okay.  And then if there's a major

7    disagreement as to terms, you will bring that to my attention

8    at that time, Ms. Reid?

9          MS. REID:  I apologize, Your Honor.

10          THE COURT:  You said you would need a week after

11   getting their response.  I mean, I would like you to try to

12   have a discussion, and then if you can't resolve it, bring it

13   to my attention.

14          MS. REID:  Yes, Your Honor.

15          THE COURT:  Today is the 23rd.  You will get the

16   proposed subpoena by the 30th, and so why don't the parties

17   give me something in writing.  If by some chance you cannot

18   agree, and I expect that you will, but if you don't, by

19   August 6th?  Is that --

20          MS. REID:  That's fine, Your Honor.

21          THE COURT:  All right.  Simultaneous submissions,

22   okay?

23          MS. GLASHAUSSER:  Yes, Your Honor.

24          THE COURT:  All right, thank you.

25          Is there anything else?

*Proceedings*                                                    312

1          MR. WEIL:  No, thank you.

2          MS. GLASHAUSSER:  No, Your Honor.

3          THE COURT:  All right.

4          Thank you marshals and thank you for your time.

5          (Matter concluded.)

6                    --ooOoo--

7

8                *I  N  D  E  X*

9

10             *W I T N E S S E S*

11

12   **C H R I S T O P H E R   D O N O H U E** (CONTINUED)

13   DIRECT EXAMINATION (CONTINUED)                189
     BY MS. GLASHAUSSER
14
     CROSS-EXAMINATION                            258
15   BY MS. REID

16

17              *E X H I B I T S*

18

19   Defendant's Exhibit B                        224

20   Defendant's Exhibit D                        243

21

22

23   *I (we) certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled matter.*
24
          */s/ David R. Roy*          *26th Day of July, 2019*
25          *DAVID R. ROY*                      *Date*