```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ---------------------------------x
                                            18-CR-654(KAM)
 3    UNITED STATES OF AMERICA,
                                            United States Courthouse
 4             Plaintiff,                   Brooklyn, New York

 5             -against-                    January 8, 2021
                                            9:30 a.m.
 6    DARRELL WOODFORD,

 7             Defendant.

 8    ---------------------------------x

 9        TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
                          VIA TELECONFERENCE
10          BEFORE THE HONORABLE KIYO A. MATSUMOTO
                  UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES

13    For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                 Eastern District of New York
14                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
15                               BY:  ERIN REID, AUSA
                                      TEMIDAYO AGANGA-WILLIAMS, AUSA
16

17    For the Defendant:         FEDERAL DEFENDERS OF NEW YORK
                                 One Pierrepont Plaza
18                               BY:  ALLEGRA W. GLASHAUSSER, ESQ.

19

20    Court Reporter:            Georgette K. Betts, RPR, FCRR, CCR
                                 Phone:  (718)804-2777
21                               Fax:    (718)804-2795
                                 Email:  Georgetteb25@gmail.com
22

23

      Proceedings recorded by mechanical stenography.  Transcript
24    produced by computer-aided transcription.

25
```

PROCEEDINGS

1          THE COURT:  I think we can proceed then.  Would you

2     like to the call case, please.

3          THE LAW CLERK:  Sure.  Good morning.  This is a

4     criminal status conference for a motion for post-conviction

5     presentencing release.  Docket number 18-CR-654, in the United

6     States versus Daniel Woodford.

7          Counsel --

8          THE COURT:  Darrell.  Sorry, it's Darrell Woodford.

9          THE LAW CLERK:  Excuse me.  Darrell Woodford,

10    apologies.

11         Counsel, can you please state your name for the

12    record.

13         MS. REID:  Yes, good morning, Your Honor.  Erin Reed

14    and Temidayo Aganga-Williams for the government.

15         THE COURT:  Good morning.  Thank you.

16         MS. REID:  Thank you.

17         MS. GLASHAUSSER:  Good morning, Your Honor.  Allegra

18    Glashausser representing Mr. Woodford, who is also on the line

19    with us.

20         THE COURT:  All right.  Good morning.  Thank you.

21         I just want to first address Mr. Woodford and just

22    confirm that he has no objection to proceeding by telephone in

23    light of the COVID pandemic, the CARES Act and an order of our

24    chief judge which authorizes courts to conduct proceedings by

25    telephone in the interest of justice.

PROCEEDINGS

1          Do you have any objection, Mr. Woodford?

2          THE DEFENDANT:  No, thank you.  Good morning,

3     though, Your Honor.

4          THE COURT:  All right.  I just want to let the

5     parties know that I have read all of the submissions related

6     to this motion including Ms. Glashausser's December 18th

7     motion, the government's response of December 23rd which

8     attached certain BOP health clinic records regarding

9     Mr. Woodford, and Ms. Glashausser's January 7th letter

10    updating the Court of Mr. Woodford's unfortunate ongoing

11    symptoms as a result of his COVID bout.

12          Is there anything Ms. Glashausser wishes to add

13    beyond the January 7th letter?

14          MS. GLASHAUSSER:  I have no further written

15    submissions, Your Honor, but I am happy to update the Court

16    about Mr. Woodford's current situation --

17          THE COURT:  Yes.

18          MS. GLASHAUSSER:  -- having just spoken to him.

19          THE COURT:  Yes.

20          MS. GLASHAUSSER:  Okay.  Thank you, Your Honor.

21          So in line with my letter that I submitted

22    yesterday, Mr. Woodford is still experiencing lingering

23    symptoms from the Coronavirus.  He is exceedingly tired, his

24    body is still aching, and he still is lacking his sense of

25    taste and smell.  He is, it seems, improving which is very

PROCEEDINGS

1  positive, but this is now about a month since his positive

2  test diagnosis.  This has been a fairly long time that he's

3  been experiencing these symptoms and he's really been unable

4  to do anything to improve them where he is.

5       He basically describes that he is just stuck in a

6  dirty cell, sleeping all day.  You know, he's not given

7  cleaning supplies, he has no fresh air and he doesn't have

8  clean water except when he's able to melt ice, which is hard

9  as it is cold.  So this is --

10       THE COURT:  Are you saying even though he's back in

11  general population, inmates are not able to access water?

12       MS. GLASHAUSSER:  My understanding is they're able

13  to access ice during the 30 minutes that they are let out of

14  their cells each day, but that's a water -- there's not a

15  clean water source other than buying liquids through

16  commissary.  He does get a serving of milk each morning I

17  believe to go along with cereal, but isn't otherwise provided

18  with any sort of bottled liquids that don't have this problem

19  of the water coming out brown.  And that's something that's

20  not just Mr. Woodford reporting it, that's something that many

21  of our clients at MDC, many of the Federal Defenders' clients

22  have been reporting the difficulty with the water.  So it is

23  just not at all an environment that is conducive to him

24  getting better.  And he is very grateful, obviously, that he

25  is not getting worse.

PROCEEDINGS

1        As I said, he does seem to be gradually improving

2   and he is very grateful that the court ordered the doctor's

3   visit and he was actually able to see a doctor.  Aside from

4   those two things, it's really a quite grim situation at MDC

5   and it's difficult to listen to a client ask me medical

6   questions when I obviously don't have the answers.  Like, you

7   know, how he should -- what he should do to try to make these

8   symptoms go away, how long it might last, when he might be

9   able to smell and taste things again, which has extraordinary

10  mental health effects that Mr. Woodford had described to me

11  and then I happened to read about in the New York Times about

12  a week later, that it really causes a disorientation when

13  you're lacking those senses, and these are things that he

14  would be able to address if he were temporarily released and

15  able to recover in the care of doctors, medical professionals

16  and in his grandmother's home.

17        THE COURT:  Well, I'm curious about, I'd like to

18  follow up because I agree with you, I'm very sympathetic and

19  sorry that he has ongoing effects of COVID.  I'm grateful to

20  hear that he has recovered, you know, in terms of the crisis,

21  potential crisis that could have been experienced with COVID,

22  but it seemed to me that the medical community has noted that

23  these effects are ongoing, they linger for some patients, and

24  that a lot of this is a matter of time.

25        So I'm trying to understand, Ms. Glashausser, what

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

6

PROCEEDINGS

1    specific remedies you believe would be available to

2    Mr. Woodford that would -- that are not available within the

3    MDC.  What medical treatment specifically are you referring to

4    that he would be able to obtain outside the MDC?

5              MS. GLASHAUSSER:  Well, right now he obtains no

6    medical treatment.  It's a bit of a hard question for me, Your

7    Honor, as I am not a medical professional at all but --

8              THE COURT:  But you've made the statement --

9              MS. GLASHAUSSER:  Yes, of course.

10             THE COURT:  You've made the statement that there is

11   medical treatment that he would like to get outside of MDC

12   that would help alleviate his symptoms.  So I'm just asking

13   you what specific treatment are you -- do you have in mind

14   when you make that statement to the Court.

15             MS. GLASHAUSSER:  Yes, Your Honor.  My understanding

16   is people that have long-term effects of the Coronavirus

17   regularly see their doctors to be monitored to make sure that

18   these lingering effects don't turn into things that are worse,

19   which the CDC website that I cited that long-term effects

20   contemplates that some of these things can worsen over time

21   even for people with seemingly not the most severe symptoms

22   that you can have from the Coronavirus.  So there is that

23   aspect and there are also -- I believe that doctors are still

24   working on ways to work with patients to improve their

25   symptoms, that people go into sort of medical rehabilitation

7

PROCEEDINGS

1   to work on improving their symptoms.  With respect to, for

2   example, smell and taste, there is a whole genre of people

3   that work on the medical issue of losing your sense of smell,

4   which I had never heard of until very recently, but in that

5   New York Times article it talks about those doctors and the

6   different therapies they're using that includes exposure to

7   strong smells over time to gradually try to coax the sense to

8   reactivate.  So people who have access to doctors who are in

9   the community are able to work with those professionals and

10  their individual cases to try to improve their symptoms.

11         On a more basic level, when you are sick, but as the

12  doctor at MDC noted, it is good to drink a lot of fluid.  With

13  the Coronavirus people are recommended to have fresh air and

14  rec, be in not a stressful environment and none of those

15  things are available to Mr. Woodford at the MDC.  So he's not

16  able to, for example, deal with the mental health difficulties

17  that these symptoms have brought on to him.  It's --

18         THE COURT:  Has he requested mental health consults

19  within the MDC and, if not, should I order one?  I mean, has

20  he requested and not received a mental health consult to deal

21  with the obvious stress of not being able to taste or smell?

22         MS. GLASHAUSSER:  Well, my understanding is it's not

23  possible really to request such things now.  I haven't asked

24  Mr. Woodford if he'd like -- I would imagine he would welcome

25  any visit from any sort of medical or mental health

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1   professional is my impression from talking to him over the

2   course of his illness.  I'm not sure what help MDC would be

3   able to provide, but yes, I think that would be one step that

4   could be taken.

5          The regular request procedure for any sort of thing

6   like medical and mental health has been interrupted due to the

7   Coronavirus is my understanding, so it's quite hard to get any

8   sort of visits or appointments.

9          THE COURT:  Well, it may be difficult I understand

10  that, but I mean I think that the request should be made by

11  Mr. Woodford in any event.  If he needs ongoing, you know, or

12  would like to get a mental health consult at least they'll be

13  aware that he has requested it.  I mean, I think that when a

14  defendant presents an ongoing lack of care, courts will issue

15  orders to the MDC to get a response, but I think that the

16  request should start with the inmate certainly.

17         I think that the situation at MDC is somewhat fluid

18  depending on what the rate of infection or positive tests are,

19  but there are, as you know, medical people who are still

20  available as they must be to deal with staff issues, inmate

21  issues.

22         So I think the bigger question, frankly, and the

23  legal question before me is whether these symptoms that

24  Mr. Woodford is still experiencing, as he recovers from COVID,

25  present compelling and extraordinary circumstances for release

PROCEEDINGS

1   when balanced against the other statutory factors that I must

2   consider, and whether or not he has sustained his burden by

3   clear and convincing evidence that he would not present either

4   a danger to the community or a risk of flight.

5           MS. GLASHAUSSER:  I understand, Your Honor.

6           THE COURT:  I understand from a humanitarian point

7   of view, certainly I want to assist him in any way that we can

8   ask the MDC to pay attention to him.  I mean, I'd hate to say

9   this, but in our courthouse water comes out of our tap

10  routinely and it's brown colored.  If we let it run for a good

11  five minutes it will ultimately run clear, but, you know,

12  unfortunately with these old buildings sometimes you get water

13  that is not -- that is obviously discolored.  So I think

14  that -- and if he's able to get out into the general

15  population, as he apparently is, I'm having a hard time

16  understanding that your representation that MDC is denying

17  inmates in general population access to water and that they

18  may only have ice, but if that's the case I mean certainly

19  I'll ask the government to look into it and see what the

20  opportunities are for inmates to have potable water.

21          MS. GLASHAUSSER:  Your Honor, I apologize.  Just to

22  be clear, I'm not saying they are denying them access to

23  water, they have sinks in their room.  My understanding is

24  nobody believes that is appropriate access.

25          THE COURT:  All right, well, the question I was

PROCEEDINGS

1  asking you was whether or not when he is in general and able

2  to get ice, whether there is also an opportunity to get fresh

3  water, you know, from the tap that's not discolored.  The

4  government doesn't provide bottled water to anybody,

5  unfortunately they don't.

6           MS. GLASHAUSSER:  All right, I understand, Your

7  Honor.  I don't have further details on that other than what

8  I've mentioned.

9           THE COURT:  But I think we need to get back to the

10  fundamental question about the burden by clear and convincing

11  evidence that Mr. Woodford does not present either a risk of

12  flight or a danger to the community.

13           I know he's stands charged --

14           MS. GLASHAUSSER:  Yes, Your Honor.

15           THE COURT:  -- right now of being a felon in

16  possession of a firearm and I'm familiar with the evidence

17  that led up to -- or undergirded the offense of conviction

18  and, frankly, you know, it's chilling video.  Shooting

19  repeatedly at someone at point blank range, not once, not

20  twice, three times after a chase on foot at which, you know, a

21  weapon was fired at a victim who was fleeing with bystanders

22  in a public area.

23           That is a concern, and one of the factors I must

24  consider is the nature and circumstances of the crimes charged

25  and when someone has a felony record of eight prior

PROCEEDINGS

1  convictions, including violent felonies involving firearms, I

2  think we have a situation where there is danger to the

3  community if he were to be released.

4       I also take note of the indication that he has

5  failed to appear on a prior occasion and a bench warrant had

6  to be issued.  Here he stands convicted and faces a 78- to

7  97-month term of incarceration and I well understand that

8  these very difficult conditions at MDC would dissuade anybody

9  from returning voluntarily to prison, you know, to appear.  I

10  think the risk of flight is significant here, but if you have

11  reasons to convince me that by clear and convincing evidence

12  that neither the risk of flight or the danger to community is

13  likely, I'm happy to hear from you.

14       MS. GLASHAUSSER:  Thank you, Your Honor.  I

15  understand Your Honor's concerns and think, however, today we

16  are not appearing before Your Honor at the beginning of

17  Mr. Woodford's case.  He's already been incarcerated for 27

18  months, which is about 40 percent of the bottom of the

19  guideline range taking into account good time, and that amount

20  of time is significant in terms of both his risk of flight and

21  the concerns about the safety of the community.

22       As far as the risk of flight, when you are

23  considering a lengthy sentence that might be imposed, those

24  cases that consider those things are about cases where the

25  person is at the beginning of their case and has no time in.

PROCEEDINGS

1   Mr. Woodford has already served a significant amount of time

2   and has every incentive to finish his time and then start his

3   life.  He's exceedingly young.  He's only 20 years old now,

4   was 18 when he was incarcerated.  I know Your Honor has his

5   whole sentencing package and I'm not going to argue all of

6   those points today, but he -- in that package it's very clear

7   that he has matured and grown from when he was 18 years old

8   until 20 years old today and that he very much wants to

9   complete his obligations -- his punishment here and then move

10  on with the rest of his life, as he is very young.

11          The danger is -- risk of danger is mitigated by some

12  of those same things, the length of time that has passed and

13  how he has grown in that time.  It's also mitigated by the

14  conditions that we're proposing which are GPS monitoring and

15  home detention at his grandmother's home in Pennsylvania that

16  is far removed from the violent community group that he, you

17  know, grew up in.

18          As far as the --

19          THE COURT:  What about, ma'am, the risk to his

20  grandmother is pretty significant, is it not?  I mean, I know

21  he's had --

22          MS. GLASHAUSSER:  You mean from --

23          THE COURT:  Well, if he were to live with an elderly

24  person who, I don't know how old his grandmother is, but, you

25  know, I think she faces a certain risk also.  I think that

PROCEEDINGS

1    once someone has COVID, generally they retain a certain amount

2    of antibodies but nobody really knows how long those are

3    effective and somebody could still possibly become reinfected

4    or pass the disease on to somebody else.

5           MS. GLASHAUSSER:  Yes, Your Honor.  Although I

6    believe Mr. Woodford may be -- may test negative for the

7    Coronavirus today, MDC has decided to move him back to the

8    general population.  I don't know how they made that decision,

9    but I'm not sure that Mr. Woodford would still be contagious

10   today, however, when I submitted my papers and thought this

11   through, he certainly was.

12          Mr. Woodford's grandmother has -- she lives in a

13   single family home that has the ability for Mr. Woodford to

14   live in a room with a bathroom that is completely -- that

15   would not be the same bathroom that his grandmother would be

16   using so there is this space in the home to quarantine

17   separately.

18          And, additionally, his grandmother is not -- I don't

19   believe she is elderly, she still works full time.  I

20   apologize, I don't have her precise age before me but I could

21   probably find it.  So I'm not sure that she is of the highest

22   risk and she works, my understanding is, within a medical

23   facility as it is.  So she is fully cognizant of any of these

24   risks and is willing, very much willing and would welcome the

25   opportunity to have him come and live in her home.

PROCEEDINGS

1    THE COURT:  All right --

2    MS. GLASHAUSSER:  Just briefly.

3    THE COURT:  -- anything else?  Yes, go ahead.

4    MS. GLASHAUSSER:  One more thing, Your Honor.  Your

5    Honor mentioned prior convictions and the bench warrant.  I

6    would just say those are from when Mr. Woodford was a minor.

7    And although they may not be that long ago in terms of years

8    because Mr. Woodford is so young still today, they really are

9    a long time ago in terms of his maturity and growth.

10    THE COURT:  Thank you.

11    Does the government want to be heard?

12    MS. REID:  Your Honor, I think the Court has

13    articulated many of the points that I would make.  I just want

14    to reiterate that we think this case really comes down to the

15    facts leading up to the defendant's conviction, which were, as

16    the Court mentioned, extremely egregious and his history

17    which, as the Court mentioned, includes that bench warrant

18    while he was waiting to be sentenced for eight prior robbery

19    convictions.  And this is in the Court's -- the government's

20    letter and I know the Court is aware of it, but while he was

21    out on that bench warrant he ended up being picked up by law

22    enforcement and was in possession of an imitation firearm and

23    actual real ammunition, which is just another reason to

24    believe that he, at that time and still, was a danger to the

25    community before he committed this attempted murder of another

PROCEEDINGS

1   person, as the Court said, in a crowded area in Brooklyn.

2        And I think in light of those facts, the

3   circumstances of the defendant's condition, although the

4   government of course is sympathetic to anyone with COVID and

5   the defendant suffering from that, it's just not sufficient,

6   Your Honor, to be a compelling reason or to be clear and

7   convincing to amount to an exceptional circumstance justifying

8   his release.

9        And I think the issue, Your Honor, with the notion

10  that his medical treatment would be remarkably different were

11  he released, I don't think that the evidence has really been

12  provided for that.  The loss of taste and smell I've read is

13  in 80 percent of COVID cases.  I don't believe the majority of

14  those people are able to be in a rehab facility, I don't see

15  how the defendant's case would be different.  I think, you

16  know, as the Court said, this is -- it's a difficult illness

17  to work with and, unfortunately, it just takes time.  But the

18  defendant is being seen by MDC staff appropriately.  As the

19  Court said, he's been seen by doctors, he's back in general

20  population, and in light of all of the circumstances it's the

21  government's position that there is just absolutely nothing

22  here that rises to a level that justifies releasing him that's

23  been demonstrated.

24        THE COURT:  All right.  Ms. Glashausser, did you

25  have anything else you wanted to add?

16

PROCEEDINGS

1          MS. GLASHAUSSER:  No, Your Honor, thank you.

2          THE COURT:  I am sympathetic to Mr. Woodford's

3    lingering symptoms, I am also glad that he was able to recover

4    and, fortunately, his youth and prior physical condition

5    probably assisted him with avoiding more serious consequences

6    of the COVID-19 virus, but I am trying to look for and have

7    looked carefully for facts that would constitute a compelling

8    reason to release Mr. Woodford pending his sentencing.

9          3145 Subsection (i)(4) would require that a

10   temporary release be based upon a judicial finding that the

11   release is necessary for preparation of a person's defense or

12   another compelling reason.  Preparation for the defense is not

13   at issue because Mr. Woodford has pled guilty and stands

14   convicted and need not prepare a defense at this point, so

15   what are the compelling reasons:

16          We have ongoing symptoms of the COVID-19 virus that

17   are common to many people, that don't compel or don't

18   constitute life-threatening conditions.  They are certainly

19   troubling for anybody and I would agree would probably cause a

20   great deal of stress to somebody who experiences them.  He's

21   got ongoing fatigue and difficulty exercising, to the extent

22   he may have been able to do so before he became ill, but he is

23   in a facility where his medical condition is on MDC's radar.

24   It appears that he is getting -- being monitored, and in terms

25   of the stress that he may be feeling, the mental health aspect

PROCEEDINGS

1    of this, certainly he can and should ask for a consult.

2         Now, are there exceptional circumstances here and

3    has Mr. Woodford justified by clear and convincing evidence

4    that he is not either a danger to the community or nor does he

5    present a risk of flight, and if we look at the bail statute

6    and the factors that I must consider, I started to review the

7    nature and circumstances of the offense here.  We have many

8    cases where felons are in possession of a firearm, some of

9    those individuals have one or two prior felonies, some have

10   multiple prior felonies.  Here, Mr. Woodford had eight.  The

11   fact that he was young and that he may have matured while in

12   custody for 27 months at MDC, but the circumstances of this

13   particular offense were, as I said, they were chilling and

14   horrifying actually to watch.  And this victim was fleeing for

15   his life and fell on the ground and was shot multiple times on

16   three separate approaches and retreats and approaches.  He

17   still lives with bullets in his body and his life is forever

18   changed obviously.

19        Mr. Woodford, despite his youth and despite the fact

20   that he was young when he committed these other serious

21   felonies, they were in fact serious felonies and some of them

22   did involve firearms, and the history of a bench warrant

23   indicates that when a judge put trust in Mr. Woodford in the

24   past that he would reappear and he didn't, a bench warrant had

25   to be issued.  This doesn't happen that often but when it does

18

PROCEEDINGS

1    happen one hopes that when a person is apprehended on a bench

2    warrant for failure to appear, that they will not be in

3    possession of ammunition or a weapon.  I accept the

4    representation that this was an imitation firearm, but there

5    is no dispute that the ammunition was real ammunition.

6          The danger posed to the community is significant in

7    this case.  And certainly I will be reading and considering

8    carefully the arguments by defense counsel that he has matured

9    and taken steps to rehabilitate himself and certainly his time

10   in custody thus far will be credited against any sentence that

11   he will receive, but the last factor, that is the weight of

12   the evidence against Mr. Woodford, as we know, is quite heavy.

13   The videotaped evidence of Mr. Woodford in possession of a

14   firearm and using it, frankly, to attempt to kill someone.

15         So given those factors I cannot find a legal basis

16   to grant Mr. Woodford release.  I cannot find that the ongoing

17   COVID symptoms constitute extraordinary circumstances or

18   override the clear risk of danger to the community and risk

19   that he will not appear.  He does face a significant sentence

20   because of this conviction.  And to the extent Ms. Glashausser

21   argued that he's anxious to fulfill the sentence and move on

22   with his life, I think those are positive signs that, yes, he

23   is young, he has a future, he will put this behind him and

24   move forward with a life in a law-abiding way and if, upon his

25   release, his grandmother is still willing to provide a place

PROCEEDINGS

1    for him to live away from the areas and the contacts that led

2    to this particular conviction, I think that's a very positive

3    thing and it's a very generous thing on her part, but until he

4    is sentenced and serves his time, I think that his release is

5    not warranted under the law.

6          He is scheduled for sentencing on February 26th at

7    11 o'clock a.m. and I am assuming we will proceed.

8    Ms. Glashausser, I think you've indicated you'd like to

9    proceed in person.  If it is safe to do so we will, otherwise

10   we'll probably proceed by video conference.  I don't know what

11   the COVID pandemic will bring with regard to ongoing exposure

12   and disease rates, but I would ask the government also to

13   please look into Mr. Woodford's ongoing needs or perhaps his

14   benefiting from some mental health treatment and to find out

15   and confirm that he does have access to potable water that is

16   not simply ice but water that runs clear from the tap and

17   appears to be potable.

18         So for the foregoing reasons I, respectfully, deny

19   Mr. Woodford's motion to be released pending his sentencing.

20         Is there anything else that I should address at this

21   time?

22         MS. REID:  Not from the government, Your Honor.

23         THE COURT:  I'm sorry, not from the government?

24         MS. GLASHAUSSER:  Sorry, Your Honor.  Yes, Your

25   Honor, this is Allegra Glashausser.  Just in terms of

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1   Mr. Woodford's sentencing, I do anticipate that he will still

2   ask to have an in-person sentencing, so in the event that it's

3   not available for us on February 26th I'll submit a letter to

4   the Court.

5              THE COURT:  All right.  Well, it will be up to him

6   whether -- we can go forward by video and it may be that

7   that's a good idea, but if we can go forward safely without,

8   you know, risking additional exposures to marshals and others,

9   we will go forward in person.

10             MS. GLASHAUSSER:  Thank you, Your Honor.

11             THE COURT:  All right.  Thank you.  Thank you to the

12  court reporter and MDC.  The MDC can be advised that we are

13  now adjourned and we can terminate this call.  Thank you.

14             (Matter concluded.)

15

16                  *     *     *     *     *

17

18  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

19

20  s/ Georgette K. Betts              January 28, 2021

21  GEORGETTE K. BETTS                 DATE

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*