1

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ------------------------------x
                                     18-CR-654(KAM)
3  UNITED STATES OF AMERICA,
                                     United States Courthouse
4                                    Brooklyn, New York

5          -versus-                  June 25, 2021
                                     10:00 a.m.
6  DARRELL WOODFORD,

7          Defendant.

8  ------------------------------x

9          TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
              BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                 UNITED STATES DISTRICT JUDGE

11 APPEARANCES

12 For the Government:       UNITED STATES ATTORNEY'S OFFICE
                            Eastern District of New York
13                          271 Cadman Plaza East
                            Brooklyn, New York 11201
14                          BY:  TEMIDAYO AGANGA-WILLIAMS, ESQ.
                            Assistant United States Attorney
15
   For the Defendant:       FEDERAL DEFENDERS OF NEW YORK
16                          One Pierrepont Plaza
                            Brooklyn, New York 11201
17                          BY:  ALLEGRA GLASHAUSSER, ESQ.

18
   Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
19                          Phone:  718-613-2268
                            Email:  RivkaTeich@gmail.com
20
   Proceedings recorded by mechanical stenography.  Transcript
21 produced by computer-aided transcription.

22

23

24

25

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

```
 1                      (In open court.)

 2              THE COURT:  Counsel and Mr. Woodford are present.

 3    This is a sentencing in the case of United States V. Darrell

 4    Woodford, 18-CR-654.

 5              Will the Government please state your appearance.

 6              MR. AGANGA-WILLIAMS:  Temidayo Aganga-Williams.

 7              THE COURT:  Good morning.

 8              MS. GLASHAUSSER:  Allegra Glashausser representing

 9    Mr. Woodford, who is here with me.

10              THE COURT:  Good morning, Mr. Woodford.

11              THE DEFENDANT:  Good morning, your Honor.

12              THE COURT:  Sir, do you speak and understand

13    English?

14              THE DEFENDANT:  Yes.

15              THE COURT:  Raise your right hand and take an oath

16    to tell the truth.

17              (Defendant sworn.)

18              THE DEFENDANT:  Yes.

19              THE COURT:  Thank you, sir.

20              Mr. Woodford, as you can see we have a court

21    reporter who is going to be making a transcript of today's

22    sentencing proceedings.  The transcript will be made part of

23    any appeal that you may wish to take.

24              I reviewed the Indictment, ECF number seven, the

25    transcript of Mr. Woodford's January 10, 2020 guilty plea, the
```

1    January 10, 2020, plea agreement, the executed preliminary

2    order of forfeiture, which is document number 75 and will be

3    made part of this judgment, the February 11, 2020 presentence

4    report, which is ECF 74, the February 11 Probation Department

5    sentencing recommendation, which is ECF 74-1, and

6    Mr. Woodford's objections to the PSR, ECF 77.

7              I've also reviewed defense counsel's submissions

8    dated February 18, 2020 and April 23, 2021.

9              As well as letters from Mr. Woodford's family

10   members and other supporters.

11             Finally, I've reviewed the Government's sentencing

12   memorandum, which is ECF number 78.

13             Have I overlooked any submissions?

14             MR. AGANGA-WILLIAMS:  I don't believe so, your

15   Honor.

16             MS. GLASHAUSSER:  No, your Honor.  Only there was an

17   extra family letter that was submitted at a different date,

18   perhaps that was included.

19             THE COURT:  Yes.  We reviewed family letters.  Thank

20   you.

21             I would like to confirm that Mr. Woodford is a

22   United States citizen so we need not address ICE notification

23   or consular notification?

24             MS. GLASHAUSSER:  That's correct, your Honor.

25             THE COURT:  Thank you.

```
 1              Mr. Woodford, are you satisfied with your attorney

 2    Allegra Glashausser?

 3              THE DEFENDANT:  Yes.

 4              THE COURT:  Ms. Glashausser, are there any

 5    unresolved conflicts, motions or any other matters that we

 6    should address before we proceed with our sentencing?

 7              MS. GLASHAUSSER:  No, your Honor.

 8              THE COURT:  Mr. Woodford does appear to be alert and

 9    following these proceedings closely.

10              Do you agree with that observation, Ms. Glashausser?

11              MS. GLASHAUSSER:  Yes, your Honor.

12              THE COURT:  Do you know of any reason why we should

13    not proceed with Mr. Woodford's sentencing today?

14              MS. GLASHAUSSER:  No, your Honor.

15              THE COURT:  I'd like to confirm that the Government

16    has not as of this date identified any victims who would

17    otherwise be entitled to restitution?

18              MR. AGANGA-WILLIAMS:  That's correct, your Honor.

19              THE COURT:  Have you given any victims the notice of

20    today's sentencing proceeding?

21              MR. AGANGA-WILLIAMS:  Yes, your Honor, in the normal

22    process.

23              THE COURT:  My understanding is that victim impact

24    statement letters were sent to any purported victims but they

25    did not respond, is that still the status?
```

1          MR. AGANGA-WILLIAMS:  That's correct, your Honor.

2          THE COURT:  All right.  Under normal circumstances

3    if the victims submitted affidavits of loss, I would be in a

4    position to award restitution for the injuries that they

5    suffered.  But I will not do so because we have not identified

6    the victim.

7          Mr. Woodford, have you read the presentence report

8    and all the sentencing submissions by the Government, your

9    lawyer and probation?

10         THE DEFENDANT:  Yes.

11         THE COURT:  Did you have any trouble understanding

12   those submissions?

13         THE DEFENDANT:  No.

14         THE COURT:  Did you have a full opportunity to

15   discuss the submissions with your lawyer?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Are you ready now to be sentenced?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Sir, you may recall that on January 10,

20   2020, you entered a plea of guilty before me.  At that hearing

21   you were placed under oath and asked questions about your

22   understanding of the charge to which you pled guilty, your

23   rights, the consequences of a guilty plea to the charge, and

24   other matters.  In addition, I did ask you what you did in

25   connection with the charge in the Indictment.  Were your

1    answers to my questions truthful, sir?

2              THE DEFENDANT:  Yes.

3              THE COURT:  I've confirmed that the statements that

4    Mr. Woodford made were knowing and voluntary, and based upon a

5    full understanding of his rights and that he did establish

6    facts to support his guilty plea to the count in the

7    Indictment, and I did previously accept his guilty plea but I

8    did reconfirm that.  I accepted Mr. Woodford's guilty plea to

9    the sole count of the Indictment, which charges that on

10   August 30, 2018, Mr. Woodford, having previously been

11   convicted in a Court of one or more crimes punishable by a

12   term of imprisonment exceeding one year knowingly and

13   intentionally possessed in and affecting commerce three

14   Remington Peters .38 automatic caliber cartridge casings in

15   violation of 18 U.S. Code Section 922(g)(1).

16             Mr. Woodford, you have a right to have what is

17   called a Fatico fact finding hearing, which is a hearing

18   during which parties may present evidence either in dispute

19   and/or relevant to sentencing.  Would you like to have such a

20   hearing?

21             THE DEFENDANT:  No.

22             THE COURT:  In addition, sir, you have the right to

23   be heard today in court.  If you would like to make a

24   statement I'm happy to hear from you.  Would you like to make

25   a statement, sir?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right, please just keep your voice

3    up if you don't mind.

4          THE DEFENDANT:  Excuse me, your Honor, I'm kind of

5    nervous.

6          THE COURT:  That's all right, I understand.

7          THE DEFENDANT:  I never really spoke before.  A

8    couple of years I would have never even said nothing.  I would

9    have just said I'm sorry and that was it.  I never even

10   thought that no one would care what I have to say.

11         I want to let you know that I'm changing and I'm

12   different.  I'm at a new stage in life.  And I apologize to

13   the victim and his family.  I apologize to my family.  I

14   apologize for the selfishness of my actions.

15         Thank you for letting me speak.

16         THE COURT:  Thank you, Mr. Woodford.  I have read

17   your lawyer's submissions.  It appears that you are taking

18   very serious steps toward putting your life back on track.  I

19   also think that your attorney has conveyed a recognition on

20   your part about the life that you led that led you here to the

21   Court, and that you are determined to change direction because

22   of all of the people who support and love you.  So I

23   appreciate hearing that.

24         Ms. Glashausser, I'm also happy to hear from you if

25   you would like to be heard.

1              MS. GLASHAUSSER:  Thank you, your Honor.  Your

2    Honor, I really had the pleasure of getting to watch Darrell

3    mature over the past three years.

4              Now I know a smart young man who reads the daily

5    news, discusses current events, and is curious about the world

6    and his place in it.  Now I know a man who is focused on his

7    future, who has tried to taking the GED the entire three years

8    he's been at the MDC and keeps asking for the opportunity to

9    take the exam, even though he's never been given it.  Now I

10   know a man who gets along well with all sorts of people.  The

11   guards and the other incarcerated people at MDC like him.

12   Half of my office knows him.  He is someone who listens and

13   respects other people.

14             These qualities aren't ones that I knew about

15   Darrell when I first met him about three years ago.  Three

16   years ago Darrell shot someone and was arrested.  Now he's

17   able to reflect on the harm that he caused.

18             Where he grew up shootings were common.  A friend of

19   his was killed when he was 14.  He thought he needed a gun to

20   protect himself.  Three years ago his life was only about

21   surviving.  Now he knows it isn't.

22             Three years ago he hadn't even started to move past

23   the traumas in his life, his mother dying when he was only

24   five, and him finding her.  His father, who he looked up to,

25   being sent to prison.  And then going to live with a

1    grandfather who stole Darrell's money to use drugs.

2            Now, he has started the work of moving past those

3    traumas so he can learn from the traumas he experienced and

4    the traumas he caused and prevent them going forward.

5            Three years ago he was only a teenager, 18 years

6    old.  Now he's a young man.  Science tells us that young

7    people have a huge capacity to change and mature and grow

8    because their brains are still growing.  And Darrell is

9    demonstrating that.  I've had the chance to watch that happen.

10            His youth and the maturity he's demonstrating since

11    then is a serious reason to sentence him below the guideline.

12    He has shown this maturity and growth despite being at MDC in

13    probably the harshest conditions that you could experience

14    there.  When the power went out in the winter of 2019, that

15    seemed like the bottom.  It was freezing, there was no heat,

16    no blankets.  He was a teenager in an adult jail for the first

17    time.  He was the first client I went to visit when visits

18    finally opened.  His hands were freezing.  That seemed really

19    bad.

20            But then Covid happened, and as your Honor knows,

21    Darrell was due to be sentenced the day New York City shut

22    down.  Instead, for over a year he was locked down at MDC.  He

23    showered rarely, talked to family infrequently, and had no

24    visits.

25            And then he got sick.  When he got sick the lockdown

1  became even worse.  It was as if he was punished for being

2  sick.

3          Other judges have described the conditions during

4  Covid at MDC as inhumane, extraordinarily harsh like solitary

5  confinement.

6          The time that he has spent at MDC already has

7  provided a huge amount of just punishment and deterrence and

8  should be counted as longer because of how harsh it was and

9  how extreme.

10          Despite this, he has continued to mature.  He's been

11  working as an orderly.  He got that job I think during the

12  pandemic, which is the best job as my clients tell me.  It's

13  given to the people that the guards trust at MDC.  He has

14  spent a lot of his time writing music lyrics.  He's a gifted

15  musician.  I suspect that's one reason he's been able to stay

16  mentally strong during such extreme difficulty.

17          Now I know, your Honor, is aware of his criminal

18  history, which is reflected in his guidelines.  This case has

19  been different.  It's his first adult sentence.  His criminal

20  history is from when he was really a kid, 15.  Being among

21  grown men at the jail has helped him grow.  It's helped him

22  realize who he does not want to be in the future.  He does not

23  want to be a person that is in jail through much of his life.

24          I also know that, your Honor, has seen the video of

25  the crime and described it as chilling.  And there is no

1  denying that it was a serious crime and a terrible thing to

2  do.  Mr. Woodford knows that.  He knows that and he's trying

3  to move forward from that, which is exactly what we would hope

4  he would do.

5            It was not something that he had planned to do.  It

6  was something that happened in the heat of the moment.  And at

7  that time he thought, as he wrote in his letter, if he didn't

8  do it someone would do it to him.  He thought that was normal.

9  He doesn't anymore.

10           These aren't excuses, none of these are excuses.

11 Darrell takes full responsibility for what happened.  But they

12 explain why it happened why it won't happen again.

13           As his aunt who basically raised him, Deanna, who is

14 here today, even though she's only six years older than him.

15 In her letter she wrote:  This is something he did but it is

16 not who he is.  She said:  We can't give up on him.

17           That's really what I'm urging your Honor to do, is

18 to not give up on Darrell.  To see that he has a bright future

19 and to sentence him below the guidelines.

20           THE COURT:  Thank you.  Sir, would you like to be

21 heard on behalf of the Government?

22           MR. AGANGA-WILLIAMS:  Yes, your Honor.  Just to

23 respond to a few points.

24           I won't recount the details.  I think your Honor is

25 well aware that what happened here was an attempted murder.

1   It was not out of self-defense.  I think defense counsel

2   mentioned the gun for protection, but as your Honor knows in

3   the video, this was not a case of self-defense.  It was a case

4   of hunting someone down, chasing them, and trying to kill them

5   in public.  That's what happened here, an attempted murder.

6          There was a mention of a first-adult sentence.  But

7   your Honor, it wasn't an adult crime.  Mr. Woodford was an

8   adult when he committed this crime and he tried to kill

9   someone.

10          With regard to the Covid, to the difficulties at MDC

11   in the last few years.  The Government does not take an

12   objection to the Court taking that into account in its

13   sentence.  I think that would be appropriate here, your Honor.

14          As you know the Government has asked for a guideline

15   line sentence of 78 to 97 months.  And I do think the Court

16   should take into account that the time at MDC over the last

17   few years has been more difficult than anyone would have

18   expected.  With that said, your Honor, I think your Honor can

19   both do that; take into account those difficulties while

20   imposing a punishment that acknowledges that this is not a

21   normal felon in possession case.  This is not the kind of case

22   we typically see, perhaps where a paroled finds a gun, someone

23   has a criminal history, and then they get a sentence that

24   often does not look like these kind of guidelines.  It looks

25   perhaps like something we might see in the 24-month range or

1    30-something-month range.  This is a different kind of case.

2          Even taking the claims of revocation at face value

3    and believing in those; nonetheless, there is a need for,

4    certainly for general deterrence here, an attempted murder on

5    Brooklyn streets, but also for specific deterrence in that

6    this is not Mr. Woodford's first criminal encounter.

7          I understand that there are hopes, and that the

8    Government shares in those hopes, that this will be his last

9    encounter with law enforcement but what happened happened,

10   your Honor.  And a crime at that level of seriousness the

11   Government respectfully submits that it's important for the

12   Court to impose a punishment that reflects that level of

13   seriousness, which here your Honor was attempted murder in

14   broad daylight.

15         As I said, your Honor, it would be appropriate for

16   the Court to perhaps go slightly lower than the guidelines the

17   Government initially indicated in its recent letter, while

18   imposing a sentence that acknowledges the seriousness of this

19   offense.  Thank you, Judge.

20         THE COURT:  Thank you.

21         Ms. Glashausser, did you want a chance to respond?

22         MS. GLASHAUSSER:  No.  Thank you, your Honor.

23         THE COURT:  Thank you.  Mr. Woodford, I note that

24   Ms. Glashausser mentioned that your aunt was here in support

25   and I've also read the letters from your family members.  I

1   understand that your childhood was a very difficult one.  And

2   I think that one of the observations that Ms. Glashausser made

3   is that your family members, your younger siblings, are

4   motivating you to be someone who is setting an example and

5   putting your life on the right track.  And you mentioned

6   taking care of your grandmother and your younger siblings, and

7   I do hope that your commitment to changing the course of your

8   life will continue.

9          Your youth does factor into this.  There is data

10  that younger people are often recidivists, but I think what

11  you've done here is try to avail yourself of opportunities

12  within the MDC, as limited as they may be, to try to improve

13  and to put yourself in a position to be a law abiding person

14  when you are released.  I am encouraged.  I hope that your

15  words about feeling regret and sorrow toward your victim are

16  genuine.

17         The video of the shooting of that young man and the

18  firing of the gun in an open plaza where other bystanders were

19  walking, was very horrific to watch.  And I accept that you

20  recognize that and will turn away from that kind of life and

21  that kind of conduct.

22         I do note that it appears, based on the record, that

23  you were released from the state sentence only a few months

24  before, and then reconnected with some friends who had a beef

25  with another group.  And I think the prosecutor accurately

1    describes your conduct, that you had an encounter, it was an

2    encounter between the two groups.  Then you pursued this

3    person through the streets, through several blocks, through a

4    public courtyard where there were people, firing at him.  And

5    once he was hit with the first few gunshots, you came back,

6    not once but twice, to fire at close range.  And that

7    miraculously he survived but.  I'm sure that incident is

8    something he can't just put behind him.  An injury like that

9    is life-changing.  Even assuming he heals from physical

10   wounds, the psychic wounds of being shot multiple times at

11   close range cannot being understated.

12           In any event, sir, I am encouraged and I understand

13   that the conditions at MDC since your incarceration have been

14   inhumane and harsh.  And I will take that into consideration

15   in deciding your sentence.

16           Now Mr. Woodford has made some objections to the

17   PSR.  First, page one, paragraph eight and 53.

18   Ms. Glashausser notes that Mr. Woodford was arrested by the

19   FBI on November 21, 2018, not November 23.  November 23 was

20   the date that Mr. Woodford was arraigned.  And Mr. Woodford

21   had been in custody since September 14, 2018, for a local

22   parole violation.  He was in custody since November 21, 2018,

23   not November 23.  So I will direct that the PSR be corrected

24   to reflect the correct dates for Mr. Woodford's arrest,

25   arraignment and confinement, both by the NYPD and the FBI when

1    he was placed in federal custody on November 21, 2018.

2             Paragraphs 8 and 42, have drawn an objection to the

3    following statement:  The arresting agents advised that the

4    defendant is a member of the 8 Trey Cowboy Crips, a street

5    gang.

6             Mr. Woodford is presumably concerned that this

7    statement intimates that he is a gang member or gang

8    affiliated.  The Government notes that at Mr. Woodford's state

9    court sentencing, the prosecutors argued for a sufficient

10   sentence based on Mr. Woodford's affiliation with a gang.

11   I've not factored in any purported affiliation with the 8 Trey

12   Cowboy Crips into my sentencing analysis.  This is an issue

13   that has not been proven.

14            And I would note, though, that the video suggests

15   that he was with a group of people who had, as I a said, a

16   violent dispute with another group.  If the parties would like

17   a Fatico hearing on this issue I'll be happy to hold one.

18            MS. GLASHAUSSER:  We're not asking for a

19   Fatico hearing, your Honor.  However, as your Honor noted that

20   it has not been proved, that's why I'm asking for it to be

21   removed from the PSR.  Because it does affect where he'll be

22   placed within the BOP system.  It changes the points that he

23   gets in the BOP system.  I would ask that, your Honor --

24            THE COURT:  I think what I could do is amend

25   paragraphs eight and 42 to leave the statement in:  That the

1    agents advised that he is affiliated with this gang but that

2    he disputes it.

3              Otherwise, we can have a hearing and I can make a

4    finding of fact on this.

5              MS. GLASHAUSSER:  We're not asking for a hearing,

6    your Honor.

7              THE COURT:  So I'll amend paragraphs eight and 42 to

8    provide that Mr. Woodford disputes that he is a member of the

9    8 Trey Cowboy Crips.

10             Ms. Glashausser also objects to the statement that

11   Mr. Woodford allocuted with respect to a 2016 state court

12   robbery conviction that he was, quote, "putting guns up to the

13   victims and threatening to shoot them."  Defense counsel

14   believes this quote derives from the state prosecutor's

15   characterization of Mr. Woodford's conduct in his 2017 state

16   court sentencing for a robbery conviction.  Defense counsel

17   asserts that Mr. Woodford generally allocuted that a

18   co-defendant possessed an apparent weapon.  The Government

19   maintains that Mr. Woodford allocuted to putting guns up to

20   the victims and threatening to shoot them, and even recalled

21   putting a gun to one victim's head and threatening to shoot

22   her.  The Government was informed by the Assistant District

23   Attorney who prosecuted Mr. Woodford that he indeed allocuted

24   to this conduct.  The Government has not yet received or

25   provided a transcript of Mr. Woodford's guilty plea and

1   allocution dated September 8, 2016, but refers the Court to

2   the description of Mr. Woodford's allocution in the 2017 state

3   court sentencing minutes.

4            How do the parties wish to resolve this?  Did you

5   get the transcript, Mr. Aganga-Williams?

6            MR. AGANGA-WILLIAMS:  The information we have

7   remains the same.

8            THE COURT:  Ms. Glashausser, do you want to be heard

9   on how to resolve this dispute?

10           MS. GLASHAUSSER:  No, your Honor.  I would more

11   generally ask your Honor not to take into consideration the

12   state prosecutor's comments at sentencing from a case --

13           THE COURT:  The dispute is whether or not

14   Mr. Woodford said these words and admitted he did this; or

15   whether the prosecutor described it.

16           MS. GLASHAUSSER:  Correct, your Honor, we don't have

17   information that Woodford did say those words, that's why I

18   would ask to strike it.

19           MR. AGANGA-WILLIAMS:  Perhaps, your Honor, it should

20   be revised to indicate that the according to the relevant

21   prosecutor he allocuted.  That's how we address concerns.

22           MS. GLASHAUSSER:  Perhaps it could just say that the

23   prosecutor said that he did this.  It's just that a plea

24   allocution is a legal -- it has specific legal meaning.  So I

25   would just worry about having it in a PSR, which also can

1   follow someone when we don't know if he's correct.  I don't

2   think it is a large point, however.

3           THE COURT:  All right, well, I will amend these

4   paragraphs to say -- paragraph 25 -- that the prosecutor

5   described Mr. Woodford's conduct as having put guns up to the

6   victims and threatened to shoot them.

7           In addition there is a notation that Ms. Glashausser

8   challenges that Mr. Woodford's 2018 parole violation was not

9   stayed but rather was revoked and restored.

10          Paragraphs 31 to 33, Ms. Glashausser challenges or

11   clarifies that Mr. Woodford's arrests reported in 31 to 33 are

12   related to his 2016 conviction.  In addition, the reported

13   date of his offense, July 7, 1995, is incorrect as defendant

14   was not yet born.

15          I will note that this is an erroneous date.  And

16   that the arrest in paragraphs 31 to 33 is related to his 2016

17   conviction.

18          Paragraphs 36, 41, and 51, defense counsel requests

19   that the PSR should be amended to reflect that Mr. Woodford's

20   father's first name is Darell, that Mr. Woodford lived in

21   Buffalo for approximately one year, and that Mr. Woodford left

22   the 11th grade because of a local arrest.

23          There is no objection, and we will make those

24   corrections to the PSR, paragraphs 36, 41 and 51.

25          Paragraph 54, defense counsel explains that

1    Mr. Woodford did not receive a regular salary for his work as

2    a rapper.  And reported during his presentence report

3    interview that he earned between $1,000 and $2,000

4    periodically.  And toward the end of this employment received

5    between $6,000 and $8,000 every couple of weeks.  Absent the

6    Government's objection, I'll instruct probation to amend the

7    PSR accordingly.

8            Paragraphs 30, 59, 75.  Defense counsel objects to

9    the PSR listing Mr. Woodford's obligation to pay taxes in 2018

10   under other criminal conduct.  Defense counsel asserts that

11   Mr. Woodford's tax obligations should not be considered

12   against him under other criminal conduct because it is not

13   entirely clear that he was required to file taxes for his

14   employment NuLa Entertainment, and he was incarcerated at MDC

15   during the tax reporting period.  In any event, the Court has

16   not considered Mr. Woodford's fulfillment of his tax

17   obligations in reaching a sentencing decision.

18           For a violation of 18 U.S. Code Section 922(g)(1)

19   the PSR calculated Mr. Woodford's advisory adjusted offense

20   level as 29.  Three points were deducted for acceptance of

21   responsibility, leaving a total offense level of 26.  The PSR

22   calculated Mr. Woodford's criminal history category as three,

23   which results in a sentencing range between 78 to 97 months.

24           Are there any other findings of fact or law that the

25   defense or Government wish me to make?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

1          MR. AGANGA-WILLIAMS:  Not from the Government, your

2     Honor.

3          MS. GLASHAUSSER:  No, your Honor.

4          THE COURT:  I have independently given respectful

5     consideration to the 2018 sentencing guidelines in calculating

6     Mr. Woodford's sentence.

7          First, for a violation of 18 U.S. Code Section

8     922(g)(1), a felon in possession of ammunition, I considered

9     guideline 2K2.1(c)(1)(A), which cross-references Section 2X1.1

10    because the defendant used the ammunition cited in the offense

11    of conviction in connection with an attempted murder.  He

12    stipulated to this in his plea agreements.  2X1.1(c)(1)

13    further instructs that when an attempt is expressly covered by

14    another offense guideleine section, the Court should apply the

15    guideline section.  Attempted murder is covered by guideline

16    Section 2A2.1, which provides a base offense level under

17    2A2.1(a)(2) of 27.

18         Because the victim suffered serious injuries as a

19    result of the offense, guideline 2A2.1(b)(1)(B) militates for

20    a two-level enhancement.

21         And Mr. Woodford did demonstrate acceptance of

22    responsibility by pleading guilty and sparing the Government

23    the need to prepare for trial.  He's given three points off

24    for acceptance for responsibility, leaving a total offense

25    level of 26.

1          Mr. Woodford has a prior conviction and at least two

2     prior arrests, in November 18, 2015 and November 23, 2016.  Of

3     the prior conviction results in five criminal history points.

4          On November 18, 2015, at age 15 Mr. Woodford was

5     arrested for robbery in the second degree.  He committed five

6     robberies over two weekend nights in November 2015 targeting

7     11 victims.  According to the Government, as well as the

8     prosecutor at Mr. Woodford's 2017 state court sentencing for

9     the robbery offense, Mr. Woodford allocuted to putting guns to

10    the victims' heads and threatening to shoot them.  However,

11    we'll note there is a dispute about whether he said it or

12    whether the Government described him saying it.

13         Although Mr. Woodford possessed a gun and

14    ammunition, the gun was apparently a replica.

15         Defendant pled guilty on September 8, 2016.  And on

16    January 6, 2017, he was sentenced in New York County Supreme

17    Court Criminal Term to 28 months to seven years custody.

18         He was released on parole on May 29, 2018.  And his

19    parole was revoked less than five months later after the

20    instant offense in August 2018.  Mr. Woodford's 2016 robbery

21    conviction generates three criminal history points.

22         Because Mr. Woodford committed the instant offense

23    while under a criminal justice sentence, that is the state

24    court parole specifically for robbery in the second degree,

25    guideline 4A1.1(d) provides that two points are added to

1    Mr. Woodford's criminal history.

2            The PSR further states that defendant has not filed

3    personal income tax returns.  But I am not going to add any

4    criminal history points related to this or consider it

5    otherwise.

6            We also checked whether Mr. Woodford's conviction of

7    minor at age 15 would count toward his criminal history.  But

8    because it occurred within the five years prior to his instant

9    offense, it does count.

10           Mr. Woodford has five criminal history points.  And

11   under Chapter 5, Part A of the guidelines he has a criminal

12   history category of three.

13           The sentencing options are as follows:  For the sole

14   count of the Indictment the maximum term of imprisonment is

15   ten years for violation of 18 U.S. Code Section 922(g)(1) and

16   18 U.S.C. Section 924(a)(2).  Based on a total offense level

17   of 26 and the criminal history category of three, the

18   guidelines provide a range of imprisonment between 78 to 97

19   months.  Had the underlying state case for which defendant was

20   arrested in November of 2017 not been dismissed, this federal

21   sentence would have run concurrently with any anticipated term

22   of imprisonment to be imposed in the underlying state criminal

23   case, since the conduct in that case is related to the instant

24   case, under guideline 5G1.3(c).  This sentence may also be

25   imposed to run concurrently, partially concurrently or

1    consecutively to the undischarged term of imprisonment

2    stemming from Mr. Woodford's 2016 state conviction and 2018

3    state parole revocation violation, guidelines Section

4    5G1.3(d).  If Mr. Woodford were to serve the remainder of his

5    state court sentence, based on PSR paragraph 25, he would be

6    eligible for release in January of 2024.

7            With regard to supervised release, the Court may

8    impose a term of supervised release of not more than three

9    years under 18 U.S. Code 3583(b)(2).  And because this offense

10   is a Class C felony, the guideline range for a term of

11   supervised release is one to three years under guideline

12   5D1.2(a)(2).

13           Although restitution is mandatory, unfortunately

14   this victim has not returned an affidavit of loss; therefore,

15   I will not be able to order any restitution for the victim's

16   injuries.

17           Because the offense is a Class C felony,

18   Mr. Woodford would be eligible for not less than one nor more

19   than five years of probation under 18 U.S.C. 3561(c)(1), but I

20   would have to impose as a condition of probation absent

21   extraordinary circumstances, a fine, restitution, or community

22   service, under Section 3563(a)(2).

23           The applicable guideline range is Zone D of the

24   sentencing table.  The defendant is not eligible for probation

25   under 5B1.1, application note two.

1          The maximum fine that may be imposed is $250,000

2    under section 3571(b) of Title 18.  The guidelines provide

3    that the fine range would be 25,000 to 250,000 under guideline

4    5E1.2(c)(3).  The Probation Department finds, and I agree,

5    that Mr. Woodford is not able to pay a fine and will not

6    likely become able to pay a fine.  So I will not impose a

7    fine.

8          Under Mr. Woodford's plea agreement, he agreed to

9    forfeit the three Remington-Peters .380 caliber cartridge

10   casings recovered from the crime scene on August 30, 2018.

11   I've signed a preliminary order of forfeiture on February 18,

12   2020, that will be incorporated into the judgment.

13         I must impose a $100 mandatory special assessment

14   under 18 U.S. Code Section 3013 for the sole count of the

15   Indictment.

16         I will not impose the cost of prosecution.

17         One thing I would note is that Mr. Woodford should

18   pay his special assessment as soon as possible through the

19   Bureau of Prisons financial responsibility program so that the

20   Government does not have to expend resources collecting this

21   money.  He can pay the assessment of $100 through his prison

22   program.

23         Mr. Woodford, you do have the right to appeal your

24   sentence.  Under paragraph four of your agreement with the

25   Government, you agreed not to file an appeal or challenge your

26

1    sentence if I impose a term of imprisonment of 108 months or

2    below.  The Appellate Court will decide if your appellate

3    waiver is enforceable.  I will not have that decision.  Any

4    appeal must be filed within 14 days of judgment being entered

5    in your case.

6            If you cannot afford to pay the cost of an appeal,

7    the filing fee, you may apply for leave to do so if you can

8    establish that you're indigent.  The clerk of this court at

9    your request -- at Ms. Glashausser' request -- will prepare

10   and file a notice of appeal on your behalf.

11           I ask Ms. Glashausser to take all necessary steps to

12   protect her client's right on appeal to file a timely appeal

13   and to have representation.  Will you do that, ma'am?

14           MS. GLASHAUSSER:  Yes, Judge.

15           THE COURT:  Thank you.

16           Next I ask whether the Government has arranged for

17   any return of property that may have been seized from

18   Mr. Woodford at the time of his arrest so we can avoid other

19   proceedings.

20           MR. AGANGA-WILLIAMS:  Your Honor, I'm not aware of

21   the Government possessing any property.  But if that's not

22   true, then I can look into that.

23           THE COURT:  Is there anything, Ms. Glashausser?

24           MS. GLASHAUSSER:  No.  I suspect that's correct,

25   because Mr. Woodford was originally arrested by the local

1    authority.

2              THE COURT:   Thank you.

3              In determining a sentence in any case I give

4    respectful consideration to the advisory guidelines, which are

5    not mandatory, in addition to the sentencing factors set forth

6    at Title 18 3553(a) one through seven.

7              First, in determining the sentence I considered the

8    nature and circumstances of Mr. Woodford's offense.  And find

9    that his offense is very serious.  He did also agree in his

10   agreement that the attempted murder guidelines would apply.

11             I think there is no doubt watching those videos that

12   as he fired repeatedly at his victim, even while he was on the

13   ground, this was incredibly serious, horrific and chilling.

14             Mr. Woodford entered a plea of guilty to the sole

15   count of the Indictment, felon in possession of ammunition.

16   The sole count charged that he on August 30, 2018, after

17   previously being convicted in a court of one or more crimes

18   punishable by a term of imprisonment exceeding one year, did

19   knowingly and intentionally possess in and affecting commerce

20   three Remington-Peters .380 auto caliber cartridge casings in

21   violation of 18 U.S.C. 922(g)(1).

22             I think the video depicts a muzzle of a firearm and

23   the flash of light coming from the muzzle at various times.

24   In any event, we talked about the serious nature of firing on

25   the street, in the evening when there were many innocent

1   bystanders.  And the video bears out there was a chase through

2   several city blocks before the victim was shot.

3          On August 29, 2018, a surveillance camera inside a

4   deli 1990 Bedford Avenue in Brooklyn recorded video of the

5   defendant on the premise along with approximately five other

6   individuals.  The video captured a clear image of

7   Mr. Woodford's face and his attire, a short sleeved T-shirt,

8   black and white basketball shorts, and a black Nike logo on

9   the shirt, a white scarf or doo-rag on his head, and red and

10  white Nike sneakers.

11         The following night, August 30, 2018, at

12  approximately 8:51 p.m. another surveillance camera captured

13  the defendant and four individuals walking in front of a deli

14  at 1844 Nostrand Avenue in Brooklyn.  Mr. Woodford was dressed

15  in the attire as the previous night but without a head

16  covering.  Though the video did not capture as close a view of

17  the defendant's face as the earlier video, Mr. Woodford's

18  beard and distinct hairline and haircut were still visible.

19  One of the men with Mr. Woodford struck a man standing with

20  others, and Mr. Woodford's group began to case the other men.

21         A minute later, a surveillance video located at 1356

22  New York Avenue captured the defendant chasing another man,

23  who I will refer to as the victim, along a walkway leading to

24  3104 Newkirk Avenue.  Mr. Woodford chased the victim into the

25  courtyard and shot at him.  Video surveillance at 3104 Newkirk

1    Avenue captured the defendant chasing the victim in the

2    courtyard while continuing to shoot at him.

3            As Mr. Woodford fired at the victim, three

4    individuals approached from the opposite direction having

5    nothing to do with this dispute, had to duck the shots.

6            Eventually Mr. Woodford hit the victim and the

7    victim fell to the ground.  Mr. Woodford approached the victim

8    and shot him several more times at close range, then ran off

9    and left the victim on the ground.

10           Police officers arrived minutes after the shooting

11   and secured the crime scene.  The victim sustained multiple

12   shots to his left thigh and lower torso and was transported to

13   the hospital.  Medical staff were not able to remove all of

14   the bullets from the victim's body.  About an hour after the

15   shooting took place, an officer from the NYPD's Evidence

16   Collection Team collected three Remington-Peters .380 caliber

17   cartridge casings from the area where the shooting had taken

18   place.

19           On September 14, 2018, NYPD officers arrested

20   Mr. Woodford on charges of violating his state parole by

21   committing the August 30, 2018 shooting.

22           On or about November 21, 2018, FBI agents arrested

23   Mr. Woodford for the instant offense at Rikers Island in

24   Queens, New York.

25           Sadly, this is not the first time that Mr. Woodford

1   has used a firearm in the commission of a violent crime.  As

2   noted above, in 2016 Mr. Woodford pled guilty to robbery in

3   the second degree.

4           Now, the use of a firearm, at least in some these

5   robberies, was established at the state court.  The weapon

6   turned out to be an imitation pistol.  That is of no moment.

7   Mr. Woodford, was sentenced to over a year in custody.  And

8   was on release on parole for a few months before he committed

9   the instant offense.  A parole violation as well as these

10  federal charges resulted.

11          I've considered Mr. Woodford's personal

12  characteristics, family history, and circumstances.

13          Mr. Woodford was born April 16, 2000 in the Bronx to

14  the union of Darell Smith and Lukisha Durant.  When

15  Mr. Woodford was only five years old, he witnessed his mother

16  tragically die, from a physical condition, in front of him.

17  After his mother passed, Mr. Woodford moved in with his

18  grandmother and uncle, who according to Mr. Woodford subjected

19  him to physical abuse, including hitting him with belts,

20  slippers, and switches.  The Administration for Children's

21  Services, or ACS, eventually intervened and Mr. Woodford moved

22  in with his grandfather in Buffalo, New York.  Unfortunately,

23  this transition did not provide Mr. Woodford with a more

24  secure or stable environment.

25          He recounts that his grandfather abused crack

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

1    cocaine and stole defendant's monthly death benefit money from

2    his mother's passing to feed his crack habit.

3            These there were some positive influences on

4    Mr. Woodford's primitive years.  His grandmother, Maxine

5    Middleton, and his aunt, Deanna Woodford, were apparently

6    loving and supportive presences in Mr. Woodford's life.

7    Though his grandmother's attention was limited due to the

8    burdens of working three different jobs to support her

9    extended family, Deanna seems to have embraced the role of Mr.

10   Woodford's parent, being only six years older than

11   Mr. Woodford himself.

12           Mr. Woodford recalls that Deanna picked him up from

13   school, helped him with his homework, and generally took care

14   of him.

15           Although Mr. Woodford's childhood could be fairly

16   characterized as traumatic and unstable, he fortunately had

17   two loving presences in his life.

18           As an adolescent, Mr. Woodford gradually began to

19   skip school and stay out late.  He first smoked marijuana at

20   11 years old, and he reports he smoked an ounce per day up to

21   the date of his arrest in this case.  He relates that he

22   picked up his marijuana habit from his father, who he saw

23   smoking the drug at home.  Mr. Woodford also ingested Ecstasy

24   on one occasion when he was 17.

25           When he was 14, one of his friends was stabbed to

1    death and Mr. Woodford witnessed that.  Mr. Woodford began to

2    carry a gun.  As his aunt Deanna notes, Mr. Woodford started

3    hanging out with individuals who were bad influences.  He had

4    some affiliation, though we are not considering any of his

5    affiliations in his sentences.  He disputes that he's

6    affiliated or 8 Trey Cowboy Crips.

7            Mr. Woodford has four paternal half siblings, all of

8    whom are in good health and reside with their mother in

9    Manhattan.  They are young, under the age of ten, and are not

10   aware of Mr. Woodford's current conviction.  Mr. Woodford's

11   father is in good health and resides in Queens, New York.  He

12   works as a bike messenger and is aware of Mr. Woodford's

13   current prosecution.  He remains supportive of his son.

14   Mr. Woodford has never been married or fathered any children.

15   He's not currently in a relationship.

16           Mr. Woodford's most recent employment includes

17   working as a maintenance construction labor helper for his

18   grandfather in Buffalo for three months in 2014, working for a

19   summer youth program in Manhattan for three months in 2014.

20   And working at a rapper for two to three months in 2018 for

21   NuLa Entertainment in New Jersey.

22           Neither Mr. Woodford nor those who wrote letters on

23   his behalf has indicated whether he has specific

24   post-confinement employment prospects, though Deanna Woodford

25   intends to help him apply for jobs generally.  His friend

1    Celaine Jean notes that she and Mr. Woodford plan to open a

2    business together.  Mr. Woodford wants to continue his career

3    as a rapper.

4            Mr. Woodford repeated the 11th grade Brooklyn, but

5    did not complete the school year because he was arrested for

6    the instant offense.  While incarcerated at MDC, it appears --

7    and maybe you can correct me, Ms. Glashausser, because you

8    said something different earlier -- that Mr. Woodford obtained

9    a GED in math and completed Alternative To Violence training

10   programs and a card making class.

11           So he completed part of his GED; is that right in

12   math?

13           MS. GLASHAUSSER:  He completed both part of his GED

14   I think previously and took a course at MDC for math, but did

15   not get the chance to take the actual test so that New York

16   state would recognize that he had his math GED.  He has done

17   the course work, but they haven't given him the test so he can

18   have the certificate.

19           THE COURT:  I'm hopeful that you'll be able to take

20   the exam.  Given your studies and preparation, I'm hoping that

21   you will be able to pass.

22           Mr. Woodford and his counsel assure the Court that

23   Mr. Woodford has changed for the better during his time at

24   MDC.  I believe that he sincerely believes in his change and

25   has taken positive steps to demonstrate that change.

1          Mr. Woodford has expressed remorse for his actions,

2    wrote to his victim and family for his August 30, 2018,

3    conduct.  In his letter he writes:  I'm sorry for all the

4    trauma I put the victim, my family, and the innocent

5    bystanders through.  It wasn't the right thing to do.  I think

6    about it every night before I go to sleep.  I think about what

7    I could have done differently and how I shouldn't have done it

8    at all.

9          Defense counsel's chief paralegal also observes that

10   Mr. Woodford has grown more communicative since his 2018

11   arrest.  She further suggests that the instant offense and its

12   consequences woke him up.

13         When defense counsel spoke to Mr. Woodford on

14   April 15, Mr. Woodford explained that he is currently driven

15   by a need to care for his family.  And acknowledged that he

16   has an important role to play in supporting his family.

17         I think, Ms. Glashausser, your statement today was

18   very encouraging and moving.  I think that Mr. Woodford, you

19   know him best, better than the prosecutor and I do, but has

20   demonstrated significant positive change.  So that is

21   encouraging.

22         Mr. Woodford has requested a below guideline

23   sentence of imprisonment for the sole count.  Counsel does not

24   request a specific amount of time.  Mr. Woodford argues that I

25   should exercise size discretion and depart from the

1    recommended guideline sentence because he was only 18 years

2    old at the time of the offense, and because for an entire week

3    last winter at MDC, where he has been held, did not have heat,

4    electricity, light, or hot water exposing Mr. Woodford to

5    abject conditions.  In other cases, I have definitely taken

6    this into consideration.  I agree with my colleagues and the

7    findings of those who have been to the MDC, that the

8    conditions during the winter black-out were inhumane and

9    resulted in a very harsh detention.

10            Mr. Woodford lived through more than 13 months of

11   lockdowns at MDC during COVID-19, in which he had limited

12   opportunities to be out of his cell to engage in courses or

13   recreational activities.  And he himself contracted COVID-19.

14   He did not have medical treatment during that time.  He was on

15   his own.  It sounds as if he had a very difficult set of

16   conditions when he was ill.

17            Mr. Woodford had very little time outside of his

18   cell.  He had one social visit and only recently was able to

19   receive legal visits.  He was put in isolation after he had

20   tested positive for the virus and he had access only to brown

21   drinking water and received no medical attention.

22            Despite these conditions Mr. Woodford has maintained

23   his position as an orderly.  And I take into account

24   Mr. Woodford's still relatively young age, he's 20 years old

25   at this time.

1          MS. GLASHAUSSER:  Twenty-one.

2          THE COURT:  I take into account the harsh conditions

3    caused by the MDC blackout and what must have been a very

4    challenging and worrisome experience in the past 13 months

5    while ill with Covid, among a global pandemic, and his

6    isolation from the outside world.

7          The Government urges me to impose a sentence within

8    the 78 to 97 month guideline range, but also notes that I may

9    take into consideration and impose a sentence below the

10   guidelines based on the harsh conditions at MDC.  I agree with

11   the Government that this particular offense is not a

12   garden-variety arms possession offense.  But rather it appears

13   to be an attempted murder.  The video displayed during the

14   pretrial hearing shows that the defendant did pursue his

15   victim and opened fire on him while running after the victim

16   in a public area.  In addition, the Government makes a point

17   that despite his youth, this crime is a very serious adult

18   crime.  Further, Mr. Woodford agreed to an attempted murder

19   enhancement in the PSR's guideline calculation as part of his

20   plea.

21         The Government highlights the 2016 robbery

22   conviction as a significant factor in the *Booker* inquiry in

23   two respects.  First, the Government argues that

24   Mr. Woodford's prior conviction on eight counts of robbery in

25   the second degree demonstrates a willingness to repeatedly

1    engage in serious criminal conduct.  Second, the Government

2    contends that Mr. Woodford's sentence by the state court to a

3    period of 28 months to seven years imprisonment to run

4    concurrent on each of the eight robberies was lenient.  Rather

5    than using his release on parole in May 29, 2018, to turn from

6    criminal activity and live a law abiding life, the Government

7    maintains that Mr. Woodford's lenient 2017 sentence only

8    emboldened him to engage in further and more serious violent

9    criminal conduct.  Given that defendant committed the instant

10   offense a mere three months after his release on parole by

11   state authorities, it is hard to refute the Government's

12   contentions that Mr. Woodford's conduct in this case

13   demonstrated that he had not been deterred specifically and

14   that he lacked respect for the law.

15          After giving respectful consideration to the

16   advisory guidelines and all of the factors set forth in 18

17   U.S. Code Section 3553(a), for the reasons explained below, I

18   will impose a sentence that falls slightly below the advisory

19   guideline range on the sole count of the Indictment.

20          I recognize that Mr. Woodford had a very difficult

21   childhood, one that no child should have in terms of seeing

22   your mother pass before your eyes when you're only five, being

23   beaten by relatives who should be loving and taking care of

24   you, and having a parent who was using drugs illegally in

25   front of him.  I take into consideration, as I said before,

1    the harsh conditions caused by the MDC's blackout in the

2    winter of 2019.  As well as the harsh conditions imposed as a

3    result of the COVID-19 pandemic, and the fact that

4    Mr. Woodford suffered through the COVID-19 illness himself.

5              It is difficult for me to reconcile frankly

6    Mr. Woodford's youth.  On the one hand he is bright, he's

7    motivated, and his life is ahead of him.  I agree with his

8    aunt, this offense doesn't define who he is as a man.  He has

9    potential to become more than this offense, more than his past

10   offenses.  I think he's on a positive path to do that.

11             Yet, this was an incredibly serious offense.  The

12   growth and maturation that is expected as one gains years and

13   experience and wisdom, is one that I take into account.  I'm

14   not convinced that the August 30, 2018, shooting was a

15   heat-of-the-moment-type of offense.  It might have been

16   triggered by an encounter, but pursuing someone for blocks at

17   a time, firing a gun, is somewhat of a deliberate prolonged

18   and really chilling act.  Although Mr. Woodford appears to

19   state was acting in self-defense, that he would have been shot

20   if he hadn't shot the victim, there is nothing before the

21   Court indicating that the victim was armed or acted in an

22   aggressive manner toward Mr. Woodford, at least based on what

23   has been presented in the videos and in the submissions.

24             It is concerning in terms of deterrence that he was

25   released only three months before from prison and was on a

1    parole sentence when this federal offense occurred.

2            Thus, given considerations of the nature of the

3    offense, whether or not my sentence will provide specific and

4    general deterrence, will protect the public including, all

5    those like those depicted in the video, will provide

6    vocational and educational training and mental health

7    treatment, I will impose a sentence on Mr. Woodford that based

8    on all of these factors will provide Mr. Woodford additional

9    time to reflect on his past actions and prepare for his future

10   as a law abiding citizen.

11           Accordingly, I sentence Mr. Woodford as follows:  I

12   sentence him to a sentence of 70 months in custody for the

13   sole of the Indictment to be served concurrently, if the state

14   agrees, with the time remaining on Mr. Woodford's state court

15   sentence for robbery and a parole violation.

16           I will recommend that Mr. Woodford be placed in Ray

17   Brook so he can avail himself of college prep courses.

18           Mr. Woodford has been in custody since November 21,

19   2018, on the federal charge; and therefore, he should receive

20   credit for time served since November 21, 2018.  I believe

21   it's approximately 29 months, but I'll leave it to the BOP to

22   calculate time in custody.

23           Mr. Woodford is urged to take advantage of

24   vocational and educational courses.  I hope at the facility

25   where he's designated he'll have the opportunity to sit for

1   his GED and take college-level courses.  I also recommend that

2   he avail himself of substance abuse and mental health

3   treatment to address his traumatic childhood and obvious anger

4   issues and substance abuse.

5        He's clearly an intelligent young man.  He's

6   motivated.  He's a gifted musician.  And I believe that his

7   life will be different if he commits to living a different

8   life.  He should pursue all educational and vocational

9   opportunities and gain further understanding of himself in a

10  path forward.

11       Mr. Woodford will also be serving a three-year

12  supervised release term with the following conditions:  He

13  must submit his person, property, house, residence, vehicle,

14  papers and computers as defined by 18 U.S. Code 1030(e)(1) and

15  other electronic communications or data storage devices or

16  media or office to a search conducted by a United States

17  Probation Officer.  Failure to submit to a search may be

18  grounds for revoking his supervised release.  Mr. Woodford

19  shall advise any other occupants who share a premise with him

20  that it may be subject to searches pursuant to this condition.

21  A Probation Officer may conduct a search under this condition

22  only when reasonable suspicion exists that Mr. Woodford has

23  violated the condition of his supervision and that the areas

24  to be searched contain evidence of this violation.  Any search

25  must be conducted at a reasonable time and in a reasonable

1   manner.

2           Mr. Woodford shall not associate, in-person, through

3   the mail, telephone, or electronic communication directly or

4   indirectly with any individual with an affiliation with any

5   organized crime group, gang, or other criminal enterprise,

6   pursuant but not limited to, a prohibition list that the

7   Government shall provide to U.S. probation.  Nor shall

8   Mr. Woodford frequent any place or establishment identified by

9   U.S. probation and the Government as a location where such

10  persons or group may meet.

11          Mr. Woodford shall maintain full-time employment and

12  when not employed full time, he should continue with

13  educational and vocational training.

14          Mr. Woodford shall submit to regular mental health

15  treatment for anger management and other mental health

16  challenges and also to drug testing and treatment.  The cost

17  of such testing and treatment for substance abuse and mental

18  health shall be borne by Mr. Woodford to the extent he's able

19  to pay based on the Probation Department's sliding scale.  He

20  must give truthful financial information to the Probation

21  Department so they can assess his ability to pay.

22          Although there is a victim, as we know, who would be

23  entitled to restitution, that victim has not come forward.

24  And, therefore, I will not impose victim restitution despite

25  the fact that it is mandated.

1          Mr. Woodford's forfeiture has been effected by the

2    Government.   The forfeiture order will be appended to this

3    judgment and incorporated, but it will be noted that it's been

4    finalized.

5          Is that correct, Mr. Aganga-Williams?

6          MR. AGANGA-WILLIAMS:   I'm not quite sure about that

7    but I'll look into it.

8          THE COURT:   Do you want me to append it to the

9    judgment?

10          MR. AGANGA-WILLIAMS:   Yes, that would be great.

11          THE COURT:   Okay.   I will not impose a fine given

12    Mr. Woodford's inability to pay a fine.

13          And in addition, sir, you must pay the $100

14    mandatory special assessment.

15          I do wish you well, sir.   I understand that this

16    offense, as serious as it was, is not who you are.   I wish you

17    well in moving forward in a positive direction with your life,

18    which looks like, given your youth, is long and promising.   So

19    good luck to you.

20          Is there anything else to address?

21          MR. AGANGA-WILLIAMS:   If I may.   On the condition

22    regarding affiliating with known gang members or locations

23    where gang members might be.   Based on the time that

24    Mr. Woodford is going to serve incarcerated and the three

25    years of supervised release, I wonder whether the term

1    condition can read:  As to individuals that he understands to

2    be affiliated with gangs and locations.  Just because,

3    practically speaking, if the FBI would provide a list of

4    individuals today that list several years from now might be

5    irrelevant.

6            THE COURT:  I don't want to leave it up to

7    Mr. Woodford to define who is in a gang and who is not.  I

8    think the Government has resources to determine which gangs we

9    need to advise Mr. Woodford to stay away from and which

10   locations.  I understand your point, that he has several years

11   left on his sentence, but in several years when he's released

12   you can provide that list based on the Government's current

13   knowledge about gangs or organized crime groups or locales.

14           MR. AGANGA-WILLIAMS:  That is true, your Honor.  The

15   limitation the Government has is -- from the Government's

16   view, Mr. Woodford is a member of a gang.  The Government has

17   an understanding of the composition of the gang, but if

18   Mr. Woodford subjectively and the Government of course through

19   a violation have to meet a burden of proof would be affiliated

20   with a gang member someone the Government did not know was a

21   gang member, the Government is a disadvantage in knowing those

22   facts, that sphere would be captured by your Honor's

23   condition.  Mr. Woodford could be affiliated with someone who

24   he nose to be in a gang, but the Government for whatever

25   reason does not, has not become aware, which will always be

1    the fact.  There are numerous people, even this specific gang,

2    the Government may not be aware that they are in the gang

3    because the Government is not privy to all that information.

4            THE COURT:  Well, the language says that he shall

5    not affiliate with any organized crime group, gang or other

6    criminal enterprise pursuant but not limited to the

7    prohibition list.  I think that cover it is.

8            MR. AGANGA-WILLIAMS:  That does cover it.  I was

9    just confirming.

10           THE COURT:  Okay, so I understand there is knowledge

11   on the Government's part that it may be stale by the time he's

12   released.  Giving him credit for the time that he already

13   served, and the 70 months is with credit for time served since

14   November 21, 2018, which is the date he was in federal

15   custody.  So 70 months less almost 29 months, plus hopefully

16   good time behavior, it may be that the time left on his

17   sentence it won't be that far in the future is what I'm

18   saying.

19           MR. AGANGA-WILLIAMS:  Understood, Judge.  Thank you.

20           MS. GLASHAUSSER:  Can I just respond to that briefly

21   so we're clear about that position?

22           I do think as your Honor wrote is one that is clear

23   so Mr. Woodford knows what he can and cannot do.  Obviously,

24   Mr. Woodford disagrees that he's in the gang.  To have the

25   list would be appropriate so the condition is not too vague to

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

1  follow.

2          THE COURT:  Right.  Okay.

3          MS. GLASHAUSSER:  Thank you.

4          MR. AGANGA-WILLIAMS:  Thank you.

5          THE COURT:  Thank you, Marshals.  Thank you, Rivka.

6          (Whereupon, the matter was concluded.)

7                    *    *    *    *    *

8  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

9

10 /s/ Rivka Teich
   Rivka Teich, CSR RPR RMR FCRR
11 Official Court Reporter
   Eastern District of New York

12

13

14

15

16

17

18

19

20

21

22

23

24

25